UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EUGENE JONES,

                                        Plaintiff,

                                                                9:12-CV-0447

v.

                                                                (NAM/TWD)

ROCK, Superintendent, Upstate Correctional Facility;
J. MARIENELLI, MHU Counselor, Upstate Correctional
Facility; JOHN DOE #3, Mental Health Doctor, Upstate
Correctional Facility; MICHAEL HOGAN, Mental
Health Commissioner; J. HEALY, C.O., Upstate
Correctional Facility; JOHN DOE #2, C.O., Upstate
Correctional Facility; JOHN DOE #3, C.O., Upstate
Correctional Facility; LAVEEN, C.O., Upstate Correctional
Facility; DWYER, C.O., Upstate Correctional Facility;
JOHN DOE #4, Lt., Upstate Correctional Facility;
S. SANTAMORE, Sgt., Upstate Correctional Facility;
BURGESS, C.O., Upstate Correctional Facility; JOHN
DOE #5, C.O., Upstate Correctional Facility; JOHN
DOE #6, C.O., Upstate Correctional Facility; JERRY
MILLER, Dental Doctor, Upstate Correctional Facility,

                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

EUGENE JONES
Plaintiff *pro se*
95-B-1881
Elmira Correctional Facility
P.O. 500
Elmira, New York 14902

HON. ERIC T. SCHNEIDERMAN              COLLEEN GALLIGAN, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**REPORT-RECOMMENDATION AND ORDER**

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983,

has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Plaintiff Eugene Jones claims that from September, 2009, through November, 2010,

while he was confined at Upstate Correctional Facility ("Upstate"), Defendants, in violation of

his rights under the Eighth Amendment to the Constitution, denied him proper and adequate care

for his serious mental health, and dental needs; used excessive force against him; sexually

harassed and assaulted him; and subjected him to unlawful conditions of confinement.  (*See*

*generally* Dkt. No. 1.)  Defendants Rock, Superintendent at Upstate; J. Marienelli ("Marienelli"),

Mental Health Unit ("MHU") Counselor at Upstate; T. Kemp ("Kemp"), MHU Unit Chief at

Upstate; Michael Hogan ("Hogan"), New York State Commissioner of Mental Health; J. Healy

("Healy"), C.O. at Upstate; Lavigne, incorrectly sued as Laveen, C.O. at Upstate; Dwyer, C.O. at

Upstate; S. Santamore ("Santamore"), Sgt. at Upstate; Burgess, C.O. at Upstate; and Jerry Miller

("Miller"), Dentist at Upstate, filed an Answer to Plaintiff's Complaint (Dkt. No. 20) and now

move for judgment dismissing Plaintiff's Complaint on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure.[1]  (Dkt. No. 23.)  Plaintiff has opposed the motion.  (Dkt.

No. 27.)

---

[1]  Plaintiff has also named John Does #1-6 as Defendants.  (Dkt. No. 1.)  It appears from
the Docket maintained by the Clerk's Office that none of the Doe Defendants have yet been
identified or served, and they are not parties to the motion now before me.

For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND[2]

### A. Plaintiff's Alleged Lack of Proper and Adequate Mental Health Treatment at Upstate

Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in a Special Housing Unit. (Dkt. No. 1 at ¶ 14.) According to Plaintiff, nearly half of the eleven buildings house single cell inmates, who are housed in single cells because of assaultive behavior, homosexual activity, or mental illness. Plaintiff was confined in a single cell in A-Block in 11-Building where mentally ill inmates were housed together without any treatment. *Id.* at ¶¶ 15, 26.

Shortly after Plaintiff was moved into the single cell, he was interviewed by Defendant Marienelli, his MHU Counselor. *Id.* at ¶ 15. Plaintiff explained to Marienelli that he had a long history of mental illness and treatment both before and during his incarceration. *Id.* at ¶ 16. Despite Plaintiff's long history of treatment for mental illness, when he was seen by a mental health doctor approximately a week later, Plaintiff was told that all inmates on the same medication as that being taken by Plaintiff were being removed from the medication. *Id.* at ¶ 17. Plaintiff requested that he be given the same type of medication for his mood disorder and other mental health problems, and the doctor said, "you'll be alright," and did not prescribe any other

---

    [2]  The background facts set forth herein are taken from the allegations in Plaintiff's Complaint, which I have, as I am required to do, accepted as true for purposes of this motion, *(see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)), as well as other submissions that may properly be considered by the Court on a Rule 12(c) motion involving a *pro se* plaintiff.

medication or mental health treatment. *Id.* at ¶ 18. Thereafter, despite his protest, Plaintiff received no mental health medication or treatment during the remainder of his time at Upstate. *Id*. at ¶¶ 15, 19.

Plaintiff wrote letters complaining about his lack of treatment to Defendant Kemp, MHU Unit Chief at Upstate, on January 13, 2010, March 22, 2010, June 17, 2010, August 30, 2010, and October 14, 2010.[3] *Id*. at ¶ 20; Dkt. No. 27-1 at 9-13. Kemp never responded to Plaintiff. *Id*. However, after nearly every one of Plaintiff's complaint letters to Kemp, Marienelli would appear at Plaintiff's cell door and warn him against writing the complaints and going over Marienelli's head. *Id*. Plaintiff also wrote letters of complaint to State Mental Health Commissioner Hogan, on May 3, 2010, September 21, 2010, and November 8, 2010. *Id*. at ¶ 21; Dkt. No. 27-1 at 5-8. Hogan did not respond. (Dkt. No. 1 at ¶ 21.)

On August 30, 2010, Plaintiff used a piece of metal to cut his arms. *Id*. at ¶ 22. When he showed his arms to Marienelli, Marienelli responded, "they don't look that bad." *Id*. Marienelli told Plaintiff that he would not take him out of his cell for those little things and to just run some water on them, and he would be fine. *Id*. Plaintiff then began screaming for help, and Marienelli walked away. *Id*.

In the early morning of October 21, 2010, Plaintiff made a rope from his sheets and hanged himself in the shower. *Id*. at ¶ 23. Defendant Healy, a Corrections Officer at Upstate,

---

[3] Plaintiff stated in his Complaint that copies of the letters to Kemp were included as Exhibit A-1. (Dkt. No. 1 at ¶ 20.) However, neither the letters, nor any of the other exhibits identified in the Complaint were filed with the Complaint. On August 15, 2012, I issued a Text Order denying Defendants' letter motion requesting an order compelling Plaintiff to file the exhibits identified in his Complaint. (Dkt. No. 19.) Plaintiff has filed copies of his letters to Defendant Kemp, along with copies of a number of other documents originally identified as exhibits to his Complaint, in opposition to Defendants' motion. (Dkt. No. 27-1 at 9-13.)

and two other corrections officers entered Plaintiff's cell and cut him down.  The three then began beating Plaintiff with their hands and feet.  Plaintiff begged them to stop.  *Id*.; Dkt. No. 27-1 at 15.  Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell.  (Dkt. No. 1 at ¶ 23.)  Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead.  *Id.*  Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs.  *Id*. at ¶ 24; Dkt. 27-1 at 15.

### B.     Conditions of Plaintiff's Confinement

The mentally ill inmates with whom Plaintiff was housed in Building 11 constantly screamed; beat on metal toilets, beds, desks, and showers; flooded the cells; and threw liquids and feces.  *Id*. at ¶ 26.  There was also an unpleasant smell because many of the inmates smeared themselves with feces and did not take showers.  *Id.*  In addition, the regular procedure at Upstate was to have one light or another on twenty-four hours a day.  *Id*. at ¶ 25.

On March 10, 2010, Plaintiff made a written complaint to Defendant Rock, Superintendent at Upstate, concerning the conditions under which he was forced to live.  He received no response from Rock.  *Id*. at ¶ 27.  On October 1, 2010, Plaintiff filed a grievance concerning the housing of inmates in constant illumination.  *Id*. at ¶ 28; Dkt. No. 27-1 at 17.  The grievance was denied by the Inmate Grievance Review Committee ("IGRC") based upon a prior Central Office Review Committee ("CORC") determination in which CORC upheld the discretion of the facility administrator to make top level decisions regarding night lights being turned on for the safety, security, and good order of their facilities. (Dkt. No. 27-1 at 18.) Plaintiff's grievance was denied on appeal by the Acting Superintendent, who found that "[t]he

night lights are used to ensure clear visibility into the cell, this is of vital importance to the safety and security of both staff and inmates." *Id*. at 19. CORC unanimously denied Plaintiff's grievance for the reasons given by the Acting Superintendent and also noted that the night lights installed produced "a minimum amount of light given the low wattage bulb used to ensure the safety and security of [the] population, without unduly interfering with the populations's sleep." *Id*. at 20.

### C. Alleged Sexual Harassment and Assault

#### 1. May 4, 2010

In April of 2010, an Alcohol and Substance Abuse Treatment ("ASAT") program was started at Upstate. (Dkt. No. 1 at ¶ 29.) Defendant Corrections Officers Lavigne and Dwyer were the escort officers responsible for taking inmates assigned to the ASAT program from their cells, frisking them, and escorting them to the program. *Id*. On May 4, 2010, Plaintiff was handcuffed and led out of his cell by Lavigne and Dwyer for a pat-frisk. *Id*. at ¶ 30. Dwyer held Plaintiff's hands above his head and against the wall by the handcuffs, while Lavigne did the pat-frisk. *Id*. According to Plaintiff, Lavigne pulled Plaintiff's pants up as high as they would go causing Plaintiff to wince in pain. *Id*. at ¶ 31. Lavigne allegedly screamed at Plaintiff, "don't move or we will take you down," and shoved his fingers between Plaintiff's buttocks with such force that one of his fingers, along with Plaintiff's pants and underwear, invaded Plaintiff's anus. *Id*. Plaintiff has alleged that when he screamed, Dwyer laughed and said, "oh, you're still a virgin, don't worry about it, we'll take care of that." *Id*. at ¶ 32. Lavigne then groped Plaintiff's genitals and squeezed them until Plaintiff cried out in pain. *Id*. at ¶ 33. Lavigne became verbally abusive, screaming in Plaintiff's face and smelling strongly of alcohol, and yelling at Plaintiff the

entire way to the ASAT program. *Id.*

Plaintiff filed a grievance concerning the alleged actions of both Lavigne and Dwyer. *Id.* at ¶ 34.; Dkt. No. 27-1 at 22. The grievance was not nearly as explicit concerning Lavigne and Dwyer's alleged actions as Plaintiff's Complaint. Plaintiff offered no additional information when interviewed in connection with the grievance, and the officer named in the grievance denied sexually harassing Plaintiff during the pat-frisk or acting unprofessionally in any way. (Dkt. No. 27-1 at 23.) Finding no evidence to support Plaintiff's claim, the Acting Superintendent denied Plaintiff's grievance as unsubstantiated, as did CORC. *Id.* at 24.

## 2. September 14, 2010

According to Plaintiff, while he was standing in the shower, naked and wet, on September 14, 2010, Defendant Santamore, a Corrections Sergeant at Upstate, was standing at Plaintiff's cell door looking into the cell at the shower. (Dkt. No. 1 at ¶¶ 37-38.) Plaintiff screamed that he was done with his shower but naked, and Santamore ordered plaintiff to "drop the sheet," which, according to Plaintiff, would have meant exposing his naked body in violation of the Department of Correction and Community Supervision ("DOCCS") standard of inmate behavior and rule 101.20 regarding sex offenders intentionally exposing their private parts. *Id.* at ¶ 38. Plaintiff also informed Santamore that taking the sheet down would put Plaintiff in violation of DOCCS standard of inmate behavior rules 118.22, unhygenic acts; 118.30 maintain cleanliness and orderliness of living quarters; and 118.33, intentionally causing a flood in living quarters. *Id.* at ¶ 39. Santamore allegedly responded, "you can either take the sheet down and let me see in there and let me see that dick or I take the sheet and you get a ticket." *Id.* at ¶ 40. Plaintiff screamed for help from Defendant Lieutenant John Doe #4, who was in the area, but the

Lieutenant instead yelled at Plaintiff to take the sheet down. *Id.* at ¶ 42. Santamore then allegedly looked up and down at Plaintiff's naked body, smirked and walked away, saying "I'll see you later." *Id.*

Santamore filed a misbehavior report against Plaintiff in connection with the incident, in which he stated that after twice being given a direct order to take down the sheet covering the shower, Plaintiff complied saying, "I think you are gay and want to watch us take showers," and yelling out to the gallery, "They won't think it is funny when we set it off tomorrow morning." (Dkt. Nos. 1 at ¶ 44; 27-1 at 25.) According to Plaintiff, after a review of the videotape of the incident at the disciplinary hearing on the misbehavior report, which supported Plaintiff's side of the incident, the misbehavior report was dismissed. (Dkt. Nos. 1 at ¶¶ 45-46; 27-1 1 at 29.)

Plaintiff filed a grievance concerning the incident. (Dkt. No. 27-1 at 26-27.) The grievance was denied by the IGRC based upon a prior CORC ruling that a curtain or private screen would not be provided for obvious security reasons. *Id.* at 28. CORC denied Plaintiff's appeal. *Id.* at 29.

### D. Plaintiff's Alleged Lack of Proper and Adequate Dental Care

On August 29, 2010, while eating breakfast, one of Plaintiff's teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff thereafter submitted a number of sick call slips to the dental department requesting assistance and sent letters to Dentist Defendant Miller asking for help on September 6th and 14th, 2010. *Id.* at ¶ 29; Dkt. No. 27-1 at 31-32.

When Plaintiff went to a dental appointment on September 29, 2010, he learned that the appointment was for a cleaning, not to treat his cracked tooth and lost filling. (Dkt. No. 1 at

¶ 50.  Plaintiff showed his cracked tooth and two impacted wisdom teeth to the hygienist and saw her write in his file.  *Id*. at ¶ 51.  The September 29, 2010, entry in Plaintiff's dental treatment record reads in part, "Pl claims he lost filling in lower molar and wisdom teeth are bothering him.  Plaintiff claims he's in pain & feels like theres not enough room in mouth." (Dkt. No. 27-1 at 45.)  The entry notes a referral to an oral surgeon for extraction of teeth #17 and #32.  *Id*.

On October 5, 2010, Plaintiff filed a grievance complaining of the Dental Department's failure to provide treatment for his lost filling.  (Dkt. No. 1 at ¶ 52; 27-1 at 33.)   Despite the entry in Plaintiff's dental treatment record showing that he had informed the hygienist of the missing filling during his September 29th cleaning, the IGRC response was that Plaintiff had not mentioned the missing filling when he went in for a cleaning that day.  (Dkt. No. 27-1 at 34.) The IGRC also noted that filing a grievance was not the proper way to get an appointment and recommended that Plaintiff write to the Dental Department.  *Id*.

On Plaintiff's appeal, the Acting Superintendent wrote on October 20, 2010 that: "According to Dr. Miller and investigation of dental records and dental staff interviews, treatment has been provided consistent with Dental Department Policy.  Inmate Jones was seen on 11/16/09, 1/28/10 and 2/1/10.  The inmate's remaining dental work is elective (not requiring immediate attention) and he has been scheduled for it.  Grievance denied."  *Id*. at 35.

On November 3, 2010, Plaintiff was taken from his cell for an ASAT treatment and a dental call out by two corrections officers.  (Dkt. No. 1 at ¶ 55.)  Plaintiff told Defendant Dwyer that he wanted to refuse the ASAT call out because he was really in pain and needed to see the dental staff.  *Id*.  Dwyer is alleged to have told Plaintiff that he made the rules and the rules were

that if Plaintiff refused one call out, he refused both.  *Id*. at ¶ 56.  Once ASAT was over, Plaintiff

watched a number of inmates enter dental before him, and when Defendant John Doe #4

attempted to take Plaintiff to see dental, Dwyer waived Defendant Doe away and stated Plaintiff

would see the dentist last if he saw him at all.  *Id*. at ¶ 57.

When Plaintiff asked Dwyer why he was doing that to Plaintiff, Dwyer, Defendant

Burgess, and two Defendant John Doe correctional officers began screaming at Plaintiff and

making threats to his person.  *Id*.  Defendant Santamore refused to intervene.  *Id.* at ¶ 58.

According to Plaintiff, Burgess retrieved a dental refusal slip and demanded that Plaintiff sign the

slip and go back to his cell, telling Plaintiff that he would be visiting the facility hospital if he

refused.  *Id*. at ¶ 59.  Plaintiff wrote on the refusal slip, "I've been waiting & staff refuse to let me

see dental staff.  I can see a number of inmates going in but correctional staff refuse to let me see

dental staff." (Dkt. No. 23-2 at 5.)

Plaintiff filed a grievance regarding the November 3, 2010 incident the following day.

(Dkt. No. 27-1 at 37-38.)  Defendant Rock denied Plaintiff's grievance on appeal based upon the

staff members' contradiction of Plaintiff's allegations and Santamore's statement that Plaintiff

had been yelling that he was going to see the dentist and saw the dentist later in the day.  *Id*. at

39.  Plaintiff denies seeing a dentist later in the day on November 3, 2010, and the dental records

for that date indicate only that "pt refused per c.o." (Dkt. No. 27-1 at 45.)  CORC upheld the

denial of Plaintiff's grievance.  *Id*. at 40.

Plaintiff was transported to Clinton Correctional Facility on November 14, 2010.  (Dkt.

Nos. 1 at ¶ 63.)  He received a temporary filling, which stopped his pain, approximately a week

later.  *Id*.; *see also* Dkt. No. 23-2 at 3.

## II.     PROCEDURAL HISTORY

Plaintiff filed his Complaint in this lawsuit, along with a motion for leave to proceed *in forma pauperis*, on March 13, 2012.  (Dkt. Nos. 1, 2.)  I subsequently issued an Order granting Plaintiff's application to proceed *in forma pauperis* and requiring a response to Plaintiff's Complaint.  (Dkt. No. 4.)  I also directed Plaintiff to take reasonable steps through discovery to learn the names of the "John Doe" Defendants.  *Id.*  The named Defendants were served in June of 2012 and filed their Answer to the Complaint on August 20, 2012.  (Dkt. Nos. 7-16, 20.)  A Mandatory Pretrial Discovery Order was entered on August 27, 2012.  (Dkt. No. 21.)  The named Defendants thereafter filed the Rule 12(c) motion for judgment on the pleadings now before me, (Dkt. No. 23), and Plaintiff filed papers in opposition.  (Dkt. No. 27.)

## III.    LEGAL STANDARD GOVERNING MOTIONS TO DISMISS ON THE PLEADINGS

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983).  "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as for a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006).  Therefore, Plaintiff's Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to avoid dismissal.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief . . . requires the . . .

court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted). Plausibility requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Twombly*, 550 U.S. at 556. A complaint may be dismissed pursuant to Rule 12(b)(6), and thus pursuant to Rule 12(c), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id*. at 570. While Rule 8(a) of the Federal Rule of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"The court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even

after *Twombly*).  This principle merits particular weight when a civil rights violation is claimed.  *See McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

In considering a Rule 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 994 F.2d 42, 47 (2d Cir. 1991) (A court may also consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference.").   "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation and internal quotation marks omitted).  Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint."  *See, e.g., Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that

"better pleading will not cure it."  *Cuoco*, 222 F.3d at 112 (citation omitted).

## IV.    ANALYSIS

### A.    Plaintiff's Official Capacity Claims For Money Damages Against Defendants

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants.  (Dkt. No. 1 at ¶ 8.)  The moving Defendants seek dismissal of those official capacity claims on Eleventh Amendment grounds.[4]  (Dkt. No. 23-4 at 3-4.)  The Eleventh Amendment protects states against suits brought in federal court.  *Alabama v. Pugh*, 438 U.S. 781, 782 (1978).  The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)), and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein.  *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against all individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).  Therefore, I recommend that Plaintiff's claims for money damages against all of the Defendants, including the Doe Defendants, in their official capacities, be dismissed on Eleventh Amendment

---

[4]  Although only the moving Defendants seek dismissal of Plaintiff's official capacity claims for money damages, the District Court is empowered to dismiss those official capacity claims *sua sponte* as against Defendants John Doe #1-6 as well.  *See Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (Eleventh Amendment may be raised *sua sponte* because it affects the court's subject matter jurisdiction); s*ee also Saxon v. Attica Medical Dept.*, 468 F. Supp. 2d 480, 484 (W.D.N.Y. 2007) (recognizing that 28 U.S.C. § 1915A directs district courts *sua sponte* to dismiss prisoner claims barred by the Eleventh Amendment).

grounds without leave to amend.

## B.    Plaintiff's Eighth Amendment Conditions of Confinement Claim

Plaintiff claims the conditions of his confinement, namely, the constant noise caused by the mentally ill prisoners, foul odors from the throwing and smearing of feces by those prisoners, and continuous illumination in the area in which he was housed, constituted cruel and unusual punishment in violation of his Eighth Amendment rights.  (Dkt. No. 1 at ¶¶ 25-28, 74.)  In his October 1, 2010, grievance complaining of the constant illumination, Plaintiff stated that it was impossible to get a full restful sleep, and that having a light on at all times was torture and caused fatigue, frustration, and depression.  (Dkt. No. 27-1 at 17.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The prohibition extends to prison conditions.  *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998).  "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and internal quotation marks omitted).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measures of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotation marks omitted).

To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Id.* (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable, human need such as food, warmth, or exercise.'" *Walker*, 717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety. *Jabbar*, 683 F.3d at 57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety."). Mere negligence is not enough. *Farmer,* 511 U.S. at 835.

1.    Objective Element

Plaintiff claims that the constant illumination made it impossible for him to get a full restful sleep, was torture, and caused fatigue, frustration, and depression. (Dkt. No. 27-1 at 17.) Although Plaintiff's Complaint does not allege specific harm resulting from the constant noise,

16

he has included as an exhibit to his Complaint, his September 21, 2010 letter to Defendant

Hogan, in which he complained that the excessive noise of the other inmates kept him from

sleeping. (Dkt. No. 27-1 at 7.) In addition, the Affidavit of another inmate describes the

screaming, banging, and crying of mentally ill inmates throughout the night as making it

impossible to rest until overwhelmed by exhaustion. (Dkt. No. 27-1 at ¶ 5.) Even then,

according to the inmate, one was quickly jolted out of sleep by the noises. *Id*.

"[S]leep is critical to human existence, and conditions that prevent sleep have been held

to violate the Eighth Amendment." *Walker*, 717 F.3d at 126 (citing *Tafari v. McCarthy*, 714 F.

Supp. 2d 317, 367 (N.D.N.Y. 2010)) ("Courts have previously recognized that sleep constitutes a

basic human need and conditions that prevent sleep violate an inmate's constitutional rights.").

Furthermore, "public conceptions of decency inherent in the Eighth Amendment," have been

found to "require that [inmates] be housed in an environment that, if not quiet, is at least

reasonably free of excess noise." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996), *amended*

*on other grounds on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (quoting *Toussaint v.*

*McCarthy*, 597 F. Supp. 1388, 1397, 1410 (N.D. Cal. 1984), *aff'd in part, rev'd in part on other*

*grounds*, 801 F.2d 1110 (9th Cir. 1986)); *see also Hamilton v. Conway*, No. 03-CV-527S, 2008

WL 234216, at *12-13, 2008 U.S. Dist. LEXIS 6064, at *37-38 (W.D.N.Y. Jan. 28, 2008)

(allegations of excessive noise and inmates throwing feces in SHU may support an Eighth

Amendment claim).

Requiring inmates to live in constant illumination can also, under certain circumstances,

rise to the level of an Eighth Amendment violation. *See Keenan*, 83 F.3d at 1090-91 (an

allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown

into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment). "Whether constant security lighting in prison cells violates the Eighth Amendment is fact-specific and often depends upon the brightness of the light at issue." *Jose v. Thomas*, No. CV 11-0486-PHX-GMS (SPL), 2012 WL 2091527, at *6, 2012 U.S. Dist. LEXIS 80199, at *16-17 (D. Ariz. June 11, 2012); *see, e.g.*, *Vasqeuz v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (twenty-four hour lighting with one 9-watt fluorescent bulb not an extreme deprivation). Exposure to low wattage night time security lighting has been found permissible based on legitimate penological interests such as security concerns. *See Chavarria v. Stacks*, 102 F. App'x 433, 436-37 (5th Cir. 2004) (policy of constant illumination related to legitimate security concerns); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (same); *see also Jones v. Beaver County Jail*, No. Civ. A 11-0816, 2013 WL 409439, at *10, 2013 U.S. Dist. LEXIS 13702, at *27-28 (W.D. Pa. Feb. 1, 2013) (collecting cases).

Although the likelihood that Plaintiff could ultimately prevail on his conditions of confinement claim as alleged seems questionable at best,[5] the conditions alleged by Plaintiff, i.e, excessive noise and constant illumination which prevented him from sleeping, taken as true and considered in their totality, arguably satisfy the objective element of the claim for pleading purposes.

---

[5] The IGRC response denying Plaintiff's illumination grievance, submitted by Plaintiff in opposition to Defendants' motion, indicates that the night lights used in the SHU where Plaintiff was housed were low wattage and were used to "ensure the safety and security of its population with out unduly interfering with the population's sleep." (Dkt. No. 27-1 at 18.) *See Chavarria*, 102 F. App'x at 436-37.

2.     Subjective Element

However, neither the allegations in Plaintiff's Complaint, nor his submissions in opposition to Defendant's motion, satisfy the subjective element of his conditions of confinement claim – that a defendant acted with a "sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker*, 717 F.3d at 125. The only defendant tied to Plaintiff's conditions of confinement claim by the allegations in his Complaint is Defendant Rock. (Dkt. No. 1 at ¶ 27.) Plaintiff claims to have sent a letter to Rock complaining about the conditions under which he and other inmates were living. *Id*. According to Plaintiff, Rock did not respond. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d

260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).[6]

Although the Court of Appeals has expressly held that a supervisor can be held liable under § 1983 for a failure to remedy a wrong after being informed through a report or appeal, *Colon, id.*, courts in this district have repeatedly held that supervisory liability cannot be established by an official's failure to respond to grievance letters or requests for investigations from prisoners. *See, e.g., Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (noting that a number of courts have held that "[i]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citation and internal quotation marks omitted); *Walker v. Pataro*, No. 99 Civ. 4607 (GBD)(AJP), 2002 WL 664040, at

---

[6] The Supreme Court's decision in *Iqbal*, 556 U.S. 662 has arguably nullified some of the categories set forth in *Colon*. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

*12, 2002 U.S. Dist. LEXIS 7067, at *43 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability."); *Rivera v. Goord,* 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000) (allegations that inmate wrote to prison officials and was ignored are insufficient to hold those officials liable under § 1983).

Plaintiff has conceded that Rock did not respond to his complaint letter, and the Complaint and Plaintiff's opposition to Defendant's motion contain no facts that make a plausible showing of personal involvement by Rock with respect to Plaintiff's conditions of confinement claim. Therefore, I recommend that Plaintiff's conditions of confinement claim against Rock be dismissed, and that in light of Plaintiff's *pro se* status, he be granted leave to amend.

**C.    Deliberate Indifference to Plaintiff's Serious Mental Health Needs and Use of Excessive Force in Violation of the Eighth Amendment**

A few months after he was taken off his medication, Plaintiff began writing complaint letters to Defendant Kemp, MHU Unit Chief.[7]   (Dkt. No. 27-1 at 9-12.)  In his January 13, 2010 letter, Plaintiff wrote:

> I'm writing you because I was taken of my meds when I first got to this jail and I really tried to manage but I'm having a lot of symptoms of mental illness now and I can't keep living like this.  I talked to or tried to talk to Marienelli but he thinks it's a game or something, could you please change my therapist to some one that

---

[7] Plaintiff also wrote three complaint letters to Hogan.  In his May 3, 2010 letter, Plaintiff told Hogan that his medication had been stopped, and he felt like he was slipping back into mental illness.  (Dkt. No. 27-1 at 8.)  Plaintiff  wrote "I keep hearing people talking & I can't tell if its in my head or not."  *Id*.

will treat me according to my issues and not treat this like a joke.

(Dkt. No. 27-1 at 10.)

On March 22, 2010, Plaintiff sent another letter to Kemp:

> How is it that I write you complaining about this guy Marienelli
> and a couple of weeks later he show up at my cell bragging that
> you gave him my letter of complaint? Please don't give this man
> the letters I write to you. He's coming around threatening me. He
> says he's going to get me more time here.

> Why can't you help me see a doctor, I talked to Marienelli about
> seeing a doctor and he laughed in my face. Instead of helping that
> guy in his efforts to liven up his day at my expense, why not allow
> me to see a doctor so I could get some meds that can stop these
> voices.

(Dkt. No. 27-1 at 9.)

In his June 17, 2000 letter, Plaintiff told Kemp that he had written to Hogan to inform

him that "Kemp and Marienelli refuse to treat mentally ill inmates, won't put in refurls (sic) for

[them] to see a mental health doctor." (Dkt. No. 27-1 at 13.) Plaintiff sent a third letter to Kemp

on August 30, 2010, the same day he cut his arms with a piece of metal. *Id*. at ¶ 22. In his

August 30th letter, Plaintiff wrote:

> I'm writing because I attempted suicide today. I cut my arms
> open and showed it to Marienelli on his rounds and he laughed at
> it. I need help now. At least send someone for me to talk to (not
> Marienelli!) I'm telling you I'm trying to deal with this but I don't
> know how much longer I can hold on. Next time I try this suicide
> thing, I'm not going to cut up. I'm going to hang myself! No
> mistakes next time!

(Dkt. No. 27-1 at 11.) In his October 14, 2010 letter to Kemp, Plaintiff threatened to sue Kemp

for violating the law by not treating inmates for mental illness, and wrote "I hope to god I make it

out of this place, and live to do it.  I don't know how the world could look at a person like me as the scum of the earth but see you as a 'good guy.'  I would never treat people the way you do." (Dkt. No. 27-1 at 12.)  A week after his October 14th letter to Kemp, Plaintiff attempted to hang himself in the shower.  (Dkt. No. 1 at ¶ 23.)

Assuming the facts alleged by Plaintiff to be true, as I must for this motion, while Kemp did not respond directly to any of Plaintiff's letters, he did give copies of the letters to Marienelli. He continued to do so even after Plaintiff informed him that Marienelli had threatened to get Plaintiff more time in the block where he was being housed if he kept going over Marienelli's head to Kemp, and had specifically asked Kemp to stop giving them to Marienelli because of the threat.  (Dkt. Nos. 1 at 20; 27 at 12; *see also* Dkt. No. 27-1 at 9.)

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments.  *Farmer,* 511 U.S. at 832.  Prison officials must ensure, among other things, that inmates receive adequate medical care.  *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  The requirement extends to adequate mental health care.  *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care.  It thus falls within the requirement of *Estelle v. Gamble*, [429 U.S. 97, 104 (1976)], that it must be provided to prisoners."); *Guarneri v. Hazzard*, No. 9:06-CV-985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U.S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar. 22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

As with conditions of confinement claims, a claim that prison officials have intentionally

disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id*. at 72. "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester County Dept. of Corrections Medical Dept*., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 820).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id*. If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.*

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698*, 702* (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id*. at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid

25

claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703 (quoting *Hathaway*, 99 F.3d at 553).

1. Marienelli

After Plaintiff's medication was stopped in September of 2009, he received no medication or treatment for his long term mental health problems while at Upstate. (Dkt. No. 1 at ¶¶ 15, 19.) It can be inferred from Plaintiff's March 22, 2010 letter to Kemp that Marienelli had an element of control over whether Plaintiff was allowed to see a doctor for his mental illness, and that Marienelli had refused Plaintiff's requests. (Dkt. No. 27-1 at 9.)

Where a plaintiff has received no treatment, the court examines whether the inmate's medical condition is sufficiently serious. *See Salahuddin*, 467 F.3d at 280. "Mental illness can constitute a serious medical need." *Hale v. Rao*, 768 F. Supp. 2d 367, 378 (N.D.N.Y. 2011). Moreover, "[a] propensity to attempt suicide or harm oneself is undoubtedly a serious medical condition, as are the health effects that flow[ ] from . . . mental illness such as lacerations from cutting and hanging." *Barnes v. Ross,* No. 12 Civ 1916(PKC), 2013 WL 646551, at *4, 2013 U.S. Dist. LEXIS 24103, at *11 (W.D.N.Y. Feb. 21, 2013); *see also Loadholt v. Lape*, No. 9:09-CV-0658 (LEK/RFT), 2011 WL 1135934, at *3, 2011 U.S. Dist. LEXIS 31368, at *9-10

(N.D.N.Y. Mar. 3, 2011) ("This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied by suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious."); *Allah v. Kemp*, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 1036802, at *6, n.9, 2010 U.S. Dist. LEXIS 25781, at *19, n.9 (N.D.N.Y. Feb. 25, 2010) (failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet "sufficiently serious" standard).

Although Plaintiff's Complaint is far from specific as to the nature of his mental health problems, his allegations of mood disorder and other mental problems and long history of medication and treatment, considered with Plaintiff's allegations that he: (1) was taking medication for his mental health problems when he arrived at Upstate; (2) was housed in an area designated for mentally ill inmates; (3) was assigned a mental health counselor; and (4) attempted suicide on two occasions, by cutting and hanging, while at Upstate, state a plausible claim that Plaintiff had serious mental health problems that went untreated.[8]

Further, the allegations in Plaintiff's Complaint and the claims in Plaintiff's letters to Defendant Kemp, accepted as true for this motion, are sufficient to make a plausible showing of deliberate indifference on Marienelli's part. As Plaintiff's mental health counselor, Marienelli was aware of his mental health problems and that he had been taken off his medication. (Dkt. No. 1 at ¶¶ 16-19.) According to Plaintiff, Marienelli laughed in his face when Plaintiff talked to him about seeing a doctor for his mental illness. (Dkt. No. 27-1 at 9.) When Plaintiff cut his

---

[8] In addition, in his letters to Defendant Hogan, Plaintiff wrote of fear of slipping back into mental illness without his medication and hearing people talking and not being able to tell if the voices were in his head or not. (Dkt. No. 27-1 at 8.)

arms, in what he described as a suicide attempt in his August 30, 2010 letter to Kemp, Marienelli laughed, told Plaintiff to run some water on the cuts, and walked away without arranging for any mental health intervention. (Dkt. Nos. 1 at ¶ 22; 27-1 at 11.) Less than two months after that cutting incident, Plaintiff attempted to hang himself. (Dkt. No. 1 at ¶ 23.)

Based upon the forgoing, I recommend that Marienelli's Rule 12(c) motion for judgment on the pleadings be denied.

        2.   <u>Kemp</u>

Plaintiff has also asserted an Eighth Amendment medical indifference claim against Defendant Kemp based upon his failure to take steps to ensure that Plaintiff received needed medication and treatment for his mental health problems. I have already concluded that Plaintiff has made a facially plausible showing that he received no medication or treatment for his mental health problems while at Upstate, and that his mental problems constituted a serious medical need for purposes of satisfying the objective element of his medical indifference claim.

Moreover, I find that under the circumstances alleged, Plaintiff has an adequate showing of deliberate indifference by Kemp. Plaintiff wrote four letters to Kemp. In each of those letters, Plaintiff complained about Marienelli including: (1) Marienelli treating Plaintiff's attempts to talk to him about his mental health issues as a game or a joke; (2) Marienelli threatening Plaintiff about his letters to Kemp and laughing in Plaintiff's face when he asked to see a doctor; and (3) Marienelli laughing when Plaintiff cut his arms in a suicide attempt. (Dkt. No. 27-1 at 9-11.) In his second letter, Plaintiff specifically implored Kemp not to give copies of his letters to Marienelli because of his threats. *Id*. at 9.

According to Plaintiff, Kemp's sole response to his letters was to continue to give copies

letters to Marienelli – the subject of Plaintiff's complaints. (Dkt. No. 1 at ¶ 20.) The failure of a supervisory official to investigate or respond to a complaint letter from an inmate is alone insufficient to establish the personal involvement necessary for liability on a § 1983 claim. *Johnson*, 234 F. Supp. 2d at 363; *Risch v. Hulihan*, No. 9:09-CV-330, 2010 WL 5463339, at *4, 2010 U.S. Dist. LEXIS 137094, at *12-13 (N.D.N.Y. Dec. 29, 2010) (writing letters to the MHU Unit Chief at Mid-State and Commissioner Hogan was insufficient to establish personal involvement). While mere receipt of a letter from an inmate is insufficient to establish individual liability . . . "[p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Boddie v. Morgenthau*, 342 F. Supp.2d 193, 203 (S.D.N.Y. 2004) (quoting *Johnson*, 234 F. Supp. 2d at 363).

"Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord*, 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004); *see also Woods v. Goord*, No. 01 Civ. 3255(SAS), 2002 WL 731691, at *7, 2002 U.S. Dist. LEXIS 7157, at *25 (S.D.N.Y. April 23, 2002) (referring a letter requesting medical assistance to a lower ranking supervisor does not constitute personal involvement). Therefore, if giving copies of Plaintiff's letters to Marienelli were viewed as merely the routine forwarding of inmate correspondence to the appropriate staff member for handling, I would be compelled to conclude that Plaintiff has not alleged facts sufficient to show Kemp's personal involvement in his medical indifference claim. However, in this case, Kemp responded to Plaintiff's letters by giving copies to the individual whom Plaintiff claimed was not only denying him mental health care, but

threatening him for writing letters.  Moreover, assuming the facts alleged by Plaintiff to be true, Kemp took no steps to ensure that Marienelli did not follow through on his threats, and that Plaintiff received needed mental health treatment.  Under the circumstances of this case, I find that while Plaintiff's claim against Kemp may not survive a summary judgment motion, for purposes of this motion, he has adequately alleged not only Kemp's personal involvement, but his deliberate indifference to Plaintiff's serious mental health needs.  Therefore, I recommend that Kemp's motion for judgment on the pleadings be denied.

3.    Hogan

Plaintiff has acknowledged that Hogan never responded to his letters and has failed to make any showing of personal involvement by Hogan in his claim that he was denied adequate mental health care.  Therefore, I recommend that Hogan's motion for judgment dismissing Plaintiff's claim against him be dismissed, and that in light of Plaintiff's *pro se* status, he be granted leave to amend.

4.    Healy

Plaintiff claims that Defendant Healy, a Corrections Officer at Upstate, and two other corrections officers beat Plaintiff with their hands and feet after discovering he had hanged himself in the shower and cutting him down.  (Dkt. Nos. 1 at ¶ 23; 27-1 at 15.)  After beating Plaintiff, Healy and the other officers made Plaintiff promise he wouldn't hang himself again, Healy then warned Plaintiff that if he wrote up the incident they would be back and he would really wish he were dead, and left.  (Dkt. No. 1 at ¶ 23.)   Later in the day, Plaintiff cut his wrist and showed it to Healy, who still did nothing to seek mental health or medical care for Plaintiff. *Id*. at ¶ 4.  Plaintiff has asserted Eighth Amendment claims for medical indifference and

excessive force against Healy.

a.      <u>Plaintiff's Medical Indifference Claim</u>

Plaintiff has made a plausible showing that he had a serious mental condition.  I find that Plaintiff has also made an adequate showing that Healy acted with deliberate indifference. "Non-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care." *Jean v. Barber*, No. 9:09-CV-430 (MAD/GHL), 2011 WL 2975218, at *5, 2011 U.S. Dist. LEXIS 79499, at *13 (N.D.N.Y. Jul. 21, 2011).  It can reasonably be inferred from Plaintiff's Complaint that finding Plaintiff hanging in the shower placed Healy on notice that he could be a suicide risk, particularly since Plaintiff was being housed in an area designated for mentally ill inmates.  Healy's alleged actions in beating and threatening Plaintiff, rather than seeing to it that Plaintiff's apparent suicidal ideation was addressed through the Upstate mental health system, suggests an intentional disregard of that risk.  Therefore, I recommend that Defendant Healy's motion for judgment on the pleadings on Plaintiff's Eighth Amendment medical indifference claim against him be denied.

b.      <u>Excessive Force Claim</u>

The Eighth Amendment prohibition on cruel and unusual punishments precludes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), and protects inmates against the use of excessive force. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  As with Plaintiff's other Eighth Amendment claims, in order to bring an excessive force claim, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

"The objective element is 'responsive to contemporary standards of decency' and requires

a showing that 'the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection.'" *Brooks v. Brennan*, No. 9:12-CV-0624 (NAM/CFH), 2013 WL 3716399 at *7, 2013 U.S. Dist. LEXIS 98942, at *22 (N.D.N.Y. Jul. 12, 2013) (quoting *Hudson*, 503 U.S. at 9) (internal citations omitted). "'The malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation *per se*' regardless of the seriousness of the injuries." *Id.* (quoting *Blyden,* 186 F.3d at 263) (citing *Hudson*, 503 U.S. at 9). That is so because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.*

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness in light of the circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000). Whether actions are characterized by wantonness "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). The Second Circuit has set forth several factors to be considered in determining whether a defendant acted maliciously or wantonly, including "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendant to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (citation and internal quotation marks omitted).

Plaintiff does not claim that he sustained any physical injuries as a result of the beating allegedly inflicted by Healy and the two other corrections officers. However, assuming the truth

of Plaintiff's allegations regarding the beating, I find that beating Plaintiff immediately after his apparent attempt to commit suicide by hanging constitutes a malicious use of force, and that Plaintiff has stated a *per se* claim for excessive force regardless of the lack of factual allegations concerning injuries. I also find that for pleading purposes, Plaintiff has satisfied the subjective element of an excessive force claim. There are no allegations in the Complaint suggesting that any amount of force was needed against Plaintiff after Healy cut him down, and there is no suggestion that Plaintiff presented any threat to the safety of Healy or the other officers at the time the beating was allegedly inflicted. The allegations in Plaintiff's Complaint instead support the inference that Healy was acting maliciously and sadistically in beating Plaintiff.

I therefore recommend that Healy's motion for judgment on the pleadings dismissing Plaintiff's Eighth Amendment excessive force claim also be denied.

### D. Plaintiff's Sexual Harassment and Abuse Claims Against Defendants Lavigne, Dwyer, and Santamore

#### 1. Lavigne and Dwyer

Sexual abuse of a prisoner by a corrections officer may, under some circumstances, violate the prisoner's Eighth Amendment right to be free from cruel and unusual punishments. *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). It may violate contemporary standards of decency and "can cause severe physical and psychological harm." *Id.* For those reasons, "severe or repetitive sexual abuse of an inmate by a prison officer can be objectively serious enough to constitute an Eighth Amendment violation" where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct." *Id.* (citation and internal quotation marks omitted).

The Second Circuit and district courts require "allegations of very extreme and severe conduct with no imaginable penological purpose before finding an inmate has stated an Eighth Amendment sexual abuse claim." *McCarroll v. Matteau*, No. 9:09-CV-0355 (NAM/GHL), 2010 WL 2346327, at *4, 2010 U.S. Dist. LEXIS 56574, at *11 (N.D.N.Y. May 17, 2010). *See, e.g., Caldwell v. Crossett,* No. 9:09-CV-576 (LEK/RFT), 2010 WL 2346337, 2010 U.S. Dist. LEXIS 56573 (N.D.N.Y. May 24, 2010) (claim that corrections officer grabbed plaintiff's testicles during a pat-frisk causing serious pain around his groin area failed to allege a violation of the Eighth Amendment based upon claims of sexual abuse or excessive force); *Excell v. Fischer*, No. 9:08-CV-945 (DNH/RFT), 2009 WL 3111711, 2009 U.S. Dist. LEXIS 88506 (N.D.N.Y. Sept. 24, 2009) (allegations that guard grabbed and squeezed prisoner's penis during pat-frisk insufficient to state an Eighth Amendment claim); *Morrison v. Cortright*, 397 F. Supp. 2d 424 (W.D.N.Y. 2005) (allegation that corrections officer shone light up inmate's anus, ran his middle finger between inmate's buttocks, causing inmate to urinate on himself, and rubbing his penis against inmate's buttocks during strip search did not implicate Eighth Amendment); *Montero v. Crusie*, 153 F. Supp. 2d 368, 375 (S.D.N.Y. 2001) (failure to state an Eighth Amendment claim where plaintiff failed to allege injury as a result of guard's squeezing his genitalia on several occasions during pat-frisking).

Plaintiff has alleged a single incident of sexual abuse by Lavigne during a pat-frisk. According to Plaintiff, while Dwyer was holding up Plaintiff's hands, Lavigne "pulled plaintiffs pants up as high as they would go causing him to winch (sic) in pain . . . . [;] shoved his fingers between plaintiffs buttock with such force that one of his fingers along plaintiffs pants, and underwear, ultimately invading plaintiff's anus . . . . [; and] groped plaintiff genitals and

squeezed them until plaintiff cried out in pain. " (Dkt. No. 1 at ¶¶ 31, 33.)  Plaintiff has not

alleged that he sustained any physical injury as a result.

While by no means condoning the acts alleged in Plaintiff's Complaint, Plaintiff has

alleged only a single instance of alleged sexual abuse by Lavigne, the actions were not extreme

or severe when measured against the case law cited herein, and Plaintiff has alleged no physical

injury.  Additionally, Lavigne was performing a pat-frisk, which has a penological purpose.

Therefore, I find that Plaintiff has not stated a plausible claim against him for sexual abuse or

assault in violation of the Eighth Amendment.[9]

Plaintiff has alleged that Dwyer's threat of sexual assault ("oh, you're still a virgin, don't

worry about it, we'll take care of that") left him in a constant state of fear and depression.  (Dkt.

No. 1 at ¶¶ 31, 36.)   However, there are no allegations in the Complaint that Dwyer sexually

---

[9]  Furthermore, I find that Plaintiff has not stated a plausible claim for excessive force as
against Lavigne with respect to the pat-frisk.  "[N]ot every push or shove, even if it may later
seem unnecessary in the peace of a judge's chambers violates a prisoner's constitutional rights,"
*Boddie,* 105 F.3d at 862 (citation omitted), and "not even every malevolent touch by a prison
guard gives rise to a federal cause of action."  *Id.* at 862. (citation and internal quotation marks
omitted).  *See, e.g.*, *Rodriguez v. Peguero,* No. 9:09-CV-1005 (TJM/ATB), 2011 WL 754123, at
* 5, 2011 U.S. Dist. LEXIS 18096, at *15-16 (Jan. 27, 2011) (allegations that defendant
handcuffed plaintiff and slammed him against a wall hurting his chest and twisting his arm in an
upward motion causing injury to his shoulder, chest and ear failed to meet the objective standard
for stating an excessive force claim); *Tavares v. City of New York*, No. 08 Civ. 3782(PAE)(JCF),
2011 WL 5877550, at *6, 2011 U.S. Dist. LEXIS 137381, at *3 (S.D.N.Y Oct. 17, 2011)
(defendant granted summary judgment because force used was *de minimis* and did not rise to the
level of a constitutional violation where plaintiff claimed defendant threw him against the wall,
kicked him harshly on both ankles, and compressed his chest against the wall so that he thought
he was going to pass out); *James v. Phillips*, No. 05 Civ. 1539 (PKC)(KNF), 2008 WL 1700125,
*4-5, 2008 U.S. Dist. LEXIS 30615, at *12 (S.D.N.Y. Apr. 9, 2008) (finding *de minimis* use of
force where prison guard had shoved inmate into a door resulting in swelling of his chin).

abused Plaintiff[10], and the law is clear that "although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997).

Given the foregoing, I recommend that Defendants Lavigne and Dwyer's motion for judgment on the pleadings dismissing Plaintiff's claims against them relating to the alleged sexual abuse in violation of the Eighth Amendment be granted, but that Plaintiff be given leave to file an amended complaint.

2.    Santamore

Plaintiff claims that Defendant Santamore sexually harassed him by ordering him to take down a sheet he had put up while he was taking a shower.  At the time Santamore directed Plaintiff to take down the sheet, Plaintiff was naked and allegedly believed that exposing his naked body would be a violation of DOCCS standards of behavior.  (Dkt. No. 1 at ¶¶ 37-39.) Santamore threatened Plaintiff with a misbehavior report if he did not comply with the directive. When Plaintiff complied, Santamore allegedly "looked at plaintiff's naked body up and down, smirked and walked away saying 'I'll see you later.'" *Id*. at ¶ 42.  Santamore thereafter filed a misbehavior report, which was dismissed after review of a videotape of the incident.[11]  *Id*. at ¶¶ 44-46.

---

[10]  Inasmuch as I have concluded that Plaintiff has not stated a claim for sexual abuse in violation of the Eighth Amendment against Lavigne, Plaintiff has no viable Eighth Amendment claim against Dwyer either for sexual abuse because he was holding Plaintiff's hands during the pat-frisk or his failure to intervene.

[11]  Plaintiff has no constitutional protection against the filing of a false misbehavior report, unless, for instance, it was filed in retaliation for the exercise of a protected First Amendment right.  *See Boddie*, 105 F.3d at 862.

"[T]o date, in this Circuit there has been 'no case in which a plaintiff ha[s] established an actionable claim of sexual harassment under *Boddie* without having physical contact with the alleged perpetrator[.]'" *Vaughn v. Strickland*, Nos. 12 Civ. 2696(JPO), 12 Civ. 3335(JPO), 12 Civ. 2995(JPO), 12 Civ. 3333(JPO), 2013 WL 3481413, at *4, 2013 U.S. Dist. LEXIS 97122, at *12 (S.D.N.Y. Jul. 11, 2013) (citation and internal quotation marks omitted). Plaintiff has not alleged physical conduct by Santamore and has not alleged facts setting forth a facially plausible claim of sexual harassment under *Boddie*. I therefore recommend that Plaintiff's claim for sexual harassment against Santamore be dismissed. Even though it appears virtually certain that Plaintiff will be unable to allege facts stating a plausible claim against Santamore in connection with the shower incident, given Plaintiff's *pro se* status, I recommend that the dismissal be with leave to amend.

### E. Eighth Amendment Claim for Indifference to Plaintiff's Serious Dental Needs by Defendants Dwyer, Burgess, and Miller

#### 1. Plaintiff's Unsuccessful Attempts to Obtain Dental Treatment

Plaintiff cracked a molar and lost the filling in the tooth on August 29, 2010. (Dkt. Nos. 1 at ¶ 48; 27-1 at 45.) Plaintiff, who was in pain and unable to eat from one side of his mouth as a result of the lost filling, began submitting dental sick call slips every evening. (Dkt. Nos. 1 at ¶ 48; 27-1 at 31.) However, as of September 6, 2010, when Plaintiff wrote to Defendant Miller, the Dentist at Upstate, asking that him be called out for treatment as soon as possible, Plaintiff had heard nothing in response to the sick call slips. (Dkt. No. 27-1 at 31.)

In his September 6th letter, Plaintiff told Miller that "since the filling came out I've been in such great pain I can't eat correctly I think I'm losing weight. . . . I need your help Sir." *Id.*

Plaintiff continued to submit dental slips with no reply.  *Id*. at 32.  On September 14, 2010, Plaintiff  wrote a second letter to Miller, who had not responded to the initial letter.  *Id*. at 32.  In his September 14th letter, Plaintiff informed Miller that he had been submitting dental call slips with no response and wrote "Sir, I need help!  I don't know what else to do.  This pain is driving me crazy.  I can't eat, or sleep right.  If there is something I can do to insure that I'm called out sooner, please tell me & I will do it.  What ever it takes."  *Id.*

On September 29, 2010, Plaintiff was called out for a dental appointment.  He asked the dental hygienist if the appointment was to treat the cracked tooth and missing filling and was told it was only for a cleaning.  (Dkt. No. 1 at ¶ 50.)  Plaintiff showed his tooth to the hygienist, who made a notation about it on Plaintiff's dental treatment record.  *Id*.; (Dkt. No. 27-1 at 45.)

Plaintiff filed a grievance complaining of the lack of treatment for the lost filling on October 5, 2010.  (Dkt. No. 27-1 at 33.)  The grievance stated: "For over a month I've been writing request to Dental because my filling came out and I need emergency treatment, but the Dental Dept will not call me out.  I've been in pain if they aren't going to call me, treat me for the pain until they see me."  *Id*.  The IGRC response stated that when Plaintiff was seen on September 29, 2010, for a cleaning, he didn't mention the missing filling.  That is contrary to Plaintiff's dental treatment record.  *Id*. at 34.  The IGRC also noted that, contrary to the information in Plaintiff's letters to Miller, the Dental Department had no call out slips from Plaintiff.  *Id*.  The IGRC stated that writing to the IGRC was not the proper procedure and recommended that Plaintiff write to the Dental Department, which Plaintiff had already done twice with no response.  *Id*.

The Acting Superintendent, in denying the grievance on appeal on October 20, 1010,

wrote that "[a]ccording to Dr. Miller and investigation of dental records and dental staff interviews, treatment has been provided consistent with Dental Department Policy." (Dkt. No. 27-1 at 35.) He indicated that Plaintiff had been seen on 11/16/09, 11/23/09, 1/28/10 and 2/1/10, long before he lost the filling, and that all remaining work was "elective (not requiring immediate attention) and had been scheduled." *Id*.

2.    Plaintiff's November 3, 2010 Dental Call Out

On November 3, 2010, Defendant Dwyer took Plaintiff to a dental call out after a scheduled ASAT. (Dkt. No. 1 at ¶ 55.) Dwyer had refused to allow Plaintiff to skip the ASAT to go to the dentist when Plaintiff told him that he was "really in pain and needed to see dental staff." *Id*. Plaintiff saw a number of inmates enter dental before him. *Id*. at ¶ 57. When a corrections officer attempted to take Plaintiff to see dental, Dwyer waived him away and said that Plaintiff would see the dentist last if he saw him at all. *Id*. Dwyer and Defendant Burgess began screaming at Plaintiff, and Burgess retrieved a dental refusal slip and threatened Plaintiff with "a visit to the facility Hospital" if he did not sign it. *Id*. at ¶¶ 58-59. Defendant Santamore, who was nearby, refused to intervene. *Id*. at ¶ 58. Plaintiff signed the refusal slip under coercion and was taken back to his cell. *Id*. at ¶¶ 60-61. Plaintiff wrote his reason for refusal as "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but correctional staff refuse to let me see dental staff." (Dkt. No. 23-2 at 5.) A notation made in Plaintiff's dental treatment record for November 3, 2010 states "pt. refused per c.o." (Dkt. No. 27-1 at 45.)

Plaintiff was transferred to Clinton on or about November 14, 2010 and received a temporary filling shortly thereafter. *Id*. at ¶ 63.

3.      Plaintiff's Serious Dental Condition

In order to state an Eighth Amendment claim for deliberate indifference to his serious

dental condition, Plaintiff must, as with his claim for indifference to his serious mental health

needs, show that he had a serious dental condition and that it was met with deliberate

indifference.  *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000); *Chance*, 143 F.3d at

702.  A serious medical, or in this case dental condition, exists where "the failure to treat a

prisoner's condition could result in further significant injury or the 'unnecessary and wanton

infliction of pain.'"  *Chance*, 143 F.3d at 702 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1373

(7th Cir. 1997).  Specifically, "[a] cognizable claim regarding inadequate dental care . . . can be

based on various factors, such as the pain suffered by the plaintiff . . . the deterioration of the

teeth due to a lack of treatment . . . or the inability to engage in normal activities."[12] *Chance,* 143

F.3d at 703 (citations omitted).   "[B]ecause a tooth cavity will degenerate with increasingly

serious implications if neglected over sufficient time, it presents a 'serious medical need' within

the meaning of our case law."  *Harrison*, 219 F.3d at 137.

Logic suggests that a tooth with a lost filling, if neglected over time, would not be any

less likely than a cavity to degenerate with increasingly serious implications or any less a serious

dental need.  *See Hoover v. Hardman*, No. 9:99-CV-1855, 2005 WL 1949890, at *8, 2005 U.S.

Dist. LEXIS 42974, at *23-24  (N.D.N.Y. Aug. 15, 2005) (finding an issue of fact as to whether a

_____

[12]  "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or
interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus
on the challenged delay or interruption in treatment rather than the prisoner's underlying medical
condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently
serious, to support an Eighth Amendment claim.*"  Smith,* 316 F.3d at 185 (quoting *Chance*, 143
F.3d at 702).

lost filling was a serious medical need).  Moreover, Plaintiff claims that he suffered from extreme pain and an inability to eat or sleep properly as a result of the lost filling.  *See Hauschulz v. Bourbon Cty. Board of Commissioners*, Civil Action No. 04-3475-KHV, 2006 WL 1675907, at *7, 2006 U.S. Dist. LEXIS 39511, at *21 (D. Kan. June 14, 2006) (The law does not require that an inmate's tooth be abscessed or infected before a lost filling can be considered a serious medical condition.  Pain can be considered substantial harm resulting from delay).  Therefore, even though a temporary filling was ultimately put in the tooth, and there are no allegations in the Complaint indicating further problems with the molar as a result of the delay, I find that Plaintiff has made a plausible showing that he suffered from a serious dental condition for purposes of this Eighth Amendment claim.

### 4.  Miller

In order to establish an Eighth Amendment claim arising out of inadequate medical care against Defendant Miller, Plaintiff must prove that Miller showed "deliberate indifference" to his serious medical needs.  *See Chance*, 143 F.3d at 702.   Plaintiff must show that Miller "knew of and disregarded [his] serious medical needs."  *Id.* at 703.  Denying or delaying access to dental care may constitute deliberate indifference.  *Harrison*, 219 F.3d at 138.

Plaintiff has alleged facts, assumed to be true for this motion, showing that he sent two letters to Miller informing him of the lost filling, the great pain he was suffering, and his inability to eat or sleep properly.  Miller did not respond to Plaintiff's requests for emergency treatment for the lost filling.  When Miller was consulted as a part of the investigation into Plaintiff's grievance complaining of the lack of treatment, he responded that treatment had been provided consistent with Dental Department policy when, according to Plaintiff and his dental treatment

records, no treatment whatsoever had been provided.[13]  (Dkt. No. 27-1 at 44-46.)

Discovery in this matter may reveal that Miller's failure to treat Plaintiff and to provide accurate information in response to the grievance investigation were inadvertent failures or negligence on his part rather than deliberate indifference.  *See Estelle*, 429 U.S. at 105-06. However, for purposes of this Rule 12(c) motion, I find that Plaintiff has made a plausible showing of deliberate indifference on Miller's part and recommend that his motion for judgment on the pleadings be denied.  *See Washington v. Farooki*, No. 9:11-CV-1137, 2013 WL 3328240, at *1, 7, 2013 U.S. Dist. LEXIS 93712, at *18-19 (N.D.N.Y. Jul 2, 2013) (letters from plaintiff to defendant dentist complaining of severe pain and the need for dental treatment, in conjunction with defendant's silence, found to create factual issue as to whether defendant intentionally delayed plaintiff's care).

### 5.     Dwyer, Burgess, and Santamore

"[W]hen an inmate alleges that non-medical subordinate prison personnel were deliberately indifferent to his serious medical needs, he must demonstrate that they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.'" *Hoover,* 2005 WL 1949890, at *4 (quoting *Baumann v. Walsh*, 36 F. Supp.2d 508, 512 (N.D.N.Y. 1999)).

Assuming the truth of Plaintiff's allegations, Defendant Dwyer was aware that Plaintiff was in extreme pain and needed dental care and nonetheless interfered with his access to dental care on November 3, 2010 by waiving away a corrections officer who tried to take Plaintiff in to

---

[13]  Miller cannot be faulted for Plaintiff missing his dental call out on November 3, 2010. However, by then, it had been nearly two months since Plaintiff first wrote to Miller informing him of the severe pain and problems with eating and sleeping that he was experiencing.

see the dental provider and stating that Plaintiff would see the dentist last if he saw him at all.[14]

*Id*. at ¶ 57.  (Dkt. No. 1 at ¶¶ 55, 57.)   Furthermore, it can be inferred from the allegations in

Plaintiff's Complaint that Dwyer was present when Burgess coerced Plaintiff into signing the

dental refusal slip with threats of bodily harm and even if not a participant, Dwyer did not

attempt to intervene.  *Id*. at ¶ 59.   Therefore, I conclude that Plaintiff made a plausible showing

of deliberate indifference on Dwyer's part and recommend that Dwyer's motion for judgment on

the pleadings on Plaintiff's Eighth Amendment medical indifference claim be denied.  *See*

*Hoover*, 2005 WL 1949890, at *9 (where court found a question of fact with regard to defendant

corrections officer's deliberate indifference where he instructed a nurse not to see plaintiff for his

dental problem and a week later instructed the same nurse not to provide plaintiff with

medication).

Plaintiff does not claim that he told Burgess or Defendant Santamore, who is alleged to

have refused to intervene and correct the situation when Dwyer and Burgess interfered with

Plaintiff seeing the dental provider, that he was in extreme pain and needed dental work.  I find

that Plaintiff has thus failed to make a facially plausible showing of deliberate indifference to his

serious dental needs by either Burgess or Santamore.  Therefore, I recommend that their motion

for judgment on the pleadings dismissing Plaintiff's dental indifference claim be granted, but that

Plaintiff be granted leave to amend.

### F.    Qualified Immunity

Defendants have raised qualified immunity as a basis for granting them judgment on the

---

[14]  Plaintiff does not allege that he described his pain to Dwyer as "extreme."  However, "really in pain," the language used by Plaintiff in his Complaint, can be construed as "extreme pain." (Dkt. No. 1 at ¶ 55.)

pleadings. (Dkt. No. 23-4 at 16-18.) "A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' at the time of the challenged conduct." *Walker*, 717 F.3d at 125 (citing *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074, 2080 (2011)) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S. Ct at 2083 (citations and internal quotation marks omitted). The Supreme Court "[does] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. If a defendant's conduct "did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted).

Qualified immunity is an affirmative defense on which defendant officials have the burden of proof. *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). "[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion [or a Rule 12(c) motion in this case] instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *Walker*, 717 F.3d at 126 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). Included in that standard is that the facts supporting the defense appear on the face of Plaintiff's Complaint. *McKenna, id.*

While recognizing that qualified immunity should be decided as early as possible in the

44

litigation, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009), the Second Circuit has taken the position that qualified immunity "is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker*, 717 F.3d at 130 (citing *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994) ("Although a defense of qualified immunity should ordinarily be decided at the earliest possible stage in litigation, and it is a defense that often can and should be decided on a motion for summary judgment, some limited and carefully tailored discovery may be needed before summary judgment will be appropriate.")

In this case, I have concluded that Plaintiff has asserted plausible claims for violation of his Eighth Amendment right to receive adequate medical care against Defendants Marienelli, Kemp, and Healy (mental health care), and Miller and Dwyer (dental care), and for excessive force against Defendant Healy, and recommended that Defendants' motion for judgment on the pleadings be denied as to those claims. If the district court adopts those recommendations, further facts will be required to decide the question of qualified immunity with regard to those defendants. Therefore, as in *Walker*, I find that it would be "inappropriate to conclude as a matter of law at the pleadings stage of the litigation that defendants did not violate [Plaintiff's] clearly established constitutional rights," 717 F.3d at 130, and recommend that Defendants Marienelli, Kemp, Healy, Miller, and Dwyer's motion for judgment on the pleadings on qualified immunity grounds be denied.[15]

---

[15]  Because I have recommended that Plaintiff's Complaint be dismissed as against Defendants Rock, Hogan, Lavigne, Burgess, and Santamore, I do not find it necessary to address their motion for qualified immunity.

**ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Defendants' Rule 12(c) motion for judgment on the pleadings dismissing Plaintiff's Complaint (Dkt. No. 23) be **GRANTED IN PART AND DENIED IN PART**.  Specifically, I recommend that Defendants' motion be **GRANTED** as follows:

1.      Dismissal on Eleventh Amendment grounds of all claims seeking money damages against all of the Defendants, including John Doe #1-6, in their official capacities, without leave to amend;

2.      Dismissal of Count #1 for deliberate indifference to Plaintiff's serious medical (mental health) needs in violation of the Eighth Amendment against Defendant Hogan, with leave to amend; and

3.      Dismissal of Count #3 for conditions of confinement in violation of the Eighth Amendment against Defendant Rock, with leave to amend;

4.      Dismissal of Count #4 for sexual harassment, assault/excessive force in violation of the Eighth Amendment  against Defendants Lavigne, Dwyer, and Santamore, with leave to amend;

5.      Dismissal of Count #5 for deliberate indifference to Plaintiff's serious medical (dental) needs in violation of the Eighth Amendment against Defendants Burgess and Santamore, with leave to amend; and it is further

**RECOMMENDED** that Defendants' motion be **DENIED** as to the following: (1) Count #1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marienelli, and Kemp; (2) Count #2 for deliberate indifference to Plaintiff's serious

46

medical (mental health) needs and for excessive force against Defendant Healy; (3) Count #5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dwyer; and (4) Defendants Marienelli, Kemp, Healy, Miller, and Dwyer's request for dismissal on qualified immunity grounds; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 14, 2013
     Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge