UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EUGENE JONES,

                                        Plaintiff,

                                                                    9:12-CV-0447

v.
                                                                    (NAM/TWD)

ROCK, Superintendent, Upstate Correctional Facility;
J. MARINELLI, MHU Counselor, Upstate Correctional
Facility; JOHN DOE #3, Mental Health Doctor, Upstate
Correctional Facility; MICHAEL HOGAN, Mental
Health Commissioner; J. HEALY, C.O., Upstate
Correctional Facility; JOHN DOE #2, C.O., Upstate
Correctional Facility; JOHN DOE #3, C.O., Upstate
Correctional Facility; LAVEEN, C.O., Upstate Correctional
Facility; DWYER, C.O., Upstate Correctional Facility;
JOHN DOE #4, Lt., Upstate Correctional Facility;
S. SANTAMORE, Sgt., Upstate Correctional Facility;
BURGESS, C.O., Upstate Correctional Facility; JOHN
DOE #5, C.O., Upstate Correctional Facility; JOHN
DOE #6, C.O., Upstate Correctional Facility; JERRY
MILLER, Dental Doctor, Upstate Correctional Facility,

                                        Defendants.
_____

APPEARANCES:                               OF COUNSEL:

EUGENE JONES
Plaintiff *pro se*
95-B-1881
Clinton Correctional Facility
P.O. 2002
Dannemora, New York 12929

HON. ERIC T. SCHNEIDERMAN              COLLEEN GALLIGAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Eugene Jones commenced this *pro se* civil rights action under 42 U.S.C. § 1983 for the violation of his Eighth Amendment right to be free from cruel and unusual punishment while he was confined in the Upstate Correctional Facility ("Upstate").  (Dkt. No. 1.)  Plaintiff asserted claims in his Complaint for: (1) deliberate indifference to his serious mental health needs against Defendants Upstate Superintendent Rock ("Rock"), Upstate Mental Health Unit ("MHU") Psychologist 2, J. Marinelli, incorrectly sued as Marienelli ("Marinelli"), MHU Unit Chief T. Kemp ("Kemp"), Mental Health Doctor John Doe #1, and Mental Health Commissioner Michael Hogan ("Hogan"), *id*. at ¶ 72; (2) excessive force and deliberate indifference to Plaintiff's serious mental health and medical needs against Defendants Corrections Officer Healy ("Healy"), and Corrections Officers John Doe # 2 and John Doe # 3, *id*. at ¶ 73; (3) conditions of confinement against Defendant Rock; *id*. at ¶ 74; (4) sexual harassment, assault, and excessive force against Defendants Lt. John Doe #4, Sgt. S. Santamore ("Santamore"), Corrections Officer Lavigne, incorrectly sued as Laveen ("Lavigne"), and Corrections Officer Dyer, incorrectly sued as  Dwyer ("Dyer"), *id*. at ¶ 75; and (5) deliberate indifference to Plaintiff's serious dental needs against Defendants Corrections Officer John Doe #6, Doctor Jerry Miller ("Dr. Miller" or "Miller").

Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure after filing an Answer to the Complaint.  (Dkt. No. 23.)  Plaintiff opposed the motion.  (Dkt. No. 27.)  The Hon. Norman A. Mordue, Senior D.J., adopting the

Report and Recommendation of this Court (Dkt. No. 30), granted Defendants motion in part and denied it in part. (Dkt. No. 31). Dismissed on the motion were: (1) all of Plaintiff's claims seeking money damages against all Defendants in their official capacity with prejudice on Eleventh Amendment grounds; (2) claim for deliberate indifference to Plaintiff's serious mental health needs as against Defendant Hogan only; (3) claim for conditions of confinement against Defendant Rock; (4) claims for sexual harassment, assault and excessive force against Defendants Lavigne, Dyer, and Santamore; and (5) claim for deliberate indifference to Plaintiff's serious dental needs as against Defendants Burgess and Santamore.[1]

Defendants Marinelli, Kemp, Healy, Dyer, and Miller have now moved for summary judgment on Plaintiff's remaining Eighth Amendment claims: (1) Count #1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marinelli and Kemp; (2) Count #2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and excessive force against Defendant Healy; and (3) Count #5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dyer. (Dkt. Nos. 46, 46-2.)

The grounds for summary judgment asserted by Defendants are: (1) Plaintiff's failure to exhaust administrative remedies as to Counts #1 and #2 against Marinelli, Kemp, and Healy; (2) Plaintiff's inability to state a prima facie claim of deliberate indifference with regard to medical (mental health) care against Defendants Kemp or Marinelli and medical (dental) care against Defendants Miller and Dyer; (3) Defendants Kemp and Miller's lack of personal involvement

---

[1] Although with the exception of the claims dismissed on Eleventh Amendment grounds, Plaintiff was granted leave to amend, no amended complaint has been filed.

3

in the alleged violation of Plaintiff's Eighth Amendment rights; and (4) Defendants Kemp, Marinelli, Dyer, and Miller's right to qualified immunity. (Dkt. No. 46-2 at 2-3.)[2]

Plaintiff has not opposed Defendants' summary judgment motion. For the reasons that follow, the Court recommends that Defendants' motion (Dkt. No. 46) be **GRANTED** in its entirety and further recommends the *sua sponte* dismissal of the action against Defendants John Does #1-6 for failure to prosecute.

## II. STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

---

[2] References to page numbers in citations to documents filed with the Clerk refer to the page numbers assigned by the Court's electronic filing system.

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the . . . motion for summary judgment"). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) JCF, 1999 WL 983876 at *3, U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[3] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law."[4] *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)

---

[3] Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

[4] N.D.N.Y. L.R. ("L.R.") 7.1(b)(3) provides that '[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

(citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'") (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

Recently, in *Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014), the Second Circuit made clear that "[i]n the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id*. at 194 (citing Fed.R.Civ.P. 56(c)(3)). "A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . ." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (internal citations omitted).[5]

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).[6] For this reason,

---

[5] Plaintiff's Complaint in this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 1 at 17-18.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

[6] *See also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.")

courts in this district have routinely enforced L.R. 7.1(a)(3)[7] in cases in which the non-movant

has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts

to have been admitted where: (1) the facts are supported by evidence in the record;[8] and (2) the

nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of

failing to respond to the motion.[9]  *See Champion*, 76 F.3d at 486; *see also Jackson*, 766 F.3d at

194 (a non-movant who fails to respond to a summary judgment motion "runs the risk of

unresponded-to-statements of undisputed facts proffered by the movant being deemed

admitted.")  While *pro se* litigants are undeniably "entitled to some measure of forbearance

---

[7] The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules. Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties."  *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc*., 426 F.3d 640, 647 (2d Cir. 2005) (citation and internal punctuation and quotation marks omitted).

   L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue.  Each fact shall set forth a specific citation to the record where the fact is established . . . . The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment . . . .  The opposing party shall file a response to the Statement of Material Facts . . . . The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."

[8] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[9] Defendants have complied with L.R. 7.1(a)(3) and L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 46.)

when defending against summary judgment motions, the deference owed to *pro se* litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Liberati v. Gravelle*, No. 9:12-CV-00795 (MAD/DEP), 2013 WL 5372872, at *6, 2013 U.S. Dist. LEXIS 137826, at * 8 (N.D.N.Y. Sept. 24, 2013) (internal citations and punctuation omitted).

In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46-1) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiff's verified Complaint, are accepted as true. *See McAllister v. Call*, No. 9:10-CV-610, 2014 WL 5475293 (FJS/CFH), at *3, 2014 U.S. Dist. LEXIS 154422, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3, 2013 U.S. Dist. LEXIS 14125, at * 6 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff [,who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) . . ., supplemented by Plaintiff's verified Complaint . . ., as true."). As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Liberati*, 2013 WL 5372872, at * 7 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. BACKGROUND

### A. Plaintiff's Mental Health Issues

Plaintiff has been incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") since the fall of 1995. (Dkt. Nos. 46-1 at ¶ 1; 47 at ¶ 6.)[10] Because Plaintiff had received psychiatric services while in the Niagara County Jail, he was seen by a psychiatrist when he entered the DOCCS system and placed on the New York State Office of Mental Hygiene ("OMH") service. (Dkt. Nos. 46-1 at ¶ 2; 47 at ¶ 7; 47-1 at 13.) He has received mental health services from OMH off and on since his incarceration. (Dkt. Nos. 46-1 at ¶ 3; 47 at ¶ 8; 47-1 at 12-21.)

During his incarceration, Plaintiff's "Mental Health Level" has fluctuated from Level 1 to Level 6 on a scale of 1 to 6. (Dkt. Nos. 46-1 at ¶ 4; 47 at ¶ 9.) The Treatment Needs Service Level UCR Policy defines Level 1 as the most serious and includes major mental illnesses such as schizophrenia and psychotic disorders requiring active treatment, and not having six months of psychiatric stability; those with documented psychotic or bipolar illness who are on certain drugs; and those with psychiatric hospitalizations within the past three years, significant or repeated suicide attempts and/or self-abuse history within the past three years, or suicide attempts resulting in in-patient hospitalization within the last six months. (Dkt. Nos. 46-1 at ¶ 5; 47 at ¶ 10; 47-1 at 9.)

Level 6 is defined as "Mental health assessment completed   does not require mental

_____

[10] Where a fact has been included in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46-1), docket references are made herein to both the Statement and the record evidence cited in support of the fact.

health services." (Dkt. Nos. 46-1 at ¶ 6; 47-1 at 9.) Although Plaintiff's mental health status improved between 2005 and 2010, in August of 2009, while he was in the Special Housing Unit ("SHU") at Great Meadow Correctional Facility ("Great Meadow"), his mental health level was downgraded to Level 3, defined as "Needs/may need short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffer from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (Dkt. Nos. 46-1 at ¶ 8; 47-1 at ¶¶ 12-13; 47-1 at 1, 10.) While Plaintiff was confined at Great Meadow, Psychiatrist Kalyana Battau prescribed Topamax for his psychiatric symptoms. (Dkt. Nos. 46-1 at ¶ 9; 47 at ¶ 14; 47-1 at 63.)

Plaintiff was transferred from Great Meadow to Upstate on September 17, 2009, and arrived with a diagnosis of Antisocial Personality Disorder ("ASPD"), and a prescription for Topamax. (Dkt. Nos. 46-1 at ¶ 11; 47 at ¶¶ 15-16; 47-1 at 8, 9, 44.) The Transfer Progress Notes prepared by a Great Meadow's Social Worker state that Plaintiff's mental status was "Alert, oriented. No evidence of thought disorder. Mood generally neutral, stable." (Dkt. Nos. 46-1 at ¶ 11; 47-1 at 44.)

According to Plaintiff, Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in SHU. (Dkt. No. 1 at ¶ 14.) Plaintiff was confined in SHU in a single cell in A-Block in 11-Building where mentally ill inmates were housed together. *Id.* at ¶¶ 15, 26. Defendant Marinelli, employed by OMH as a Psychologist 2 at the Central New York Psychiatric Center ("CNYPC") satellite unit at Upstate, first saw Plaintiff on September 21, 2009. (Dkt. Nos. 1 at ¶ 15; 46-1 at ¶ 12; 48 at ¶ 8; 48-1 at 46-47.) Plaintiff has alleged in his Complaint that he told Marinelli he had a long history of mental illness and treatment both

before and during his incarceration.  (Dkt. No. 1 at ¶ 16.)  Marinelli observed no concerns or

issues at that time.  (Dkt. Nos. 46-1 at ¶ 12; 48 at ¶ 8; 48-1 at 46-47.)  He placed Plaintiff on

"active status" so he would continue to receive OMH services.  (Dkt. No. 48-1 at 46-47.)

On September 23, 2009, Marinelli prepared a Mental Health Treatment Plan ("Plan") for

Plaintiff based upon his mental health history, diagnosis of ASPD, and current mental status.

(Dkt. Nos. 46-1 at ¶ 13; 48 at ¶ 9; 48-1 at 23-34.)  The Plan included Plaintiff being placed on

Marinelli's service so that he would be seen regularly at his cell, monthly call-outs for private

mental health interviews, and continuation of his prescribed medication Topamax.  *Id.*  The Plan

was approved by OMH Staff Psychiatrist Bezalel Wurzberger ("Dr. Wurzberger") on October 2,

2009.  (Dkt. Nos. 46-1 at ¶; 48 at ¶ 12.)

When Marinelli saw Plaintiff for a cell-side visit on September 29, 2009, Plaintiff was

doing well and had no current health concerns.  (Dkt. Nos. 46-1 at ¶ 14; 48, at ¶ 11; 48-1 at 48.)

When he met with Plaintiff for a private therapy session on October 7, 2009, Marinelli observed

no active mental illness and Plaintiff had no health complaints.  (Dkt. Nos. 46-1 at ¶ 15; 48 at

¶11; 48-1 at 49.)

Plaintiff saw Dr. Wurzberger for an evaluation on October 9, 2009.  (Dkt. Nos. 1 at ¶ 17;

23 at ¶ 14; 46-1 at ¶ 18; 47-1 at 30.)  Wurzberger's Psychiatric Progress Note states in part:

> **COMPLAINTS/CURRENT ISSUES**:
> Inmate recently transferred to this facility; gives a history of "ups
> and downs and anxiety"; says that he was treated with multiple
> medications in the past; reports "doing alright now", rates himself
> "in the middle" on the 0-10 moods scale; sleep and appetite are
> adequate; has no complaints.
>
> The record indicates an extensive history of behavioral problems,
> characterologically driven, for which he was referred twice to the

[Behavioral Health Unit] BHU.

**MENTAL STATUS EXAMINATION AND CHANGES:**
Is alert, oriented, coherent and relevant; mood and affect are
appropriate; there are no signs of abnormal psychomotor activity;
denies hallucinations; denies self harm thoughts or intent;
cognitive functions adequate.

**SUICIDE RISK ASSESSMENT**:
No current warning signs of suicidality.

**PLAN:**
Discussed treatment options, including risks and benefits involved;
he is psychiatrically stable, with no objective evidence of a mood
disorder or a thought disorder; discussed with him the fact that
Topamax has no psychiatric indications, is non-formulary, and is
not indicated for his clinical presentation; I suggested a trial of an
SSRI for the anxiety symptoms he described; he told me "thank
you, but no thank you", and refused to consider other alternatives;
we'll monitor for changes and reassess treatment options as
needed.

(Dkt. Nos. 46-1 at ¶ 18; 47-1 at 30.)  Dr. Wurzberger discontinued Plaintiff's Topamax on

October 9, 2009.  (Dkt. Nos. 46-1 at ¶ 19; 48 at ¶ 15.)  Marinelli and Kemp did not make the

decision to discontinue the Topamax.  (Dkt. Nos. 46-1 at ¶¶ 43-44; 47 at ¶ 40; 48 at ¶ 48; 48-1

at 64.)  According to Kemp, the discontinuance was proper because there is no psychiatric

indication for the use of Topamax.  (Dkt. Nos. 46-1 at 46; 47 at ¶ 50; 48-1 at 30.)

When Marinelli saw Plaintiff for his weekly cell-side visits on October 13, 2009,

October 23, 2009, and November 9, 2009, after discontinuance of the Topamax, Plaintiff denied

mental health issues or concerns, and Marinelli observed no evidence of mental illness or

ongoing mental health issues or concerns.  (Dkt. Nos. 46-1 at ¶¶ 20-22;  48 at ¶¶ 16-18; 48-1 at

50-53.)  At a private therapy session with Marinelli on November 13, 2009, Plaintiff discussed

efforts to make positive changes in his life, his relationship with his family, and how his early

12

experiences affected how he related to authority figures. (Dkt. Nos. 46-1 at ¶ 23; 48 at ¶ 19; 48-1 at 50.)

The reports from Marinelli's cell-side visits with Plaintiff on November 25, 2009, and December 16 and 31, 2009, and his private mental health interview with Plaintiff on December 15, 2009, all reflect Marinelli's observation that Plaintiff had no current mental health issues. (Dkt. Nos. 46-1 at ¶¶ 24-26; 48 at ¶¶ 20-23; 48-1 at 53-55.) On November 25, 2009, Plaintiff reported he was happy that he had been moved to the PIMS[11] gallery, which was a quieter gallery, and on December 31, 2009, reported that he liked his new "hood." (Dkt. Nos. 46-1 at ¶ 24; 48 at ¶¶ 20 and 23.) Plaintiff had also told Marinelli he liked his current housing situation at a private mental health interview on December 15, 2009. (Dkt. Nos. 46-1 at ¶ 25; 48 at ¶ 29; 48-1 at 53.)

However, in a January 13, 2010, letter to Defendant Kemp, a Licensed Clinical Social Worker employed by the NYS OMH as Unit Chief for the CNYPC mental health unit at Upstate, Plaintiff complained of being taken off the medication he was on when he arrived at Upstate, and that despite really trying, he was having a lot of symptoms of mental illness and couldn't keep living like that. Plaintiff claimed that he tried to talk to Marinelli, "but he thinks it's a game or something." Plaintiff asked Kemp to change his therapist to someone who would treat his mental health issues rather than treating them like a joke. (Dkt. Nos. 1 at ¶ 20; 27-1 at 10.) Plaintiff claims to have received no reply from Kemp, and Defendants have not referenced the letter in their statement of material facts. (Dkt. Nos. 1 at ¶ 20; 46.) According to Plaintiff,

---

[11] According to Marinelli, PIMS stands for "Progressive Inmate Movement System," established for the standardization of a system of progressive advancements for SHU inmates based upon behavioral adjustment. (Dkt. No. 48 at ¶ 20 n.3.)

every time he wrote to Kemp, Marinelli would appear at his cell door and warn him against writing the complaints and telling him "not to go over his head." (Dkt. No. 1 at ¶ 20.)

On January 25, 2010, Plaintiff refused to attend his private interview with Marinelli, and Marinelli noted that termination of Plaintiff's mental health services should be considered based upon his stability and lack of reported or observed mental health concerns. (Dkt. Nos. 46-1 at ¶ 28; 48 at ¶ 24; 48-1 at 55.) Marinelli thereafter had a cell-side meeting with Plaintiff on January 29, 2010, and noted that no mental health concerns were reported or observed. (Dkt. Nos. 46-1 at ¶ 29; 48 at ¶ 25; 48-1 at 56.) Marinelli and Plaintiff discussed whether mental health treatment should be discontinued, and according to Marinelli, Plaintiff wanted to wait a month before discontinuing services. *Id.* Marinelli had cell-side visits with Plaintiff on February 18, 2010, February 25, 2010, March 16, 2010, and March 30, 2010. (Dkt. Nos. 46-1 at ¶¶ 31-34; 48 at ¶¶ 27-30; 48-1 at 58-61.) According to Marinelli, Plaintiff denied any mental health issues, and Marinelli did not observe any mental health concerns. *Id*.

On March 30, 2010, Marinelli prepared Termination Transfer Notes recommending that Plaintiff be terminated from OMH service and a Treatment Needs/Service Level Designation recommending that Plaintiff's Mental Health Level be changed to Level 6. (Dkt. Nos. 46-1 at ¶¶ 35-36; 48 at ¶¶ 31-32; 48-1 at 11, 62.) Kemp reviewed the recommendation and Plaintiff's mental health records and approved the change in Mental Health Level and Plaintiff's removal from OMH services. (Dkt. Nos. 46-1 at ¶ 37; 47 at ¶ 42; 47-1 at 11.) Even after Plaintiff's termination from the OMH caseload, he continued to receive regular mental health evaluations by OMH staff every ninety days due to his SHU placement. (Dkt. Nos. 46-1 at ¶ 42; 48 at ¶ 39; 48-1 at 3-6.)

On March 22, 2010, prior to the termination, Plaintiff had written to Kemp, identifying the subject of the letter as "I want to know why you are trying to ruin my life worse than it already is." (Dkt. Nos. 1 at ¶ 22; 27-1 at 9.)  In the letter, Plaintiff asked why every time he wrote to Kemp complaining about Marinelli, Marinelli would show up bragging that Kemp had given him a copy of the letter. (Dkt. No. 27-1 at 9.)  He asked Kemp why he couldn't help him to see a doctor so he could get some medication to stop the voices in his head and told him that when he talked to Marinelli about seeing a doctor, he laughed in his face. *Id.*  Again, according to Plaintiff, he received no reply or visit from Kemp regarding the letter. (Dkt. No. 1 at ¶ 20.)  The letter is not referenced in Defendants' statement of material facts.  (Dkt. No. 46-1.)

On May 3, 2010, Plaintiff wrote to NYS Commissioner of Mental Health Michael Hogan ("Commissioner Hogan" or "Hogan") explaining that the only reason he was bothering him was that Kemp either wouldn't reply to his letters or would keep sending Marinelli to his cell to harass him about writing to Kemp.  (Dkt. Nos. 1 at ¶ 21; 27-1 at 8.)  Plaintiff explained to Hogan that he had a long history of mental health problems and taking medication.  Plaintiff told Hogan that his medication had been taken away, and he felt himself slipping back into mental illness.  Plaintiff also complained of hearing people talking and not knowing if the voices were real or in his head.  (Dkt. No. 27-1 at 8.)  Hogan did not reply.  (Dkt. No. 1 at ¶ 21.)  The letter is not referenced in Defendants' statement of material facts.  (Dkt. No. 46-1.)

Marinelli conducted a SHU 90-day mental health examination of Plaintiff on June 3, 2010, which confirmed that his Mental Health Level was 6, and that he did not require mental health services at that time.  (Dkt. Nos. 46-1 at ¶ 38; 48 at ¶ 34; 48-1 at 3-4.)  On June 17, 2010, Plaintiff wrote a second letter to Kemp informing Kemp that he had written to his boss about the

conditions in SHU and the fact that Kemp and Marinelli had refused to treat mentally ill inmates or let them see mental health doctors.  (Dkt. Nos. 1 at ¶ 20; 27-1 at 13.)  Kemp did not reply.  (Dkt. No. 1 at ¶ 20.)  The letter is not addressed in Defendants' statement of material facts.  (Dkt. No. 46-1.)

Plaintiff claims that on August 30, 2010, he used a piece of metal to cut his arms, and when Plaintiff showed Marinelli, he said "they don't look that bad," and told Plaintiff to run some water on the cuts and he would be fine.  (Dkt. No. 1 at ¶ 22.)  Plaintiff claims that he started screaming and Marinelli just walked away.  *Id*.  Plaintiff wrote to Kemp the same day.  In the letter, Plaintiff told Kemp that he had attempted suicide by cutting his arms open, and Marinelli laughed when he showed him.  (Dkt. Nos. 1 at ¶ 20; 27-1 at 13.)  Plaintiff asked Kemp to arrange for him to talk to someone other than Marinelli and informed Kemp that the next time he tried suicide, he would not just cut himself but would hang himself and make no mistakes.  *Id*.  Kemp did not respond.  (Dkt. No. 1 at ¶ 20.)  The letter is not referenced in Defendants' statement of material facts.  (Dkt. No. 46.)  Marinelli denies the incident occurred and claims that if it had, he would not have responded in the manner Plaintiff has alleged.  (Dkt. Nos. 46-1 at ¶ 36; 48 at ¶ 36.)  Plaintiff's mental health records, which have been submitted by Defendants, include no reference to the suicide attempt Plaintiff claims to have made.  (*See* Dkt. Nos. 47-1 and 48-1.)

On September 10, 2010, Marinelli conducted another SHU 90-day mental health evaluation of Plaintiff, which confirmed that Plaintiff's Mental Health Level remained at Level 6 and did not require any mental health treatment at that time.  (Dkt. Nos. 46-1 at ¶ 39; 48 at ¶ 35; 47-1 at 5-6.)  On September 21, 2010, Plaintiff wrote a second letter to Hogan.  (Dkt. Nos.

1 at ¶ 21; 27-1 at 7.)  In the letter, Plaintiff asked Hogan to come visit Upstate to see what was going on and to help him.  According to Plaintiff, the inmates on the mental health caseload were off their medications and were screaming, banging, and throwing things.  Plaintiff claimed to be unable to sleep, or eat, and told Hogan that when the mental health staff came around, including Marinelli, they just laughed at everyone and didn't try to talk or do anything about the situation.  *Id*.  Hogan did not respond.  (Dkt. No. 1 at ¶ 21.)  There is no reference to the letter in Defendants' statement of material facts.  (Dkt. No. 46-1.)

Plaintiff wrote to Kemp again on October 14, 2010.  (Dkt. Nos. 1 at ¶ 20; 27-1 at 12.)  In the letter, Plaintiff told Kemp that he had been reading and found out that Kemp and his friends had been violating the law by not treating people for their mental illnesses, and that he planned to sue him.  Plaintiff wrote that he could not understand how people could look at a person like him as the scum of the earth but see Kemp as a good guy   that he would never treat people the way Kemp did.  (Dkt. No. 27-1 at 12.)  Kemp did not reply.  (Dkt. No. 1 at ¶ 20.)  There is no reference to the letter in Defendants' statement of material facts.  (Dkt. No. 46-1.)

On November 8, 2010, Plaintiff sent a formal complaint against Marinelli to Hogan  "as outlined in NYCRR § 701.2(A), (C), (E)," and requested that Hogan follow the regular procedure of the Grievance Committee.  (Dkt. Nos. 1 at ¶ 21; 27-1 at 5.)  In the letter, Plaintiff referenced his previous complaints to Hogan of May 3 and September 21, 2010, and Hogan's failure to take action.  (Dkt. No. 27-1 at 5.)  The gist of Plaintiff's complaint against Marinelli was that Plaintiff disclosed his long history of mental illness and that the parole board had informed him he needed to take a mental health unit program before he could be released.  *Id*.  Marinelli said he had reviewed Plaintiff's file and would help him.  *Id*.  Instead, Plaintiff was

taken off his medication and received no treatment at all. *Id.* Plaintiff described the single cell SHU section where he was housed as being filled with mentally ill inmates who were not being treated by the mental health staff and were banging and screaming all night, cutting themselves, smearing feces, and refusing to eat. *Id.* Plaintiff informed Hogan of the letters he had sent to Kemp with no response, and that Marinelli had done nothing to improve the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) The formal complaint is not referenced in Defendants' statement of material facts. (Dkt. No. 46-1.)

Plaintiff was transferred from Upstate to Clinton Correctional Facility on November 15, 2010. (Dkt. Nos. 46-1 at ¶ 40; 48 at ¶ 37.) At that time, Plaintiff's Mental Health Level was still 6, and he did not require any mental health services. *Id.*; Dkt. No. 48-1 at 1.

## B. Healy[12]

According to Plaintiff, in the early morning of October 21, 2010, he made a rope from his sheets and hanged himself in the shower. (Dkt. No. 1 at ¶ 23.) In his Complaint, Plaintiff alleged that Healy and two other corrections officers entered Plaintiff's cell and cut him down and then began beating him with their hands and feet. *Id.* Plaintiff begged them to stop. *Id.* Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. *Id.* Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24.

---

[12] Defendant Healy seeks summary judgment solely on failure to exhaust grounds and has submitted no factual evidence with regard to Plaintiff's Eighth Amendment claim against him. (*see* Dkt. No. 46-1 at ¶¶ 82-86, 88.) The background facts included herein are from Plaintiff's verified Complaint.

**C.  Plaintiff's Alleged Lack of Proper and Adequate Dental Care**

On August 29, 2010, while eating breakfast, one of Plaintiff's teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth.  (Dkt. No. 1 at ¶ 48.)  Plaintiff claims that he thereafter submitted a number of sick call slips to the dental department requesting assistance and sent letters to Defendant Miller, a dentist at Upstate, asking for help on September 6 and 14, 2010.[13]  *Id*. at ¶ 29.

On October 5, 2010, Plaintiff submitted Grievance No. UST 44009-10, in which he complained that he had been in pain for over a month because of a lost filling and had written to the dental department several times but had not been called out.  (Dkt. Nos. 46-1 at ¶ 74; 49-2 at 4.)  In his Declaration, Dr. Miller has stated that he investigated the claim and determined that no dental call out slips had been received from Plaintiff during that time period, as Plaintiff has claimed (*see* Dkt. No. 1 at ¶ 49), but made no mention of Plaintiff's September 6 and 14, 2010, letters.[14]  (Dkt. Nos. 46-1 at ¶ 75; 49 at ¶ 19.)

Prior to filing the grievance, Plaintiff had gone to a dental appointment on September 29, 2010.  (Dkt. Nos. 1 at ¶ 50; 46-1 at ¶ 51; 49 at 3.)  When he arrived for the appointment, he learned from the hygienist that he was there for a cleaning, not to treat his lost filling and cracked tooth.  (Dkt. No. 1 at ¶ 50.)  Plaintiff's dental records confirm his claim that he

---

[13]  Copies of the letters, which were identified as exhibits in the Complaint were submitted by Plaintiff in opposition to Defendants' earlier motion to dismiss and are considered herein as a part of Plaintiff's Complaint.  (Dkt. Nos. 1 at ¶ 49; 27-1 at 31-32.)

[14]  In its denial of Plaintiff's grievance, the Internal Grievance Resolution Committee wrote "Grievant should write to the Dental Dept. and address his concerns and to be scheduled. writing to the IGRC isn't the proper procedure to obtain an appt."  (Dkt. No. 49-2 at 3.) The Committee appears to have made no reference to the September 6 and 14, 2010, letters Plaintiff claims to have sent to Miller.  *Id*.; Dkt No. 27-1 at 31-32.

informed the dental hygienist of the lost filling at the September 29th appointment, and Miller

acknowledges that Plaintiff's dental records reflect that he informed the hygienist about the lost

filling, and states that Plaintiff was scheduled for a follow-up appointment on November 3,

2010, to address the lost filling concern. (Dkt. Nos. 46-1 at ¶¶ 51, 53-54; 49 at ¶¶ 10-13; 49-1 at

3.) The hygienist's note did not indicate that Plaintiff complained of pain from the lost filling,

and Dr. Miller has opined that a lost filling without significant pain is not emergent and does not

require immediate dental treatment. (Dkt. Nos. 46-1 at ¶¶ 78-79; 49 at ¶¶ 22-23.)

On November 3, 2010, Dyer and Corrections Officer Burgess escorted Plaintiff from his

cell for an Alcohol and Substance Abuse Treatment Program ("ASAT") evaluation and a dental

call-out. (Dkt. Nos. 46-1 at ¶¶ 55-56; 51-2 at ¶¶ 6-7.) The ASAT evaluation was to be

conducted in the room next to the block dental office. *Id*. Plaintiff claims that he told Dyer he

wanted to refuse the ASAT call out because he was really in pain and couldn't eat or sleep and

really needed to see the dentist. (Dkt. No. 1 at ¶ 55.) Dyer is alleged to have told Plaintiff that

he made the rules, and the rules were that if Plaintiff refused one call out, he refused both. (Dkt.

No. 1 at ¶ 56.) Dyer denies that Plaintiff ever told him he was in pain or that he wanted to skip

the ASAT evaluation in order to see the dentist sooner. (Dkt. Nos. 46-1 at ¶ 57; 51-2 at ¶ 8.)

Plaintiff was placed in a holding pen, and while he was waiting to see the dentist, Dyer

escorted him to the ASAT evaluation. (Dkt. Nos. 46-1 at ¶¶ 58-59; 51-2 at ¶ 10.) After the

ASAT evaluation, Plaintiff was returned to the holding pen to wait for the dentist. (Dkt. Nos.

46-1 at ¶ 60; 51-2 at ¶ 11.) According to Dyer, while Plaintiff was waiting in the holding pen,

he began yelling at the dental escort that he was going to be seen next by the dentist. (Dkt. No.

46-1 at ¶ 61; 51-2 at ¶ 12.) Plaintiff claims that when a corrections officer tried to take Plaintiff

to see the dentist, Dyer waived him away and told Plaintiff if he made it into the dentist at all he would be last, and he might not get in there at all. (Dkt. No. 1 at ¶ 57.) Dyer contends that he did not threaten Plaintiff in any way, and the only thing he said to him was "Jones, stop causing a disturbance," when Plaintiff was yelling at the dental escort. (Dkt. Nos. 46-1 at ¶¶ 62-63; 51-2 at ¶ 13.)

According to Dyer, Santamore spoke to the dentist, who said he had priority cases ahead of Plaintiff. (Dkt. Nos. 46-1 at ¶ 64; 51-2 at ¶ 14.) Plaintiff was told to quiet down or he would be returned to his cell, and when he continued to yell and create a disturbance, Santamore ordered Plaintiff returned to his cell. (Dkt. Nos. 46-1 at 65-66; 51-2 at ¶ 16.) Dyer claims he had no interest or intent in interfering with Plaintiff's dental care and was only complying with Santamore's order in taking Plaintiff back to his cell. (Dkt. Nos. 46-1 at ¶¶ 67-68; 51-2 at ¶¶ 17-19.) Dyer does not address Plaintiff's execution of a Refusal of Medical Examination And/Or Treatment with regard to the dental work he was supposed to have done on November 3, 2010, or the notation by Plaintiff "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but corrections staff refuse to let me see dental staff." (Dkt. Nos. 46-1 at ¶ 70; 49-1 at 6.) Plaintiff claims that it was dismissed Defendant Burgess who demanded Plaintiff sign the dental form and go back to his cell or he would be seeing more than the dentist with a visit to the facility hospital. (Dkt. No. 1 at ¶ 59.) According to Dr. Miller, he did not see Plaintiff on November 3, 2010, and was not involved in obtaining the refusal signed by Plaintiff. (Dkt. Nos. 46-1 at ¶ 72; 49 at ¶ 16.)

Plaintiff's tooth was not fixed before he left Upstate, but according to Plaintiff, he was seen by dental approximately a week after being transferred to Clinton and received a temporary

filling.  (Dkt. No. 1 at ¶ 63.)

IV.    **ANALYSIS**

A.    **Exhaustion of Administrative Remedies with Regard to Claims Against Defendants Healy, Marinelli, and Kemp**

Defendants Healy, Marinelli, and Kemp seek summary judgment dismissing Plaintiffs' Eighth Amendment claims against them on the ground that Plaintiff failed to exhaust his administrative remedies.  (Dkt. Nos. 46-2 at 4-7; 46-4 at ¶¶ 11-12.)  The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be brought with respect to prison conditions under § 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

1.    DOCCS Internal Grievance Program

In New York State prisons, DOCCS has a well-established three-step Internal Grievance Program ("IGP").  *See* N.Y. Comp. Codes R. & Regs. ("NYCRR")  tit. 7, Part 701 (2013); (Dkt.

Nos. 46-1 at ¶¶ 82-84; 46-4 at ¶¶ 4-6.)  The first step requires an inmate to file a grievance complaint with the facility's IGP clerk within twenty-one days.  *Id.* at § 701.5(a).  If there is no informal resolution, the Inmate Grievance Resolution Committee ("IGRC") holds a hearing.  *Id.* at § 701.5(b)(2).  If the grievance is denied by written decision of the IGRC, *id.* at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id.* at 701.5(c)(1).  The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility.  *Id.* at § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Review Committee ("CORC") for a decision under the process applicable to the third step.  *Id.* at 701.5(c)(3)(i).  The third step is an appeal to CORC, *id.* at 701.5(d)(1)(i), which issues a written decision.  *Id.*  at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies.  *Woodford*, 548 U.S. at 93.  Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies.  *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14-15 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

An exhaustion review does not end when defendants are found to have met the burden of establishing a plaintiff's failure to exhaust.  "Once a defendant has adduced reliable evidence

that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York*, 380 F. 3d 680, 686 (2d Cir. 2004)]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff.

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility." *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray*, 2010 WL 1235591, at *5 & n.26 (collecting cases).

Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified.[15] *Hemphill*, 380 F.3d at 686. "Special circumstances" have been

---

[15] Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo*, 548 U.S. 81 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id*. at 83-84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id*. at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as

found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

### 2. Exhaustion as to Healy

Plaintiff's allegations with respect to his Eighth Amendment deliberate indifference and excessive force claims against Healy are set forth in paragraphs 23 and 24 of his Complaint. (Dkt. No. 1 at ¶¶ 23-24.) Plaintiff has alleged in his Complaint that he "used the prisoner grievance procedure available at Upstate on 1/13/10 to exhaust all remedies all remedies were exhausted on 10/14/10 for issues in paragraph # 23 and # 24." (Dkt. No. 1 at ¶ 66.) The dates provided by Plaintiff make no sense given that Plaintiff's claims against Healy arise out of an incident that allegedly occurred on October 21, 2010. *Id*. at ¶¶ 23-24. Furthermore, as discussed below, the documentary evidence in the summary judgment record establishes that Plaintiff never appealed a grievance arising out of that incident to CORC. (Dkt. Nos. 46-1 at ¶ 88; 46-4 at ¶ 12 and 4.)

Jeffrey Hale (Hale"), Assistant Director of the IGP, is the custodian of records maintained by CORC, which renders the final administrative decisions under the DOCCS IGP.

---

to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews*, 655 F.3d 89, 102-03 (2d Cir. 2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

(Dkt. No. 46-4 at ¶ 2.)  According to Hale, the issues alleged in Plaintiff's Complaint are proper

subjects for grievances under the DOCCS IGP.  (Dkt. Nos. 46-1 at ¶ 86; 46-4 at ¶¶ 8-9.)

DOCCS Directive # 4040 stipulates that when an inmate appeals a grievance to CORC, it is

DOCCS' policy to maintain grievance files for the current year and four prior years.  (Dkt. Nos.

46-1 at ¶ 85; 46-4 at ¶ 7.)  CORC maintains records in accordance with that policy and, in fact,

the CORC computer database contains records of all appeals of grievances received from the

IGP Supervisor, as well as those reviewed under the expedited procedure at § 701.8, since 1990.

*Id.*  Hale conducted a diligent search for appeals filed by Plaintiff based on grievances filed at

the facility level and has submitted true and correct copies of records maintained by CORC

which show that Plaintiff did not appeal any grievance filed under §§ 701.5 or 701.8 claiming he

was denied adequate mental health treatment or subjected to excessive force by Healy while he

was confined at Upstate.[16]  (Dkt. Nos. 46 at ¶ 87; 46-4 at ¶ 11 and 4.)  Inasmuch as Plaintiff has

failed to complete all of the steps of the DOCCS IGP with regard to his Eighth Amendment

claim against Healy for deliberate indifference to his serious mental health needs and excessive

force, he has failed to exhaust his administrative remedies.  *See Woodford*, 548 U.S. at 90

(PLRA requires a plaintiff to complete all of the steps of the applicable IGP and to do so

properly to exhaust administrative remedies).

Plaintiff fairs no better under the three-part *Hemphill* inquiry.  As to the first question,

New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA."  *Taylor v.*

*Chalom*, No. 9:10  CV  1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U.S. Dist. LEXIS

---

[16]  Defendants have submitted the grievance files on the grievances listed as having been appealed to CORC by Plaintiff (Dkt. No. 46-4 at 4) so that the Court has been able to ascertain that none of them involved Plaintiff's claims against Healy.  *Id*. at 8-77.

150512, at *12 (N.D.N.Y. Dec. 13, 2011). That the grievance procedure was made available to, and actually used by, Plaintiff during his incarceration, is clear from his history of grievances revealed by Hale, and the grievance Plaintiff filed regarding his lost filling. (Dkt. Nos. 46-1 at ¶¶ 74, 82-85; 46-4 at 6-77; 49-2 at 4.)

Furthermore, there is no evidence in the record that Healy interfered in any way with efforts by Plaintiff to file a grievance against him under the IGP and, therefore, no basis for an estoppel. Third, the record is devoid of evidence of "special circumstances" excusing Plaintiff's failure to exhaust. To the contrary, Plaintiff has alleged in conclusory fashion in his Complaint that he did exhaust. *See Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (conclusory assertions are not enough to avoid summary judgment when the movant has set out a documentary case).

Therefore, the Court finds that Plaintiff has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims against Defendant Healy and recommends that Healy be granted summary judgment on that ground.

3.    Exhaustion as to Marinelli and Kemp

In his Complaint, Plaintiff has alleged that he filed complaints regarding his claims against Marinelli and Kemp with the OMH all the way up the chain to the OMH Commissioner. (Dkt. No. 1 at ¶ 65.) Although Plaintiff alleged that he also filed a grievance with Upstate, presumably under the IGP, and appealed the results to be sure exhaustion was complete, Hale's search of CORC records revealed no appeal by Plaintiff of a grievance complaining of his mental health treatment by Marinelli and Kemp. (Dkt. Nos. 1 at ¶ 65; 46-1 at ¶ 87; 46-4 at ¶ 11 and 4.) Therefore, the Court finds that Plaintiff did not exhaust his claims against Marinelli and

Kemp under the IGP. *See Woodford*, 548 U.S. at 90.

That, however, does not end the Court's inquiry on the exhaustion because issues remain

as to whether administrative remedies were in fact available to Plaintiff under the IGP with

respect to his claims against Marinelli and Kemp[17] and whether there were special

circumstances excusing exhaustion. *See Hemphill*, 380 F.3d at 686.

Plaintiff was questioned at his deposition[18] as to whether he filed a grievance against

Marinelli:

> Q. Did you file any grievances against Mr. Marienelli (sic)?
>
> A. I think I did, yes.
>
> Q. Okay.
>
> A. I'm pretty sure I did. Or - - because also, when you're dealing with M.H.U., you can't really grieve them. You have to write a complaint through - -
>
> Q. To the medical - -.
>
> A. - - to the mental health department.
>
> Q. Right. Right. So the mental health issues go to mental health and the medical issues go to the medical director.
>
> A. Go to medical, right.
>
> Q. Yes, okay.

---

[17] As noted above, Defendants have the burden of showing that the administrative remedy was actually "available" to Plaintiff. *See Murray*, 2010 WL 1235591, at *4.

[18] Defendants submitted Plaintiff's deposition transcript in support of their summary judgment motion. (Dkt. No. 46-3.)

A. So even though you could write it, but its not going to get anywhere. So you have to    they tell you

Q. That's why you wrote to Kemp?

A. Kemp, exactly.

Q. Yup. Okay.

A. That's the whole reason why, because you know, even they    they're not even allowed to discuss your mental health file with the grievance people because of confidentiality. So that's kind of like a catch twenty-two.

Q. So you complained to Kemp because, as you understood it, that's the proper process?

A. Right.

(Dkt. No. 46-3 at 35-36.)

In determining whether administrative remedies are available to a particular inmate, a court should "be careful to look at the applicable set of grievance procedures, whether city, state, or federal." *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004) (citation and internal quotation marks omitted). Administrative remedies are not available "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint.*" Booth v. Churner*, 532 U.S. 731, 736 (2001).

Hale has described Plaintiff's Eighth Amendment claims against Marinelli and Kemp as the "proper subject for DOCCS grievance procedures as outlined under 7 NYCRR § 701.1 et seq." (Dkt. No. 46-4 at ¶ 9.) However, both Marinelli and Kemp are OMH, not DOCCS employees, and § 701.3(f) provides:

(f) Outside agencies excluded.

> Any policy, regulation or rule of an outside agency (e.g., the division of parole, immigration and customs enforcement, the office of mental health, etc.) or action taken by an entity not under the supervision of the commissioner is not within the jurisdiction of the IGP.

7 NYCRR, § 701.3(f).

Grievances involving actions taken by OMH have in at least some instances been determined by DOCCS to be outside the jurisdiction of the DOCCS IGP based upon § 701.3(f). *See, e.g., Westmoreland v. Conway*, No. 07-CV-104(Sr.), 2009 WL 2991817, at * 3-4, 2009 U.S. Dist. LEXIS 83993, at * 9-10 (W.D.N.Y. Sept. 15, 2009) (plaintiff's allegation that his grievance was dismissed because the IGRC lacked authority over the OMH found to comport with 7 NYCRR § 701.3(f)); *Christian v. Goord*, No. 9:03-CV-901 (FJS/GJD), 2006 WL 1459805, at * 5, 2006 U.S. Dist. LEXIS 32143 (N.D.N.Y. May 22, 2006) (both the IGRC and Superintendent on appeal concluding that the OMH is outside the purview of DOCCS and the IGP).

Given the foregoing, the Court cannot conclude that administrative remedies under the IGP were available to Plaintiff with regard to his claims against OMH employees Marinelli and Kemp, or that Plaintiff's understanding that the IGP did not apply to OMH employees did not constitute a special circumstance excusing failure to exhaust, and recommends that Marinelli and Kemp be denied summary judgment on exhaustion grounds.

**B.** **Merits of Plaintiff's Eighth Amendment Claim Against Marinelli and Kemp**

Defendants Marinelli and Kemp also seek summary judgment on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual

punishments. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). The requirement extends to adequate mental health care. *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble*, [429 U.S. 97, 104 (1976)], that it must be provided to prisoners."); *Guarneri v. Hazzard*, No. 9:06-CV-985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U.S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar. 22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

To state a claim for denial of medical or mental health care, a prisoner must demonstrate (1) a serious medical (mental) condition, and (2) deliberate indifference. *Farmer*, 511 U.S. at 834-35; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("*Hathaway I*"). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). A "serious medical condition" has been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I,* 37 F.3d at 66; *Chance v. Armstrong*, 143 F.3d 698*,* 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143

31

F.3d at 702-03.

The second prong is a subjective standard. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id*. at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) ("*Hathaway II*"). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")

The record evidence does not support Plaintiff's claim that he suffered from a serious

mental illness during his time at Upstate.[19]  Furthermore, even though Plaintiff was deemed to

have some degree of mental illness during at least a part of his time at Upstate, given the

evidence of the mental health treatment Plaintiff received from OMH during his time there, no

reasonable jury could find that either Marinelli or Kemp had been deliberately indifferent to

Plaintiff's mental health issues and treatment needs.[20]  *See Selevan v. N.Y. Thruway Auth.*, 711

F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmovant fails

to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or

her favor on an essential element of a claim") (internal quotation marks omitted).

Plaintiff arrived at Upstate with a diagnosis of ASPD, a prescription for Topamax, a

Mental Health Level of 3, and a Transfer Progress note from Great Meadow stating his mental

status was alert and oriented, with no evidence of a thought disorder, and a generally neutral and

stable mood.  (Dkt. Nos. 46-1 at ¶¶ 2-11; 47-1 at ¶¶ 5-16.)  When Plaintiff was seen by Marinelli

for a mental health assessment less than a week after his arrival at Upstate in September of 2009,

Marinelli observed no mental health concerns or issues.  (Dkt. Nos. 46-1 at ¶ 12; 48 at ¶ 12.)

Marinelli nonetheless placed Plaintiff on "active status" so he would continue to received

---

[19]  Plaintiff's letters to Kemp and Hogan regarding his mental health problems and alleged lack of proper care, with the exception of his complaints about Marinelli's reaction to his alleged suicide attempt discussed below, were far too general and conclusory to create an issue of material fact as to the seriousness of his mental health issues in light of the mental health records submitted by Defendants.  (Dkt. No. 27-1 at 5-13.)

[20]  A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference.  *Chance v. Armstrong*, 143 F.3d at 703.  Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment support a constitutional claim.  *Sonds v. St. Barnabas Hosp. Correc. Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986).

OMH services and continued to see Plaintiff either cell-side or for a private therapy session on a regular basis until he was terminated from service on March 30, 2010, with Kemp's approval, after Plaintiff had denied the need for services and his Mental Health Level had been upgraded to a Level 6. (Dkt. Nos. 46-1 at ¶¶ 13-17, 19-36; 47-1 at 1; 48 at ¶¶ 30-33.) During that time, Plaintiff generally reported no mental health issues or concerns, and Marinelli reported that he observed no evidence of mental health issues. *Id.* Marinelli's notes are largely in accord with Dr. Wurzberger's positive assessment of Plaintiff's mental status on October 9, 2009, when he, not Marinelli or Kemp as Plaintiff claims, took Plaintiff off Topamax. (Dkt. Nos. 46-1 at ¶¶ 18-19, 43-44.)

Even after Plaintiff's OMH services were terminated, Marinelli continued to do SHU 90-day mental health evaluations, which confirmed that Plaintiff's Mental Health Level remained at Level 6 from March 30, 2010, until his transfer to Clinton on November 15, 2010. (Dkt. No. 46-1 at ¶¶ 38-40; 47-1 at 1; 48 at ¶¶ 34-35, 37.)

While Plaintiff claims that Marinelli responded to his attempt at suicide by cutting his arms with a piece of metal by telling him it did not look too bad and to run water on the cuts (Dkt. No. 1 at ¶ 22), Marinelli denies the incident ever occurred, and there is no evidence of such an incident in Plaintiff's mental health records. (Dkt. Nos. 46-1 at ¶ 36; 48-1 at 1-118.) Even assuming, *arguendo*, that the incident did occur, Plaintiff has failed to present evidence that the cuts he inflicted were severe enough to cause serious injury or constitute what could reasonably have been construed by Marinelli as a serious attempt at suicide, and that Marinelli showed deliberate indifference.

In light of the foregoing, the Court recommends that Defendants Marinelli and Kemp be

granted summary judgment on the merits on Plaintiff's Eighth Amendment medical indifference claim.

C.     **Eighth Amendment Claim Against Dyer**

Plaintiff claims that Defendant Dyer, a corrections officer, showed deliberate indifference to his serious dental needs by preventing him from seeing the dentist for his lost filling on November 3, 2010.  (Dkt. No. 1 at ¶¶ 55-58.)  Although medical deliberate indifference claims are most-often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs, in this case dental needs, when a plaintiff proves that "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin*, No. 92 Civ. 0622 (LAP), 1994 WL 519902, at * 11, 1994 U.S. Dist. LEXIS 13409, at * 31 (S.D.N.Y. Sept. 22, 1994) (citations and internal quotation marks omitted), *aff'd*, 52 F.3d 310 (2d Cir. 1995) (table); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (same).

The record evidence shows that on November 3, 2010, Dyer was tasked with escorting Plaintiff to an ASAT evaluation and an appointment with the dentist to have his lost filling addressed.  (Dkt. Nos. 1 at ¶ 55; 46-1 at ¶¶ 55-56; 51-2 at ¶¶ 22-23.)  Dyer took Plaintiff to his ASAT evaluation while Plaintiff was waiting to see the dentist, and after the evaluation returned Plaintiff to the holding pen to wait to see the dentist.  (Dkt. No. 46-1 at ¶¶ 58-60; 51-2 at ¶¶ 10-11.)  There is no evidence in the record indicating that Plaintiff would have seen the dentist any sooner had he not gone to the ASAT evaluation.

According to Dyer, while waiting to see the dentist, Plaintiff created a disturbance by yelling at the dental escort that he was going to be seen next by the dentist and was told to quiet

down or he would be returned to his cell. (Dkt. Nos. 46-1 at ¶¶ 61-63; 51-2 at ¶¶ 12, 16.) At his deposition, Plaintiff admitted that he had started complaining and had called out to the dentist that he needed to see him. (Dkt. No. 46-3 at 53.) Dyer told Plaintiff to "stop causing a disturbance." (Dkt. Nos. 46-1 at ¶¶ 62-63; 51-2 at ¶ 13.)

Corrections Sergeant Santamore spoke to the dentist and was told there were priority cases ahead of Plaintiff. (Dkt. Nos. 46-1 at ¶ 64; 51-2 at ¶ 14.) Plaintiff continued to yell and create a disturbance, and Santamore ordered Dyer to take Plaintiff back to his cell. (Dkt. No. 46-1 at ¶¶ 65-66; 51-2 at ¶ 16.) Dyer followed the order and returned Plaintiff to his cell. (Dkt. No. 46-1 at ¶¶ 67-68; 51-2 at ¶¶ 17-19.)

Even if Dyer was aware that Plaintiff was "really in pain," as Plaintiff has alleged and Dyer has denied (Dkt. Nos. 1 at ¶ 55; 46-1 at 46-1 at ¶ 57; 51-2 at ¶ 8), there is no evidence in the record supporting Plaintiff's claim that Dyer intentionally delayed his access to dental care, or that Dyer was responsible for Plaintiff missing his dental appointment on November 3, 2010. Therefore, the Court recommends that Dyer be granted summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to his serious dental needs.

**D.     Eighth Amendment Claim Against Miller**

Plaintiff claims that Dr. Miller was deliberately indifferent to his serious dental needs in violation of the Eighth Amendment by his failing to attend to a lost filling in a timely manner. (Dkt. Nos. 1 at ¶¶ 49, 76.) Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate indifference from Miller. *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000); *Chance*, 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to

treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Chance*, 143 F.3d at 702 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).  Specifically, "[a] cognizable claim regarding inadequate dental care . . . can be based on various factors, such as the pain suffered by the plaintiff . . . the deterioration of the teeth due to a lack of treatment . . . or the inability to engage in normal activities." *Chance*, 143 F.3d at 703 (citations omitted); *see also Berry v. Wright*, No. 04-CV-0074(Sr.), 2011 WL 231626, at *5, 2011 U.S. Dist LEXIS 6347, at * 12-13 (W.D.N.Y. Jan. 24, 2011) ("[a]lthough delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation, . . . a prisoner can state a claim of deliberate medical indifference under section 1983 if 'the delay was deliberate and that it caused him to suffer unnecessary and wanton infliction of pain.'") (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay . . . in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay . . . in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Washington v. Farooki*, No. 9:11-CV-1137 (TJM), 2013 WL 3328240, at *6, 2013 U.S. Dist. LEXIS 92623, at *16 (N.D.N.Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk*, No. 11-CV-586 (SJF)(ETB), 2012 WL 2921180, at *3, 2012 U.S. Dist. LEXIS (E.D.N.Y. July 11, 2012)).

Dr. Miller has opined that "the loss of a filling without significant pain is not an emergent situation and does not require immediate dental treatment."  (Dkt. Nos. 46-1 at ¶ 79; 49 at ¶ 23.) In this case, however, Plaintiff claims that the lost filling caused him a great deal of pain, left him

unable to eat out of one side of his mouth, and prevented him from sleeping. (Dkt. Nos. 1 at ¶ 48; 27-1 at 31-32; 49-2 at 4.) There is no evidence to the contrary in the summary judgment record. Plaintiff lost the filling on August 29, 2010, was not scheduled to have the lost filling addressed by the dentist until November 3, 2010, more than two months later, and ultimately did not have the lost filling taken care of until shortly after he was transferred to Clinton on November 15, 2010. (Dkt. Nos. 1 at ¶¶ 48, 63; 46-1 at ¶¶ 54, 72.) Even assuming without deciding that the great pain and problems with eating and sleeping Plaintiff claims resulted from the lost filling, when considered with the delay in treatment, constituted a serious dental condition, Dr. Miller is entitled to summary judgment because the record evidence does not show deliberate indifference on his part. *See Hunt*, 865 F.2d at 200 (deliberate indifference where the delay was deliberate and caused plaintiff to suffer unnecessary and wanton infliction of pain).

The note in Plaintiff's dental records from his September 29, 2010, cleaning, which Miller acknowledged seeing noted only that Plaintiff had complained of a lost filling and said nothing about being in pain as a result. (Dkt. Nos. 46-1 at ¶ 51; 49-1 at 3.) Because in Miller's opinion, absent a report of significant pain, the lost filling was not emergent (Dkt. Nos. 46-1 at 79; 49 at ¶ 23), failure to schedule an appointment to fix the tooth until November 3, 2010, does not show culpable recklessness on his part. *See Hathaway II*, 99 F.3d at 553.

While Plaintiff claims to have submitted a number of sick call slips to the Dental Department requesting assistance, Miller investigated Plaintiff's chart in response to an October 5, 2010, grievance filed by Plaintiff and determined that no call-out slips from Plaintiff had been received by the Dental Department during the relevant time period. (Dkt. Nos. 46-1 at ¶ 75; 49 at ¶ 19.) Moreover, while Plaintiff also claims to have sent letters of September 6 and September

38

14, 2010, to Miller advising him of his great pain and requesting assistance regarding the lost filling (Dkt. Nos. 1 at ¶¶ 49; 27-1 at 31-32), Dr. Miller has stated in his Declaration that he was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that he ignored. (Dkt. Nos. 46-1 at ¶ 80; 49 at ¶ 24.)  There is no evidence in the record refuting that statement, no evidence that Dr. Miller ever saw the dental slips Plaintiff claims to have submitted or the letters Plaintiff claims to have sent to him.  Given Plaintiff's failure to respond to Defendants' L.R. 7.1 Statement of Material Facts, he is deemed to have admitted that Miller's investigation revealed no call-out slips regarding Plaintiff's lost filling, and Miller was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that was ignored.  (Dkt. Nos. 46-1 at ¶¶ 75, 80; 49 at ¶¶ 19, 24.)

Finally, the evidence shows that an appointment was scheduled for November 3, 2010, for Plaintiff's lost filling to be addressed, and Miller had no part in Plaintiff being returned to his cell before seeing him, or in the execution of the Refusal of Medical Examination and/or Treatment form.  (Dkt. Nos. 46-1 at ¶¶ 67, 72; 49 at ¶ 16; 51-2 at ¶ 17.)  Plaintiff was transferred to Clinton shortly thereafter where his tooth was fixed.  (Dkt. No. 46-1 at ¶ 73; 49 at ¶ 17.)

In light of the foregoing, the Court recommends that Miller be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim against him.

### E.    Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity.  (Dkt. No. 46-2 at 15-18.)  Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

### F.     John Doe Defendants #1-6

Plaintiff has asserted claims against John Doe Defendants # 1-6 in this action.  There is nothing in the record showing that any of the John Doe Defendants have been identified and served in this lawsuit which was commenced nearly three years ago.  (Dkt. No. 1.)  The discovery completion deadline in the case was January 18, 2014, more than a year ago.  (Dkt. No. 32.)  The Court finds that Plaintiff has had ample time and opportunity to discover the identity of the John Doe Defendants and serve them.  Given Plaintiff's failure to do so, the Court recommends the *sua sponte* dismissal of John Doe # 1-6 from the action for failure to prosecute. *See Delrosario v. City of N.Y*, No. 07 Civ. 2027 (RJS), 2010 WL 882990, at * 5, 2010 U.S. Dist. LEXIS 20923, at * 12 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants."); *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.") (citation and internal quotation marks and punctuation omitted).

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 46) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that Plaintiff's claims against John Doe Defendants # 1-6 be **DISMISSED WITHOUT PREJUDICE** from this action due to Plaintiff's failure to prosecute; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: January 30, 2015
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge



Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
Oct. 4, 2012.

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.
**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[FN1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

> FN1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*
Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[FN2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

> FN2. The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[FN3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

> **FN3.** According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[FN4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances.[FN5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

> **FN4.** Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

> **FN5.** Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
(Cite as: 2012 WL 6935254 (N.D.N.Y.))

mencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[FN6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

> **FN6.** Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was

required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [FN7] *Id.*

> **FN7.** During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Of-

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

ficer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties.[FN8],[FN9]

FN8. The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

FN9. Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

### III. *DISCUSSION*

#### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the

plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[FN10,FN11] *Id.*

> **FN10.** In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

FN11. In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for exam- ple—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

C. *Application of Governing Legal Principles*

1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at *3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at *5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at *4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and co-operate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at * 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at *6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

*8 During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

### IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS RE-PORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.
Bailey v. Fortier
Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
**(Cite as: 2011 WL 231626 (W.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Joseph BERRY, Plaintiff,
v.
Lester N. WRIGHT, et al., Defendants.

No. 04–CV–0074(Sr).
Jan. 24, 2011.

Joseph Berry, New York, NY, pro se.

George Michael Zimmermann, Office of the New
York State Attorney General, Buffalo, NY, for De-
fendants.

### DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties
have consented to the assignment of this case to the
undersigned to conduct all proceedings in this case,
including the entry of final judgment (Dkt.# 24).

### PRELIMINARY STATEMENT

Currently before the Court is the defendants' mo-
tion for summary judgment (Dkt.# 151).

Plaintiff Joseph Berry ("plaintiff") commenced
this *pro se* action pursuant to 42 U.S.C. § 1983 (Dkt.#
1). At all times relevant to the allegations in plaintiff's
complaint, plaintiff was incarcerated in the custody of
the New York State Department of Correctional Ser-
vices ("DOCS"). Defendant Lester N. Wright, M.D.
("Wright"), was assigned to DOCS offices in Albany,
New York; Anthony DePerio, M.D. ("A.DePerio"),

Habib Sheikh, M.D. ("Sheikh"), Robert Takos, M.D.
("Takos"), and Renzo Nylander, D.D.S. ("Nylander"),
were assigned to Wyoming Correctional Facility
("Wyoming"); and Jose DePerio, M.D. ("J.DePerio"),
and Stephen Laskowski, M.D. ("Laskowski") were
assigned to Attica Correctional Facility ("Attica").

Plaintiff's third amended complaint (Dkt.# 121)
alleges that defendants A. DePerio, J. DePerio,
Sheikh, Takos, and Laskowski violated his Eigth
Amendment rights when they were deliberately in-
different to his serious medical needs by failing to
provide him with adequate and appropriate medical
treatment for his diabetes. Compl., ¶¶ 10, 35–36, 40,
47–49, 51. Plaintiff further claims that defendant
Nylander violated his Eighth Amendment rights when
he was deliberately indifferent to his serious medical
needs by failing to provide him with adequate and
appropriate treatment for his dental needs. *Id.,* ¶¶
31–32, 54. Finally, plaintiff asserts that defendants
Wright and J. DePerio, failed to adequately supervise
their subordinates and/or allowed a policy or custom
that permitted various violations of plaintiff's consti-
tutional rights. *Id.,* ¶¶ 18–20, 23–24, 54–55, 65,
67–68. Plaintiff seeks injunctive relief and damages.
*Id.,* ¶¶ 69, 75.

For the reasons that follow, defendants' motion
for summary judgment is granted.

### FACTS

During all time periods relevant to this action,
plaintiff was a sentenced prisoner in the custody of
DOCS. He began serving his sentence in 2000 and
was released in 2007. Statement of Facts ("S.O.F."),
¶¶ 1–2 (Dkt.# 152). Prior to entering DOCS custody,
plaintiff was diagnosed with diabetes and was pre-
scribed medications Glucophage and Glyburide.
S.O.F., ¶¶ 3–4. Also prior to entering DOCS custody,
plaintiff had been diagnosed with temporomandibular

Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
**(Cite as: 2011 WL 231626 (W.D.N.Y.))**

joint disorder ("TMJ"). *Id.,* ¶ 5. Plaintiff maintains that his diabetes was stable from the time of his arrest until he was sent to Five Points Correctional Facility ("Five Points").

In September, 2001, plaintiff was transferred to Wyoming, where he remained until October of 2003. There, he was examined by defendant A. DePerio on October 2, 2001. During his stay at Wyoming, plaintiff was treated by defendants A. DePerio, Sheikh, and Takos. At both Five Points and Wyoming, plaintiff was seen by an endocrinologist for his diabetes. *Id.,* ¶¶ 7–10. Plaintiff was treated by Nylander, a dentist, at Wyoming. *Id.,* ¶ 11.

**\*2** In December of 2003, plaintiff was transferred to Attica. There, plaintiff was treated by defendant Laskowski and another physician who is not a named defendant in this action. *Id.,* ¶¶ 12–13. Defendant J. DePerio was the Medical Director of Attica. *Id.,* ¶ 14.

During plaintiff's time in DOCS custody, defendant Wright was the Chief Medical Officer of DOCS. Plaintiff wrote to defendant Wright regarding his complaints concerning his medical care, and received correspondence back. Plaintiff did not have personal contact with Wright. *Id.,* ¶ 14.

### DISCUSSION AND ANALYSIS
#### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations

omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if

Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
**(Cite as: 2011 WL 231626 (W.D.N.Y.))**

testified to at trial may not properly be set forth in an affidavit).

## II. Eighth Amendment Claims

**\*3** The Eight Amendment's "deliberate indifference" standard consists of both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Under the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

To satisfy the subjective component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 826, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

"[D]eliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired". *Shire v. Greiner,* No. 02 Civ. 6061(GBD), 2007 WL 840472, \* 12 (S.D.N.Y.2007). Instead, plaintiff must establish that defendants "acted with a sufficiently culpable state of mind, i.e., deliberate indifference. Plaintiff must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment". *Tafari v. Stein,* No. 01 CV0841, 2009 WL 331378, \*6 (W.D.N.Y.2009). "[A]llegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness." *Calloway v. Denane,* No. 07–CV–664 (TJM/DRH), 2009 WL 3064781, \*4 (N.D.N.Y.2009).

### A. Defendants A. DePerio, Takos, and Sheikh

Plaintiff first alleges that during his stay at Wyoming, his blood glucose level was persistently poor until his consultation with an endocrinologist, who recommended a treatment plan including daily insulin injections and glucose monitoring. The specialist also recommended follow-up treatments. Compl., ¶¶ 35–40. According to plaintiff, defendants denied plaintiff's follow-up treatments and generally contends that defendants "continu[ed] to administer inadequate medical treatment, causing plaintiff's adverse symptoms to resume." *Id.,* ¶ 40.

**\*4** The record indicates that, upon his arrival at Wyoming, plaintiff was recognized as a non-insulin dependent diabetic suffering from TMJ pain in his right jaw. A. DePerio examined him five days following his arrival at the facility and ordered an American Diabetes Association diet and medication. A. DePerio Decl.,¶ 7. In the following months, plaintiff was seen regularly and his medication and treatment was modified as appropriate. His blood sugar was monitored, and various complaints were reviewed and addressed. *Id.,* ¶¶ 8–55. Plaintiff was examined at least twenty-seven times by either A. DePerio or his

Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
**(Cite as: 2011 WL 231626 (W.D.N.Y.))**

colleagues in the two years he was incarcerated at Wyoming. *Id.,* ¶ 57. Plaintiff was also seen by outside specialists, including an endocrinologist, opthamologist, and dermatologist. *Id.,* ¶¶ 22, 25, 32.

Contrary to plaintiff's assertion, the medical records indicate that Takos followed the recommendations of the endocrinologist, and plaintiff received follow-up care. Takos Decl., ¶ 22–28; Ex. A at 85–86, 88–89, 92, 98.

While district courts in this Circuit have held that diabetes is a sufficiently serious medical condition to meet the objective prong, *see Butler v. Smith,* 07–CV–00431, 2008 WL 4186338, at *4 n. 6 (N.D.N.Y. Sept.10, 2008); *Shabazz v. Lee,* 03–CV–1520, 2007 WL 119429, at *6 (N.D.N.Y. Jan.10, 2007); *Johnson v. Harris,* 479 F.Supp. 333, 337 (S.D.N.Y.1979); *see also Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (recognizing that diabetes is a serious medical condition), plaintiff still does not establish that the defendants acted with a sufficiently culpable state of mind to satisfy the subjective prong of the deliberate indifference standard. The record, which includes plaintiff's own submissions, is clear that the defendants were aware of plaintiff's diabetes and other medical needs, and continuously treated him for those issues. Plaintiff does not allege that the defendants ignored his needs or refused to treat him. While plaintiff may disagree with the decisions made by the defendants in their treatment of him, it is well-settled that an issue of medical judgment is "precisely the sort of issue that cannot form the basis of a deliberate indifference claim." *Hernandez,* 341 F.3d at 147. Plaintiff has not presented any evidence to raise a material issue of fact of negligence, much less deliberate indifference. On this basis, plaintiff's claim is dismissed and the defendants' summary judgment motion is granted.

**B. Defendant Nylander**

Plaintiff next complains that defendant Nylander improperly denied/delayed issuing dentures, filling cavities, performing a root canal, and extracting decayed teeth. Compl. ¶¶ 52–54.

According to Nylander's declaration, plaintiff was seen by Nylander thirty-one times while he was incarcerated at Wyoming. During those visits plaintiff was treated for a variety of symptoms, including pain, TMJ, decay, and abscessed and bleeding teeth. Nylander Decl., ¶ 42.

**\*5** Plaintiff contends, however, that upon examination by an oral surgeon in February 2002, it was recommended that upper and lower partial dentures be fabricated for plaintiff. Pl. Statement of Facts, ¶ 11 (Dkt.# 162); Compl., Ex. A–18. Three months later, on May 3, 2002, defendant Nylander examined plaintiff and noted that "per DOCS policies, Plaintiff was not eligible for partial dentures at this time." Nylander Decl., ¶¶ 12–13. Plaintiff's next examination with Nylander took place on October 8, 2002, in which Nylander performed an oral examination and submitted an application for partial upper and lower dentures. Plaintiff's dentures were approved by the dental clinic on October 17, 2002. *Id.,* ¶¶ 24–25. The three-month gap between October 17, when plaintiff was approved for the dentures, and February 18, 2003, when the upper and lower dentures were actually inserted, was attributable to the time Nylander spent making impressions, examining/preparing plaintiff for the procedure, and fitting plaintiff for the dentures. *Id.,* ¶¶ 26–36. It is worth noting that plaintiff failed to appear for his initial appointment at the dental clinic to make impressions for his dentures. *Id.,* ¶ 26; *see also* Pl. Second Amend. Compl., Ex. A–14 (Dkt.# 47).

"Although delay in providing a prisoner with dental treatment, standing alone, does not constitute an [E]ighth [A]mendment violation," *Hunt v. Dental Dep't,* 865 F.2d 198, 201 (9th Cir.1989), a prisoner can state a claim of deliberate medical indifference under section 1983 if "the delay was deliberate and that it caused [him] to suffer unnecessary and wanton in-

Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
**(Cite as: 2011 WL 231626 (W.D.N.Y.))**

fliction of pain." *Hunt,* 865 F.2d at 201 (internal quotation omitted). Here, plaintiff's allegation that he was subject to a one-year delay in obtaining his dentures is contradicted by the evidence. The three-month time frame in which he was fitted and prepared for the insertion of his dentures is reasonable, and petitioner has failed to allege a material issue of fact that Nylander was deliberately indifferent to plaintiff's dental needs. Summary judgment is therefore granted to defendant Nylander. *See* *Alster v. Goord,* ——F.Supp.2d ——, 2010 WL 3835081 (S.D.N.Y.2010) (no Eighth Amendment violation where seven-month delay before scheduled oral surgery date was reasonable). Summary judgment is therefore granted to defendant on this ground.

### C. Defendants J. DePerio and Laskowski

Plaintiff's next cause of action alleges that defendants J. DePerio and Laskowski delayed/denied access to necessary medical treatment to improve plaintiff's diabetes, that the defendants were aware of plaintiff's symptoms and that neither took the appropriate action "to abate the serious risk to plaintiff's health" while plaintiff was housed at Attica. Plaintiff specifically complains that medications prescribed by Laskowski were ineffective and that J. DePerio failed to train Laskowski to ensure adequate medical care for the plaintiff. Compl., ¶¶ 47–51. Plaintiff also alleges that an informal policy of "giving low priority to the serious medical needs of chronically ill inmates" existed at Attica, and that Laskowski knew of this informal policy and "acquiesced in its application to the plaintiff." *Id.,* ¶ 48–49.

**\*6** Laskowski examined plaintiff four times during plaintiff's stay at Attica, during which Laskowski adjusted plaintiff's insulin dosages and continued to monitor plaintiff's blood sugar. Laskowski Decl., ¶ 6; Ex. A at 153–155, 166–167. Plaintiff was also seen by another physician, a podiatrist, and a nurse or physician's assistant on several occasions during the six months plaintiff was housed at Attica. Laskowski Decl., ¶¶ 7–10.

As stated earlier, a plaintiff cannot sustain a claim of deliberate indifference under section 1983 "when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired". *Shire,* 2007 WL 840472 at * 12 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). The Eighth Amendment does not entitle plaintiff to the treatment of his choice, and Laskowski's care was clearly adequate, even if plaintiff felt that particular medications were less effective than other alternatives. He thus cannot establish that Laskowski was indifferent to plaintiff's chronic diabetes. Moreover, his claim that an "informal policy" of providing inadequate medical care to chronically ill inmates is unfounded. For that reason, plaintiff's assertion that defendant J. DePerio failed to supervise medical staff regarding treatment for his diabetes as a result of "acquiescing" in an alleged policy that gives low priority to chronically ill inmates also fails.

In sum, plaintiff cannot demonstrate that defendants acted with a sufficiently culpable state of mind to meet the deliberate indifference standard. *See* *Hathaway,* 37 F.3d at 66. To the contrary, the record contains numerous progress reports and medical records that demonstrate that Plaintiff received medical treatment for his diabetes at Attica. Based on the record evidence, no reasonable trier of fact could conclude that defendants knew of and disregarded a medical condition that presented an excessive risk to plaintiff's health, and summary judgment is granted to the defendants on this ground. *See id.*

### D. Defendant Wright

Finally, plaintiff contends that Wright, as DOCS Chief Medical Officer, failed to adequately supervise his subordinates and/or allowed a policy or custom that permitted violations of plaintiff's Eighth Amendment rights. Compl., ¶¶ 23–24. Defendant Wright argues that he lacks the requisite personal involvement for plaintiff to maintain a section 1983 claim against him. Def. Mem. at 9.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
(Cite as: 2011 WL 231626 (W.D.N.Y.))

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* ——— U.S. ———, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (May 18, 2009). Thus, it is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *AlJundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873.[FN1]

FN1. At least one district court in this Circuit has opined that the holding in *Iqbal* substantially limited the *Colon* categories. *See Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 W L 1835939, at *6 (S.D.N.Y. June 26, 2009)* ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster .... The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated."); *but see D'Olimpio v. Crisafi,* Nos. 09 Civ. 7283, 09 Civ. 9952, 718 F.Supp.2d 340, 2010 WL 2428128, at *4–*5 (S.D.N.Y. June 15, 2010) ("[T]he five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.").

**\*7** Plaintiff's complaint alleges that Wright failed to train and supervise the plaintiff's treating physicians, set policy for medical care and violated state requirements, was deliberately indifferent to plaintiff's health services grievances, and encouraged subordinates to follow an informal policy of denying prisoner's adequate medical care. Compl., ¶¶ 6, 18–20, 65, 67–68. Plaintiff's allegations, however, are conclusory statements that find no support in his voluminous submissions to the Court. "Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability." *Webster v. Fischer,* 694 F.Supp.2d 163, 179 (N.D.N.Y.2010) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

It appears, then, that Wright is being sued on the sole basis of his position within DOCS. There mere fact that a defendant was part of the prison chain of command, without more, is insufficient to maintain a section 1983 claim. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (to hold a prison official liable under § 1983 "requires a showing of more than the linkage in the prison chain of command"); *Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (holding that "[i]t is not enough to show that a defendant 'ultimately supervised those who allegedly violated plaintiff's Constitutional rights.'" (quoting *Mallard v. Menifee,* No. 99 Civ. 0923, 2000 WL 557262, at *3 (S.D.N.Y. May 8, 2000)).

Further, the evidence set forth by the other de-

Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)
**(Cite as: 2011 WL 231626 (W.D.N.Y.))**

fendants in this action indicates there was no custom or policy to deny inmates with chronic medical conditions proper care and no proof that plaintiff was provided with inadequate care. The crux of plaintiff's complaint is that he disagreed with the course of medical treatment prescribed by his treating physicians. However, plaintiff cannot prevail on a theory of supervisory liability because he has not alleged an underlying Eighth Amendment violation. It is therefore unnecessary to reach the issue of whether plaintiff's allegations show the requisite personal involvement of Wright. *See Bryant v. Wright,* No. 09 Civ. 2456(GBD)(GWG), 2010 WL 3629443, *10 n. 1 (S.D.N.Y. Aug. 31, 2010) (citing *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Reddick v. Lantz,* 2010 WL 1286992, at *6 (D.Conn. Mar.29, 2010) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisory liability."); *Dorsey v. Fisher,* No. 9:09–CV–1011 (GLS)(DEP), 2010 WL 2008966, at *12 (N.D.N.Y. May 19, 2010) (citing cases); *D'Angelo–Fenton v. Town of Carmel,* 470 F.Supp.2d 387, 399 (S.D.N.Y.2007)). Summary judgment is therefore granted to defendant Wright on this basis.

## CONCLUSION

**\*8** For the reasons set forth above, the defendants' motion for summary judgment is hereby granted.

## SO ORDERED.

W.D.N.Y.,2011.
Berry v. Wright
Not Reported in F.Supp.2d, 2011 WL 231626 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 2921180 (E.D.N.Y.)
**(Cite as: 2012 WL 2921180 (E.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Glen BRUNSKILL, Plaintiff,
v.
COUNTY OF SUFFOLK and Steven John, M.D.,
Defendants.

No. 11–CV–586 (SJF)(ETB).
July 11, 2012.

Glen Brunskill, Gouverneur, NY, pro se.

Brian C. Mitchell, Suffolk County District Attorney's
Office, Hauppauge, NY, for Defendants.

### ORDER

FEUERSTEIN, District Judge.

**\*1** On January 24, 2011, incarcerated *pro se*
plaintiff Glen Brunskill ("plaintiff") commenced this
action pursuant to 42 U.S.C. § 1983, alleging that
medical staff at the Suffolk County Correctional
Center failed to identify and treat his broken ribs, and
then "neglected to answer" his "numerous slips to
medical staff." Complaint ("Compl.") [Docket Entry
No. 1] at IV. Plaintiff alleges that he suffered from
"pains in his stomach," difficulty breathing, and
"damage to his face and nose" after passing out on the
floor. *Id.* FN1

> FN1. Plaintiff originally named "Suffolk
> County Medical," "John Doe," and "John
> Jane" as defendants in this action. [Docket
> Entry No. 1]. After a conference before
> Magistrate Judge E. Thomas Boyle, the
> complaint was amended to substitute de-

fendant County of Suffolk for defendant
"Suffolk County Medical" and to substitute
defendant Steven John, M.D. for defendants
"John Doe" and "John Jane." [Docket Entry
Nos. 19–20].

Before the Court are defendants' motion to dis-
miss pursuant to Federal Rule of Civil Procedure
12(b)(6) [Docket Entry No. 27] and several motions
filed by plaintiff [Docket Entry Nos. 32, 38]. For the
reasons that follow, defendants' motion to dismiss is
granted, and plaintiff's motions are denied as moot.

### I. Discussion

### A. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must
contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.' "
*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949,
173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167
L.Ed.2d 929 (2007)). "A pleading that offers 'labels
and conclusions' or 'a formulaic recitation of the
elements of a cause of action will not do.' " *Iqbal,* 556
U.S. at 678 (quoting *Twombly,* 550 U.S. at 555). "Nor
does a complaint suffice if it tenders 'naked asser-
tion[s]' devoid of 'further factual enhancement.' "
*Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at
557).

In deciding a motion pursuant to Rule 12(b)(6),
the Court must accept all factual allegations in the
complaint as true and draw all reasonable inferences in
favor of the plaintiff. *Matson v. Bd. of Educ. of the
City Sch. Dist. of N.Y.,* 631 F.3d 57, 63 (2d Cir.2011);
*see also Ruston v. Town Bd. for the Town of
Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010) ("When

Not Reported in F.Supp.2d, 2012 WL 2921180 (E.D.N.Y.)
**(Cite as: 2012 WL 2921180 (E.D.N.Y.))**

there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Matson,* 631 F.3d at 63 (internal quotation marks and citation omitted).

**B. Analysis**

Defendants move to dismiss this action in its entirety, arguing that plaintiff has failed to adequately allege a claim for deliberate indifference to his medical needs. [Docket Entry No. 27–4].

**1. Defendant County of Suffolk**

**\*2** "Section 1983 imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights." *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 439 (2d Cir.2009) (quoting *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)) (internal quotation marks omitted); *see also Gordon v. City of New York,* No. 10–CV–5148, 2012 WL 1068023, at *3 (E.D.N.Y. Mar. 29, 2012) ("In order to sustain a claim for relief under 42 U.S.C. § 1983 against a municipal defendant, a plaintiff must show the existence of an officially adopted policy or custom, and a direct causal connection between that policy or custom and the deprivation of a constitutional right."). *Monell* 's "policy or custom" requirement is satisfied "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly author-

ized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell."  Id.* (citing cases). However, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

It is, of course, axiomatic that the Court reads the *pro se* plaintiff's complaint liberally and interprets it to raise the strongest arguments it suggests. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). However, "even a *pro se* complaint ... must satisfy the pleading standards set forth in [*Twombly* and *Iqbal* ]." *Parker v. Mack,* Fed. Appx. 62, 62 (2d Cir.2012). Plaintiff has failed to allege the existence of any policy or custom sufficient to subject Suffolk County to Section 1983 liability. At most, plaintiff claims that medical staff at the Suffolk County Correctional Center failed to properly diagnose his condition and that subsequent medical treatment was delayed.[FN2] The claims arise exclusively from a single incident in which plaintiff alleges that he received inadequate medical care. He does not allege the existence of a municipal policy or custom that is causally connected to the alleged constitutional deprivations, and his submissions do not indicate that he could allege a legally sufficient claim. Accordingly, the motion is granted insofar as it seeks dismissal of the claims against Suffolk County. *See Gordon,* 2012 WL 1068023, at *4 (dismissing claim when allegations of municipal policy or custom were "unsupported by anything other than the facts of what occurred in [plaintiff's] particular case").

> FN2. In his opposition brief, plaintiff claims that his "request for medical attention went ignored about 16 times." [Docket Entry No. 28] at 1–2.

**2. Defendant Steven John, M.D.**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 2921180 (E.D.N.Y.)
**(Cite as: 2012 WL 2921180 (E.D.N.Y.))**

Nor has plaintiff adequately alleged a claim against defendant Steven John. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 492 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)).[FN3] "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citations omitted). "[N]ot every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Rather, 'a prison official violates the Eighth Amendment only when [both the objective and subjective] requirements are met.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

> FN3. While "[a] convicted prisoner's claim of deliberate indifference to his medical needs ... is analyzed under the Eighth Amendment," "a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under ... the Due Process Clause of the Fourteenth Amendment if held in state custody." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). Although plaintiff argues that his claim arises under the Eighth Amendment, [Docket Entry No. 28] at 1, it is not clear whether, at the time of the incidents at issue, plaintiff had been convicted of the charges against him. The Court need not resolve this issue, however, because such claims are subject to a similar analysis irrespective of whether they arise under the Eighth or Fourteenth Amendments. *See id.* at 72.

**\*3** Plaintiffs complaints of inadequate medical care appear to be twofold. First, he claims that prison medical staff failed to identify his broken ribs. Compl. at IV. Second, he claims that medical staff "refuse[d] and neglected to answer" his requests for a medical appointment. *Id.*

a. Misdiagnosis

Although plaintiff's condition may have risen to the level of a "serious medical need," there is nothing to indicate that Doctor John or anyone else acted "with a sufficiently culpable state of mind" as to constitute "deliberate indifference" to that need. Plaintiff has merely alleged a mistaken diagnosis and an erroneous course of treatment, which, at most, would be medical malpractice. However, "the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady." *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000). Plaintiff's argument, raised in his opposition papers, that the defendants failed to send him for an x-ray is merely a "disagreement over a course of diagnosis and treatment which is not actionable under the Eighth Amendment." *Rodriguez v. Smith,* No. 10–CV–0734, 2011 WL 4479689, at *6 (N.D.N.Y. Aug. 19, 2011). Thus, plaintiff's claim, insofar as it arises from the allegedly mistaken diagnosis, is also dismissed. *See Thomas v. Nassau Cnty. Corr. Ctr.,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) ("The plaintiff's allegations that the doctors initially mis-diagnosed and mistreated his injury do not rise to the level of a constitutional violation.").

b. Delay in Medical Treatment

Plaintiff also claims that his requests for a medical appointment were "ignored." [Docket Entry No.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 2921180 (E.D.N.Y.)
**(Cite as: 2012 WL 2921180 (E.D.N.Y.))**

28 at 2]. Although it appears that plaintiff was ultimately treated, the Court interprets this claim as one for delay in the provision of medical treatment.

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith,* 316 F.3d at 185 (quoting *Chance,* 143 F.3d at 702) (emphasis in original). "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas,* 288 F.Supp.2d at 339 (quoting *Chance,* 143 F.3d at 703). This classification has been "reserved ... for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Id.* (quoting *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). "A plaintiff is not required to show that a defendant acted or failed to act 'for the very purpose of causing harm or with knowledge that harm will result,' but must show that the official was 'aware of facts' from which one could infer that 'a substantial risk of serious harm' exists, and that the official drew that inference." *Bellotto,* 248 Fed. Appx. at 236–37 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*4** This claim is also dismissed. Most importantly, plaintiff has not alleged that Doctor John or any other official was aware of facts from which one could infer that a substantial risk of serious harm existed or that they drew that inference. Indeed, the allegations in the complaint only suggest that the officials were *not* aware of any substantial risk of serious harm, as the medical staff had concluded that plaintiff's ribs were not broken. In short, plaintiff does not allege that any state actor acted with "deliberate indifference" to his alleged condition. Second, plaintiff has not alleged facts suggesting that the risk of harm resulting from the delay was sufficiently serious to rise to the level of a constitutional violation. *Bellotto,* 248 Fed. Appx. at 236.

Even under a liberal reading of the complaint, it is clear that plaintiff cannot state a valid claim. Therefore, he will not be granted leave to amend.

II. Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted. The Clerk of Court is respectfully directed to close this case.

**IT IS SO ORDERED.**

E.D.N.Y.,2012.
Brunskill v. County of Suffolk
Not Reported in F.Supp.2d, 2012 WL 2921180 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)
**(Cite as: 2006 WL 1459805 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Bryan D. CHRISTIAN, Plaintiff,
v.
Glenn GOORD, et al., Defendants,

No. 9:03-CV-901.
May 22, 2006.

Bryan D. Christian, Plaintiff, pro se.

Eliot Spitzer, New York State Attorney General, for
Defendants.

Michael G. McCartin, Asst. Attorney General, of
Counsel.

*DECISION AND ORDER*
SCULLIN, Senior J.

**\*1** The above-captioned matter having been pre-
sented to me by the Report-Recommendation of
Magistrate Judge Gustave J. DiBianco filed April 26,
2006, and the Court having reviewed the Re-
port-Recommendation and the entire file in this mat-
ter, and no objections to said Report-Recommendation
having been filed, it is hereby

ORDERED, that the Report-Recommendation of
Magistrate Judge Gustave J. DiBianco filed April 26,
2006 is ACCEPTED in its entirety, for the reasons
stated therein; and it is further

ORDERED, that defendants' motion for summary
judgment is DENIED, and it is further

ORDERED, that to the extent that plaintiff's op-
position to the defendants' motion was labeled a
cross-motion for summary judgment, that motion also
is DENIED.

IT IS SO ORDERED.

REPORT-RECOMMENDATION
DIBIANCO, Magistrate J.

This matter has been referred to me for Report
and Recommendation by the Honorable Frederick J.
Scullin, Jr., Senior United States District Judge, pur-
suant to 28 U.S.C. § 636(b) and Local Rules N.D.N
.Y. 72.3(c).

In this amended civil rights complaint, plaintiff
alleges that defendants have denied him proper med-
ical care in violation of the Eighth and Fourteenth
Amendments. (Dkt. No. 3).

Presently before the court is defendants' motion
for summary judgment pursuant to FED. R. CIV. P.
56. (Dkt. No. 74). Plaintiff has filed what has been
docketed as a cross-motion for summary judgment,
but is in reality simply a response in opposition to
defendants' motion. (Dkt. No. 77). Defendants have
filed a reply, (Dkt. No. 78), and plaintiff has filed a
"supplemental response" in opposition to the motion.
(Dkt. No. 79).

DISCUSSION
1. *Summary Judgment*

Summary judgment may be granted when the
moving party carries its burden of showing the ab-
sence of a genuine issue of material fact. FED. R. CIV.
P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d
Cir.1990) (citations omitted). "Ambiguities or infer-
ences to be drawn from the facts must be viewed in the
light most favorable to the party opposing the sum-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)
**(Cite as: 2006 WL 1459805 (N.D.N.Y.))**

mary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002) (citations omitted). However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted).

2. *Exhaustion of Administrative Remedies*

Defendants argue that plaintiff has not exhausted his administrative remedies as to his claims as required by the Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement applies to *all inmate suits about prison life,* whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). The Second Circuit has also held, however, that the exhaustion requirement is an *affirmative defense,* not a jurisdictional prerequisite, and there are instances in which the exhaustion requirement may either be waived or excused. *Id.* at 675. (citations omitted).

**\*2** Additionally, as with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies. *McCoy v. Goord,* 255 F.Supp.2d 233, 247-48 (S.D.N.Y.2003). Where questions of fact exist as to exhaustion, summary judgment is not appropriate. *Pendergrass v. Corrections Officers,* 01-CV-243A, 2004 U.S. Dist. LEXIS 28224, *6-7

(W.D.N.Y. Sept. 1, 2004). At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004)(remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)(whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004)(complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims). New York State provides inmates with a grievance procedure to follow by which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW § 139; N.Y. COMP.CODES R. & REGS. tit. 7 §§ 701.1 *et seq.* (N.Y.CRR). The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill,* 380 F.3d at 682. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* ¶ 701.7(a)(1). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.7(b). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.7(c). Time deadlines apply at all levels of the process, but exceptions to any of the deadlines may be made based on "mitigating circumstances." *Id.* § 701.7(a)(1). An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

There is also an expedited process for the review of complaints of inmate harassment or other miscon-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)
**(Cite as: 2006 WL 1459805 (N.D.N.Y.))**

duct by corrections officers or prison employees. 7 NYCRR § 701.11. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.11(b)(1). The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.11(b)(2). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* § 701.11(b)(3)-(b)(4). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.11(b)(6)-(b)(7). A similar "special" procedure is provided for claims of discrimination against an inmate. *Id.* § 701.12.

**\*3** In this case, defendants concede that plaintiff did file the appropriate grievance regarding the incidents in question, but that plaintiff filed the *original* complaint *five days* prior to receiving a final decision from the CORC, thus, failing to exhaust his administrative remedies.

In *Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), the Second Circuit held that exhausting administrative remedies after a complaint is filed will not save a case from dismissal. Although portions of *Neal* were overruled by *Porter v. Nuzzle,* 534 U.S. 516 (2002), the Supreme Court left this holding undisturbed. The final decision of the CORC constitutes the exhaustion of an inmate's remedies. *Jackson v. Goord,* 99 Civ. 9872, 2004 U.S. Dist. LEXIS 15464, \*5-6 (S.D.N.Y. Aug. 9, 2004). In this case, the final decision of the CORC was rendered on July 23, 2003. Defendants' Ex. 1 at "unnumbered" p. 12. Plaintiff's original complaint was filed on July 18, 2003. (Dkt. No. 1).

The court does note that after plaintiff's original complaint was filed, then-Chief Judge Scullin issued a conditional order of dismissal, finding that the original complaint did not meet the requirements of FED. R. CIV. P. 8 & 10. (Dkt. No. 2). Judge Scullin stated that in order for plaintiff to avoid dismissal of the action, he would have to file an amended complaint within thirty days. *Id.* Plaintiff complied with Judge Scullin's order and filed the amended complaint on August 22, 2003, approximately one month *after* plaintiff had received the final decision of the CORC.

Defendants appear to concede that plaintiff did exhaust his remedies, but argue that the exhaustion came too late. The first argument for plaintiff is that since the operative complaint in this action was not filed until *after* plaintiff exhausted administrative remedies, he should be deemed to have exhausted his remedies. This is distinguishable from a case in which plaintiff voluntarily amended his complaint or moved to amend his complaint after defendants had been served and had answered the complaint. In this case, Judge Scullin *sua sponte* ordered plaintiff to amend the complaint or be subject to dismissal prior to any involvement of defendants. Thus, the original complaint would never have been served or proceeded forward.

If this were the only argument for plaintiff, the case law would not be in his favor. After *Neal v. Goord,* various courts have held that completion of the grievance process after the federal complaint has been filed is insufficient to exhaust an inmate's administrative remedies. It has been held, even in the Northern District of New York, that if a plaintiff files an action prior to obtaining the CORC's decision, even if that decision was signed on the *same day* that the complaint was filed, plaintiff has failed to exhaust his administrative remedies. *See Mejia v. Goord,* 03-CV-124, 2005 U.S. Dist. LEXIS 32394, \*11-14 (N.D.N.Y. Aug. 16, 2005) (M.J.Peebles), *adopted by* (N.D.N.Y. Sept. 24, 2005)(J. Kahn). There was,

Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)
**(Cite as: 2006 WL 1459805 (N.D.N.Y.))**

however, no conditional order of dismissal in *Mejia* and, thus, no amended complaint filed *after* exhaustion.

**\*4** This court does not have to decide the issue of whether this case is sufficiently distinguishable from *Mejia* with respect to filing the complaint prior to obtaining a decision by the CORC because there are other reasons for excusing the exhaustion requirement. The Second Circuit has developed a three-part test to determine whether the exhaustion requirement has been waived or may be excused. *Hemphill,* 380 F.3d at 686. First, the court should determine whether the administrative remedies were, in fact, "available" to the plaintiff. *Id.* (citing *Abney,* 380 F.3d at 667-69). Second, the court determines whether the defendants have forfeited the defense of exhaustion by failing to raise or preserve it or whether the defendants are otherwise estopped from raising the defense. *Hemphill,* 380 F.3d at 686 (citing *Johnson,* 380 F.3d at 695-96; *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir2004)). Finally, the court considers whether there are any "special circumstances" that justify the plaintiff's failure to comply with the exhaustion requirement. *Hemphill,* 380 F.3d at 686 (quoting *Giano,* 380 F.3d at 676).

Defendants in this case have clearly raised the issue, thus, the second inquiry is not relevant here. However, the *Abney* case is applicable to this situation. In *Abney,* the Second Circuit held that a plaintiff does not have a responsibility to appeal favorable grievance decisions nor does the plaintiff have to appeal the failure of defendants to implement favorable decisions. 380 F.3d at 669. The failure to appeal a favorable decision that was never implemented does not constitute a failure to exhaust. The Second Circuit specifically stated that such a situation would make the administrative remedy "unavailable." *Id.*

In this case, the court notes that plaintiff received a favorable decision by the IGRC when he filed his grievance. The IGRC response was that the

[i]nvestigation has revealed that grievant does have several referrals for OMH and has yet to be seen.

*OMH is outside DOCS. However 6 months is a long time. It is unanimously recommended that grievant be seen by appropriate personnel from OMH.*

Plaintiff's Response to Summary Judgment, Declaration at p. 13 (Dkt. No. 77) (emphasis added). This appears to be a favorable decision, and the court would also point out that the response to the grievance indicates that OMH is "outside" of DOCS, and thus, the matter would not be "grievable." Since plaintiff obtained the relief that he sought from the IGRC, he would *not* have had to appeal the decision. A review of the grievance form shows that although plaintiff marked a box on the decision form that stated that he *agreed* with the IGRC, he also marked the box, stating that he wished to appeal to the Superintendent.

In response to the appeal, the Superintendent's decision made it clear that plaintiff's request was "outside" the "IGP" (Inmate Grievance Program). Specifically, the Superintendent stated

**\*5** Although the IGRC contradicts itself, OMH remains *outside the purview of DOCS and IGP.*

The grievant has been referred to OMH. This is the extent that DOCS is involved. Scheduling is done at the discretion of this OMH.

The grievance is denied.

*Id.* at p. 14 (emphasis added). The Superintendent appears to be attempting to state that the IGRC was incorrect in deciding in favor of plaintiff because OMH is "outside the purview of DOCS *and IGP* [Inmate Grievance Program]" and thus, DOCS would

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)
(Cite as: 2006 WL 1459805 (N.D.N.Y.))

not be able to grant plaintiff the relief that he sought. Although the Superintendent "denied" the grievance, the denial appears to be because the IGP did not have the power to grant plaintiff the relief that he was seeking. If the OMH was outside the purview of the IGP, then administrative relief was not "available" through the IGP, and plaintiff was again not required to appeal further, even though he did appeal.

The decision from the CORC is confusing because the CORC states that the grievance is "unanimously accepted in part", but then states that the action requested is "accepted only to the extent that the CORC upholds the determination of the Superintendent for the reasons stated." Plaintiff's Declaration at p. 15. However the Superintendent "denied" the grievance because the OMH is not under the purview of DOCS. The CORC then stated that it was up to OMH to schedule appointments and also stated apparently as an aside, that plaintiff had been examined by OMH and had refused prescribed medications. *Id.*

This court finds that even though plaintiff appealed all the way to the CORC, he would not have had to do so, since the IGRC decision was favorable, and the Superintendent basically stated that the Grievance Program had no authority over OMH. Defendants argue that although it is true that the IGP had no authority over OMH, plaintiff in this case is suing DOCS defendants, so he would have had to exhaust his administrative remedies. Plaintiff's request, however, was to be examined by OMH personnel. It appears that he did not name specific individuals in his grievance, but if he had named DOCS personnel, the decision of the IGRC would have been the same.

The grievance program only pertained to DOCS personnel, and DOCS personnel were not in charge of OMH. He could not name OMH employees in a grievance for the same reason. In fact, in a letter dated May 28, 2003 from defendant Nurse Administrator Smith to R. Boyea, the IGP Supervisor, defendant Smith stated that "[s]ince OMH is not part of DOCS,

an inmate cannot grieve them [sic]." Plaintiff's Declaration at p. 16. On May 14, 2003, plaintiff wrote a letter to defendant Smith, who wrote back to plaintiff telling him that the case loads were very high, and that if plaintiff believed that he was getting worse, he should go to sick call. *Id.* at 26. Plaintiff wrote to defendant Wright on May 21, 2003. *Id.* at p. 28. Dr. Wright wrote plaintiff a letter, dated June 4, 2003, telling plaintiff to address his concerns directly to OMH and told plaintiff that he could contact the OMH Satellite Unit Chief at Clinton Correctional Facility. *Id.* at p. 29.

**\*6** Plaintiff wrote several more letters, including a June 12, 2003 letter to William Henri, the Acting Executive Director of the South Beach Psychiatric Center. Mr. Henri wrote to plaintiff on June 17, 2003, telling plaintiff that he had referred plaintiff's letter to Hal Smith, the Executive Director of the Central New York Psychiatric Center. *Id.* at p. 40. On June 23, 2003, plaintiff received a memorandum from Senior Corrections Counselor R. Weeks stating that he had spoken to defendant Smith, and that plaintiff's case had been referred to OMH. *Id.* at p. 41. Plaintiff was told in this memorandum that if he were "again" not seen in a timely fashion, he should bring it up with Corrections Counselor Vondell. *Id.*

Based on all the evidence presented, this court finds that plaintiff appears to have attempted all avenues of exhaustion, formal and informal. It also appears that the grievance program was not the appropriate avenue to obtain relief, although if he had not appealed his first favorable decision, he may have been able to obtain a mental health appointment. Thus, even if the CORC decision was rendered after plaintiff filed his initial complaint, this court would find that plaintiff had either sufficiently exhausted his remedies or that he should be excused from the exhaustion requirement because the remedies were not "available" under the statute.

There is one other reason in favor of finding that

Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)
**(Cite as: 2006 WL 1459805 (N.D.N.Y.))**

plaintiff either exhausted his remedies or should be excused from exhaustion. The regulations provide that the CORC *shall* decide the appeal within *twenty working days* of receipt of the appeal. 7 NYCRR §§ 701.6(d); 701.7(c)(4). There is also a special section for "time limits." *Id.* § 701.8. This section provides that time limit extensions may be requested at any level of review, but may only be granted with the written consent of the inmate. *Id.* The section also provides that "[a]bsent such extension, matters not decided within the time limits may be appealed to the next step." *Id.*

Defendants in this case are arguing that plaintiff has not exhausted because he filed his action five days prior to obtaining a decision from the CORC, however, defendants did not note that the CORC was approximately *seven days late* in rendering a decision, and there appears to be *no request for an extension of time* and no evidence that plaintiff consented to an extension. Plaintiff's appeal statement is dated June 13, 2003 (a Friday). Plaintiff's Declaration at p. 14. The CORC decision is dated July 23, 2003 (a Wednesday). *Id.* at p. 15. Counting only working days, and not counting July 4, 2003, the CORC decision was due Monday, July 14, 2003, nine calendar days later and seven working days later.

As stated above, the regulations provide that if the IGP decision is late, plaintiff may appeal to the next step. Since the CORC decision was late, plaintiff was justified in filing his federal action on July 18, 2003. Thus, this court finds that there are special circumstances in this action that would make dismissal for failure to exhaust inappropriate.

**\*7** WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 74) be DENIED, and it is

RECOMMENDED, that to the extent that plaintiff's opposition to the defendants' motion was labeled a cross-motion for summary judgment (Dkt. No. 77), that motion also be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993)(citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Christian v. Goord
Not Reported in F.Supp.2d, 2006 WL 1459805 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven
Correctional Facility, R. Pflueger, A. Glemmon, Sgt.
Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T.
Healey, and John Doe # 1–5, all as individuals, De-
fendants.

No. 93 Civ. 5981(WHP) JCF.
Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility,
Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, New York, for Defendant.

### MEMORANDUM & ORDER
PAULEY, J.

**\*1** The remaining defendant in this action, Cor-
rection Officer Richard Pflueger, having moved for an
order, pursuant to Fed.R.Civ.P. 56, granting him
summary judgment and dismissing the amended
complaint, and United States Magistrate Judge James
C. Francis IV having issued a report and recommen-
dation, dated August 20, 1999, recommending that the
motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff
does "not contest the dismissal of this action", it is

ORDERED that the attached report and recom-
mendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its
entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

### REPORT AND RECOMMENDATION
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pur-
suant to 42 U.S.C. § 1983. Mr. Cole alleges that the
defendant Richard Pflueger, a corrections officer,
violated his First Amendment rights by refusing to
allow him to attend religious services. The defendant
now moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the de-
fendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at
the Green Haven Correctional Facility. (First
Amended Complaint ("Am.Compl.") ¶ 3). From June
21, 1993 to July 15, 1993, the plaintiff was in keeplock
because of an altercation with prison guards.
(Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony An-
nucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS
policy, inmates in keeplock must apply for written
permission to attend regularly scheduled religious
services. (Reply Affidavit of George Schneider in
Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.")

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." ' *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International,*

*Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

> FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jairo DELROSARIO, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 07 Civ.2027(RJS).
March 4, 2010.

West KeySummary**Civil Rights 78 🔗1351(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases

Neither official in charge of prisoner movement nor official in charge of security had authority to make final policy decisions for the city with respect to the protection or housing of prisoners at penal institution, as required to hold the city liable under § 1983 for officials' alleged unconstitutional acts. Inmate alleged that officials deliberately ignored a known risk to his safety from fellow prisoners, who repeatedly threatened and assaulted inmate for cooperating with authorities, but the only reference to them was prosecutor's identification of their respective roles at institution. No information was given with respect to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. 42 U.S.C.A. § 1983.

Robert B. Marcus, Schwartzapfel, Truhowsky, Marcus, P.C., Jericho, N.Y., for Plaintiff.

Mark D. Zuckerman, Office of the Corporation Counsel of the City of New York, New York, N.Y., for Defendants.

MEMORANDUM AND ORDER
RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiff Jario Delrosario brings this action against the City of New York ("the City"), Manhattan Assistant District Attorney Susan Lanzatella, and ten John Doe Defendants pursuant to 42 U.S.C. § 1983 for alleged deprivations of his civil rights. Now before the Court is Defendants' motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative, Defendants move for summary judgment pursuant to Rule 56(a). For the reasons set forth below, Defendants' motion for summary judgment is granted.

I. BACKGROUND

Plaintiffs lawsuit stems from injuries inflicted by other inmates while he was incarcerated at Riker's Island Correctional Facility ("Riker's"), located in Bronx County, New York and part of the New York City Department of Corrections ("DOC"). Plaintiff alleges that, although he was repeatedly threatened and assaulted by other inmates for acting as a cooperating witness, Defendants failed to take steps necessary to protect him from further violence. In addition, Plaintiff alleges that Riker's personnel denied him medical care after he was assaulted.

A. Facts
1. Plaintiff's Arrest, Attack, and Injury

Plaintiff was arrested on September 1, 2005 and charged with various crimes under New York state law arising out of a "sting" operation. (Defs.' 56.1 ¶ 3.) After he was arrested, Plaintiff was taken to and de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

tained at Riker's. (*Id.* ¶ 4.) Defendant Lanzatella, an assistant district attorney and chief of the Narcotics Gang Unit of the New York City Special Narcotics Prosecutor's Office ("SNPO"), was assigned to prosecute Delrosario and his co-defendants. (*Id.* ¶ 7.) Lanzatella was assisted by the only attorney under her supervision at that time, Nigel Farinha. (Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 25.)

Within two months of his arrest, Plaintiff became a cooperating witness. (Defs.' 56.1 ¶ 11.) In the course of his cooperation, Plaintiff was removed from Riker's and taken to the SNPO as many as 60 times for interviews with investigators and prosecutors. (Decl. of Robert B. Marcus ("Marcus Deck") Ex. A (Dep. Tr. of Susan Lanzatella ("Lanzatella Dep. Tr.")) at 65:25–66:2.) Throughout his cooperation, Plaintiff was repeatedly threatened by his co-defendants on account of the cooperation that they suspected he was providing to authorities. (Pl.'s 56.1 ¶ 8.) Plaintiff's attorney in the state criminal matter, Barry Weinstein, testified that he repeatedly advised both Lanzatella and Farinha of the threats against Plaintiff. (Pl.'s 56.1 ¶ 9; Marcus Decl. Ex. C (Dep. Tr. of Barry Weinstein ("Weinstein Dep. Tr.")) at 12:21–14:21.) [FN1]

> FN1. Lanzatella disputes that she was informed of such threats prior to the March 9, 2006 incident. (*See* Defs.' Reply 56.1 ¶ 8.)

In January 2006, Plaintiff was assaulted at Riker's. (Pl.'s 56.1 ¶ 10; Weinstein Dep. Tr. at 18:7–12.) Weinstein testified that he quickly contacted either Lanzatella or Farinha and so informed them. (*Id.* at 19:7.) It is unclear whether this attack was connected to Plaintiffs cooperation. Plaintiff testified that he did not know why he was attacked (Delrosario Dep. Tr. at 50:10–11), but he also testified that "the same people on my case" were responsible for the attack (*id.* 48:9). Lanzatella states that she was not aware of any January assault. (Supp. Lanzatella Decl. ¶ 3.)

*2 After the January assault, Plaintiff was moved to another Riker's building, which he describes as unit C73. (Delrosario Dep. Tr. at 52:5–7.) Plaintiff continued to be threatened in his new housing unit. (*Id.* at 53:13–56:25.) The record indicates that Plaintiff was again assaulted on March 1, 2006. (Weinstein Dep. Tr. at 15:19–20; Marcus Decl. Ex. E (Report of Arthur Elias).) [FN2] Weinstein testified that Plaintiff was then brought before Lanzatella on March 3, 2006 for further interviews. (Weinstein Dep. Tr. at 16:1–5.) [FN3] Weinstein testified that after the March 3, 2006 meeting, Lanzatella or Farinha informed Weinstein that Lanzatella was sending a letter "immediately" or "right away" to have Plaintiff moved from Riker's to another facility. (*Id.* at 17:10–13; 26:20–27:10; 27:17–25.)

> FN2. Defendants object to Weinstein's testimony on this point on hearsay grounds. Defendants object to Elias's report on the grounds that no foundation has been laid for the expert report. Because this evidence does not change the outcome, the Court need not resolve the objection.

> FN3. Defendants also object to this testimony on hearsay grounds because Weinstein was not sure whether or not he was there himself. Because this evidence does not alter the outcome of Defendants' motion, the Court need not resolve the objection.

Plaintiff testified that on March 8, 2009, fearing further violence, he contacted his attorney and asked to be relocated. (Delrosario Dep. Tr. at 60:4–22.) In response, prison officials prepared him to be moved and transferred him to a holding cell. (*Id.* at 60:15–22.) While awaiting transfer to another facility on March 9, 2006, Plaintiff was assaulted by another inmate and suffered serious facial injuries, including a broken jaw. (Pl.'s 56.1 ¶ 16.) Plaintiff does not know

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

the identity of his assailant or whether the assault was related to his cooperation. (Delrosario Dep. Tr. at 61:8–62:13.)

What steps, if any, were taken by officials between the March 1 and March 9 assaults remains unclear. During discovery, Defendants produced a letter written by Lanzatella and addressed to either Captain Vasatoro, the captain in charge of prisoner movement at Riker's, or Captain Boden, the captain in charge of security at Riker's. (Lanzatella Dep. Tr. at 102:10–103:3.) [FN4] The letter bears the date of March 3, 2006 and states:

> [FN4]. The intended recipient of the letter is unclear. While the inside address contains the name of Captain Vasatoro, the greeting is addressed to Captain Boden. (Decl. of Mark D. Zuckerman (Zuckerman Decl.) Ex. F.)

I am requesting that the above-named inmate [Delrosario] be moved for security reasons from GMDC [at Riker's] where he is currently being held to BBKC [another DOC facility]. The above-named inmate, who was arrested in an armed robbery conspiracy with ten co-defendants, has been repeatedly assaulted while being held at GMDC in the past few weeks, including most recently when his jaw was broken. The inmate is needed as a witness in an ongoing investigation.

Thank you for your assistance in this matter and please feel free to call should you have any additional questions. (Zuckerman Decl. Ex. F.) The letter is a copy retrieved from Lanzatella's computer; no originals were found. (*See* Lanzatella Dep. Tr. at 104:16–21.) It also references Plaintiff's broken jaw, which did not occur until March 9, 2006. (Pl.'s 56.1 ¶ 16.) Lanzatella speculates that she first wrote a draft on March 3, 2006, in response to an attack on Plaintiff, but did not send it because she then learned that the attack was unrelated to his cooper-

ation. (Lanzatella Dep. Tr. at 122:24–123:24.) She then edited and sent it after the March 9, 2006 attack. (*Id.*)

**\*3** Weinstein testified, however, that Lanzatella or Farinha informed him that a letter was sent on March 3, 2006, the date appearing in the letter. (Weinstein Dep. Tr. at 17:10–13; 26:20–27:10; 27:17–25.) Further, he testified that Farinha told him that the letter had been sent but was disregarded by officials at the DOC because of animus towards Delrosario. (Weinstein Dep. Tr. at 16:10–17:6.) Farinha denies that he made such statements. (Marcus Decl. Ex. B (Dep. Tr. of Nigel Farinha (Farinha Dep. Tr.)) at 84:4–22.) Because the final version contains information concerning the March 9, 2006 attack, and based on Farinha's representations to Weinstein that it was originally sent on March 3, Plaintiff concludes that the letter was originally sent on March 3 and was edited and resubmitted on March 15, 2006. This conclusion is partially corroborated by information taken from Lanzatella's computer, which indicates the letter was created March 3, 2006 and modified on March 15, 2006. (Marcus Decl. Ex. F.)

After spending time at Bellevue hospital and recovering from his injuries, Plaintiff was transferred to the Manhattan Detention Center, often referred to as the "Tombs." (Delrosario Dep. Tr. at 66:14–15.) After some of his co-defendants were also sent to the Tombs, Plaintiff was again transferred, this time to the Vernon C. Bain Correctional Center, or the "Boat," another City correctional facility. (*Id.* at 67:1–6.) Finally, Plaintiff was transferred to federal custody.

2. Procedures or Practices for Cooperating Witnesses

The DOC policies and procedures allow an "inmate [to] be placed into Close Custody Housing either by his or her own request or pursuant to the Department's determination that such housing is necessary and appropriate." (Decl. of Harry Ahl Ex. C III.C.) Close Custody Housing can be used for inmates' own protection. (*Id.* at II.A.) The procedures specifically

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

require that anytime a staff member has reason to believe that an inmate is in danger, or anytime an inmate so requests, he must be placed in Close Custody Housing until a captain arrives. (*Id.* III.C.2.a.) The policy lays out further procedures for determining when an inmate qualifies for such housing, as well as his right to a hearing and other administrative process. (*Id.*)

Lanzatella's practice was "not to get involved with the protection of cooperating witnesses while they were in custody because NYC Department of Corrections has its own criteria for housing inmates" that the DA's office was not involved with. (Def.'s 56.1 ¶ 12.) Further, any requests or recommendations that her office made were "non-binding and whether NYC Department of Corrections honored it was out of [Lanzatella's] hands." (*Id.* ¶ 13.) She testified that if there was a risk to any witness, however, she would inform the DOC. (*See* Lanzatella Dep. Tr. at 112:8–15.)

### B. Procedural History

Plaintiff filed this lawsuit on March 9, 2007, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the docket of the undersigned. Plaintiff filed the Amended Complaint ("AC") on May 20, 2009, after discovery had closed. On July 17, 2009, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment and submitted their Local Rule 56.1 statement. Plaintiff submitted its opposition and own Rule 56.1 statement on September 8, 2009. The motion became fully submitted on September 17, 2009.

**\*4** The Amended Complaint purports to contain a single claim under Section 1983. (AC ¶ 64.) Read more closely, however, the Amended Complaint actually asserts several claims against various Defendants. "Count One" alleges that Defendants acted with "deliberate indifference in failing to transfer Plaintiff to another facility and/or remove him from the general

population and/or place him in protective custody." (AC ¶ 68.) It also alleges that "Defendants acted with deliberate indifference in intentionally denying and/or delaying Plaintiff's access to medical care and/or attention." (*Id.* ¶ 69.) Finally, it alleges that the Defendants were "supervisors and/or final decision makers" who acted with deliberate indifference towards Plaintiff in failing to adequately supervise, train, or discipline Defendants, "thereby causing said Defendants in this case to engage in the above-mentioned conduct." (*Id.* ¶¶ 71–72.)

Thus, the AC seeks redress from Defendants for both failing to prevent Plaintiffs injuries and for refusing or delaying medical treatment after the March 9, 2006 attack. Liberally construed, the Amended Complaint seeks to impose municipal liability on the City for DOC's failure to adequately safeguard Plaintiff, DOC's failure to timely treat Plaintiff after the March 9, 2006 attack, and Lanzatella's failure to prevent the March 9, 2006 attack. In addition, the Amended Complaint can be read to set forth a claim against Lanzatella in her individual capacity for failing to prevent the assaults, as well as individual claims against the John Doe Defendants for both injuries.

Because Plaintiff has utterly failed to produce evidence to support many of the allegations in the Amended Complaint, the Court will, for reasons of judicial economy, treat Defendants motion as one for summary judgment.

### II. DISCUSSION
#### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir.2007). The moving party

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson,* 411 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.' " *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

**B. Claims Against John Doe Defendants**

**\*5** Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute. Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice. *See Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005). Therefore, Plaintiff's claims against the John Doe Defendants are dismissed without prejudice.

**C. Municipal Liability for the Acts of Prison Officials**

Plaintiff alleges that the City is liable for the DOC's failure to adequately transfer, segregate, or otherwise protect him while he was in custody. (AC ¶¶ 68, 71.) Similarly, Plaintiff seeks to hold the City liable for the DOC's failure to timely treat Plaintiffs injuries after the March 9, 2006 attack. (AC ¶¶ 69, 71.) These allegations attempt to state a claim against New York City for liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia,* that Plaintiff has not identified a causal link between any municipal custom or policy and the alleged constitutional violations. (Defs.' Mem. at 7.) For the reasons stated below, the Court grants Defendants' motion for summary judgment with respect to these claims.

1. Applicable Law

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Blazina v. Port Auth.,* No. 06 Civ. 481(KNF), 2008 WL 919671, at \*6 (S.D.N.Y. Apr.1, 2008) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

An official policy or custom can be demonstrated in a number of ways. First, such a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority" undertakes an unconstitutional act. *Warheit v. City of N.Y.,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at \*12 (S.D.R.Y. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, a custom or practice may be demonstrated through behavior that is " 'so well settled and widespread that the policy-making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis v. City of N.Y.,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am.,* 361 F.3d at 127–28 & 127 n. 8. Finally, a plaintiff can state a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
(Cite as: 2010 WL 882990 (S.D.N.Y.))

*Monell* claim where he or she demonstrates that the municipality failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an un-lawful municipal policy of ratification of unconstitu-tional conduct within the meaning of *Monell.*" *Batista,* 702 F.3d at 397.

2. Analysis
a. Decisions by Final Policymakers

**\*6** Plaintiff alleges that Captains Boden and Vasaturo deliberately ignored Lanzatella's or Farinha's March 3, 2006 letter request to move Plaintiff. The Weinstein deposition provides the chief support for this allegation. (Weinstein Dep. Tr. at 16:10–17:6.) Undoubtedly, such an allegation would be sufficient to state a claim for relief against Boden and Vasaturo individually, if they were defendants in this action. *See Heisler v. Kralik,* 981 F.Supp. 830, 837–38 (S.D.N.Y.1997). Because Boden and Vasaturo are not defendants, however, Plaintiff must succeed in demonstrating that they are municipal policymakers on the subject of protecting inmates. *See Chin v. N.Y. City Nous. Auth.,* 575 F.Supp.2d 554, 561–62 (S.D.N.Y.2008).

Although *Monell* liability may attach for the de-cisions of final policymakers, "[t]he fact that a par-ticular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 481. Rather, a deliberate choice must be made "from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. Whether or not an official is a "policy-making offi-cial" for purposes of imposing *Monell* liability is a question of state law determined by the Court. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff bears the burden of showing that Boden and Vasaturo are officials with final policymaking authority. *See Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000).

Plaintiff has failed to demonstrate that either Boden or Vasaturo make final policy decisions for the City with respect to the protection or housing of in-mates. The only reference to them in the record is Lanzatella's statement that they were "in charge" of "security" and "prisoner movement," respectively. (Lanzatella Dep. Tr. at 102:14–15, 103:2–3.) Plaintiff did not, however, interview or depose any prison officials, including Boden and Vasaturo, or produce any discovery relating to the role of Boden and Vasaturo at Riker's. Plaintiff has produced no evidence as to what authority each had, what guidelines and poli-cies they were subject to, and what oversight was in place. Accordingly, the Court cannot allow this claim to go forward on a theory that either Captain Vasaturo or Boden had final policymaking authority. *See, e.g., Cruz v. Liberatore,* 582 F.Supp.2d 508, 521 (S.D.N.Y.2008) (granting summary judgment where plaintiff failed to provide "any documentary evidence or testimony suggesting that" the named official was the defendant municipality's final policymaker); *Springle v. Metro. Transp. Auth.,* No. 06 Civ. 734(GEL), 2008 WL 331362, at \*7 (S.D.N.Y. Feb.1, 2008).

b. Deliberate Indifference to a Widespread Practice

To the extent that Plaintiff argues that the City was aware of similar constitutional violations but failed to do anything to end the practice, Plaintiff has failed to adduce any evidence of widespread consti-tutional violations by DOC personnel.

**\*7** Plaintiff argues that a lawsuit by another prison inmate in this District, *Shuford v. City of N.Y.,* No. 09 Civ. 945(PKC), as well as a recent article in the *New York Times,* provide ample evidence of a policy or practice of the DOC. (*See* Pl.'s Mem. 6–7; Marcus Decl. Exs. G, H.) Neither of these documents, how-ever, is admissible evidence.[FN5] Although this Court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of the lawsuit

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

or filing, not for the truth of matters asserted in those claims. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see also Boyd v. City of Oakland,* 458 F.Supp.2d 1015, 1047–48 (N.D.Cal.2006) (declining to take notice of similar lawsuits to establish policy or practice for purposes of *Monell* claim). Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *See Griffin v. City of N.Y.,* 287 F.Supp.2d 392, 395 n. 8 (S.D.N.Y.2003); *McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom.").

> **FN5.** It is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality *and its response to them to* determine whether the municipality acted with deliberate indifference. *See Fiacco v. City of Rensselaer,* 783 F.2d 319, 327–28 (2d Cir.1986). Plaintiff, however, simply cites to allegations of misconduct to support the proposition that the conduct occurred, or, in the alternative, cites to the allegations of misconduct without investigating how the City responded. Neither supports an inference of deliberate indifference.

Similarly, Plaintiff's Rule 56.1 statement cites no evidence, admissible or otherwise, that the DOC ever denied Plaintiff medical care at any time other than on March 9, 2006, when Plaintiff alleges that his "requests for medical care and attention were ignored, and [P]laintiff was told by the corrections officers that if he sought medical care or informed anyone of his requests for care he would receive an infraction and/or be placed in solitary confinement." (Pl.'s 56.1 ¶ 20.) Such a single isolated incident, especially one involving only low-level or non-policymaking em-

ployees, is insufficient to support a *Monell* claim. *See Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

c. Failure To Train, Supervise, and Discipline

To succeed on a theory of liability based on either failure-to-train or failure-to-supervise, a plaintiff must make three showings.

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees [sic] mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

> *Green v. City of N.Y.,* 465 F.3d 65, 80 (2d Cir.2006) (quotations and citations omitted); *accord Walker v. City of N. Y.,* 974 F.2d 293, 297–98 (2d Cir.1992).

Additionally, to survive summary judgment on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129; *accord Jenkins v. City of N.Y.,* 478 F.3d 76, 94 (2d Cir.2007); *Amensty Am.,* 361 F.3d at 127 n. 8 ("[A] failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation."). In this case, Plaintiff has failed to conduct any discovery as to the training that prison officials undergo regarding the housing of cooperating witnesses, the provision of medical care or—for that matter—any training at the

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

DOC in general.

**\*8** To succeed on a failure-to-supervise claim, Plaintiff "must establish [Defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious,' " but that the municipality "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.' " *Amnesty Am.,* 361 F.3d at 127 (quoting *Vann v. City of N.Y.,* 72 F.3d 1040, 1049 (2d Cir.1995)). Plaintiff has failed to adduce any evidence of a causal connection between the supervision received by unnamed prison employees and the alleged failure to transfer or segregate Plaintiff or provide him with medical care on March 9, 2006. In fact, the only evidence in the record about DOC procedure is the DOC Directive entitled Restrictive Housing Due Process and its replacement, Close Custody Housing. (*See* Decl. of Harry Ahl Ex. C.) Neither references how employees are supervised. Accordingly, there is no evidence in the record that could support a claim that the City's supervision over prison employees was insufficient.

Finally, Plaintiff has failed to put forth any evidence that the City or DOC failed to adequately discipline its personnel. The record is completely silent with respect to how the DOC responded to complaints against its personnel.

Because Plaintiff has offered no admissible evidence that will support a *Monell* claim for failure to train, supervise, or discipline, the City is entitled to summary judgment.

### D. Municipal Liability for Lanzatella

Plaintiff likewise seeks to hold the City liable for Lanzatella's alleged failure to take steps to ensure his safety. Plaintiff has produced no evidence that the City failed to adequately train, supervise, or discipline Lanzatella. Accordingly, Plaintiff can only succeed if Lanzatella herself is "responsible for establishing final government policy." *Pembaur,* 475 U.S. at 482; *accord Gronowski v. Spencer,* 424 F.3d 285, 298 (citing *Pembaur* ) (2d Cir.2005) ( "Even one episode of [unconstitutional conduct] may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy."). Because Lanzatella is not a final policymaker, however, the City is entitled to summary judgment on this claim as well.

Section 177–c of the New York Judiciary Law provides authority for the district attorneys of the counties comprising large New York cities to create a plan for a special narcotics prosecuting unit. *See* N.Y. Judiciary Law § 177–c. The SNPO is one of these units and it was created by agreement among the district attorneys of the five counties that make up New York City. (*See* Decl. of Kristine Hamann (Hamann Decl.) Ex. E.) The plan calls for the appointment of one Special Assistant District Attorney, who "[u]nder the policy direction of the five District Attorneys" will "formulate policies, procedures and standards for the prosecution of cases" in that unit. (*Id.* at 3.) That Special Assistant District Attorney is Bridget Brennan. (*See* Defs.' 56.1 ¶ 29.) In addition to Brennan, an Executive Staff supervises the different bureaus and units within the SNPO. (*Id.* ¶¶ 30–31.) The Narcotics Gang Unit is one of these subunits. (*Id.*)

**\*9** Lanzatella is an ADA in the SNPO and the chief of the Narcotics Gang Unit. (Defs.' 56.1 ¶ 7.) Her duties are limited to "supervising the lawyers and staff people in the Narcotics Gang Unit, interacting with detectives, going to court and handling cases in court, interviewing witnesses, and motion and grand jury practice ." (*Id.* ¶ 26.) At the time of the events that gave rise to Plaintiff's claim, Lanzatella supervised only one other attorney, Farinha. (*Id.* ¶ 25.)

Based on New York state law and the uncontroverted evidence in the record regarding the structure of the SNPO, Lanzatella cannot be said to have final responsibility for establishing governmental policy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

with respect to the handling of cooperating witnesses or ensuring inmate safety. *See Peterson v. Tomaselli,* 469 F.Supp.2d 146, 169–70 (S.D.N.Y.2007) (concluding that unit chief in same office was not a final policymaker), Plaintiff has adduced no evidence or legal authority indicating otherwise.

Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim for Lanzatella's conduct.

### E. Individual Claims Against Lanzatella

Plaintiff also asserts claims against Lanzatella in her individual capacity. Lanzatella argues that all claims brought against her must be dismissed under the doctrines of absolute or qualified immunity.

#### 1. Absolute Immunity

Prosecutors have absolute immunity for claims for damages arising out of duties that "are intimately associated with the judicial phase of the criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Actions are not, however, immune simply because they are performed by a prosecutor. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. 273 (1993). "[W]hen a prosecutor performs an investigative or administrative function"—functions not accorded immunity at common law—"absolute immunity is not available." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). To determine whether absolute or qualified immunity attaches to particular conduct, courts apply a functional approach. *See Cornejo v. Bell,* 592 F.3d 121, 126 (2d Cir.2010) ("The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of."). When asserting absolute immunity, the official claiming the privilege "shoulders the burden of establishing the existence of immunity for the function in question." *Hill v. City of N.Y.,* 45 F.3d 653, 660 (2d Cir.1995).

Prosecutors are entitled to absolute immunity only for "conduct 'intimately associated with the judicial phase of the criminal process,' " *Hill,* 45 F.3d at 661 (quoting *Imbler,* 424 U.S. at 430), including the initiation of prosecutions, the presentation of evidence at trial, preparatory functions such as evaluating and organizing evidence and presenting it to a grand jury, and the decision of which criminal charges to bring, *id.* Put another way, those functions a prosecutor carries out not as an advocate, but as an investigator and administrator, are not accorded absolute immunity. *See Buckley,* 509 U.S. at 273–274 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973))).

**\*10** This is not to say that the functional approach draws a bright line between in-the-courtroom and out-of-the-courtroom tasks. As the Supreme Court stated in *Buckley,*

> [w]e have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273.

The Second Circuit has twice considered what immunities attach to a prosecutor's dealings with a cooperating witness. First, in *Barbera v. Smith,* the estate of a murdered cooperating witness brought suit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
(Cite as: 2010 WL 882990 (S.D.N.Y.))

against an Assistant United States Attorney for negligently disclosing the witness's cooperation and for denying the witness's requests for protection. *See Barbera,* 836 F.2d at 98–99. In rejecting absolute immunity, the court characterized the prosecutor's activity as the "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution." *Id.* at 100. The *Barbera* court noted that, at the time the cooperating witness was put at risk and killed, "the government was still seeking evidence, including testimony from witnesses such as Barbera, that would enable it to prosecute" the targets of the investigation. *Id.* at 101. The *Barbera* decision did "not foreclose the possibility in an appropriate case" of absolute immunity for such a claim; it merely concluded that on the facts before the court, the prosecutor's "activities at the time of the alleged conduct ... seem[ed] to have involved primarily" investigative functions. *Id.*

Similarly, in *Ying Jing Gan v. City of New York,* the Second Circuit found that a prosecutor's failure to protect a witness was "not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings." 996 F.2d 522, 531 (2d Cir.1993). Although the investigation was, as in *Barbera,* in its preliminary stages at the time of the witness's death, the Circuit held that the plaintiff complained of "conduct that plainly is not integral to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings," and accordingly found that it was not entitled to the protection of absolute immunity. *Id.*

As in *Barbera* and *Gan,* the record reveals that the primary role of Plaintiff's cooperation was to develop evidence, both for the prosecution of Plaintiff's co-defendants and for new prosecutions. "Lanzatella was debriefing ... Delrosario to determine whether or not he had information about other potential criminal activity. That investigation eventually led to another prosecution." (Farinha Dep. Tr. at 14:5–13.) Although Lanzatella testified that her interviews of Plaintiff

were intended "to obtain information about the defendants he was arrested with and their criminal activities *and others,"* (Lanzatella Dep. Tr. at 71:13–16 (emphasis added)), she also testified that a primary purpose of Plaintiff's cooperation was to "develop additional cases about others and additional crimes" (*id.* 72:17–20). In fact, most of the cooperation sessions that Lanzatella "sat in on had to do with other people that [Delrosario] knew that were involved in criminal activity." (*Id.* 73:3–6.) Similarly, Farinha testified at his deposition that "Lanzatella is primarily responsible for conducting investigations." (Farinha Dep. Tr. at 13:9–13.) Because Lanzatella's primary purpose in signing Delrosario up as a cooperator was investigating criminal activity, both Plaintiff's own and that of others, rather than "a decision with regard to whether or not to institute a prosecution" or the "performance of [her] litigation-related duties," *Gan,* 996 F.2d at 530, her conduct is not shielded by the doctrine of absolute immunity.

### 2. Qualified Immunity

**\*11** " 'The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known.' " *Peterson v. Tomaselli,* No. 02 Civ. 6325(DC), 2003 WL 22213125, at \*5 (S.D.N.Y. Sept.29, 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996)). "Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity 'if it was objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)). When an official asserts the privilege of qualified immunity, a Court should uphold that immunity "unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gan,* 996 F.2d at 531 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

(1987)).

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gan,* 996 F.2d at 533 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *accord Matican v. City of N.Y.,* 524 F.3d 151, 155 (2d Cir.2008). The Supreme Court has, however, recognized two exceptions to this broad principle. First, "the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." *Matican,* 524 F.3d at 155. "Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Matican,* 524 F.3d at 155 (quotations and citations omitted).

The *DeShaney* line of cases recognizes that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199–200 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)); *accord Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Accordingly, courts have found that liability can be imposed on prison officials where a prisoner faces an objectively serious risk of harm and the prison official acts with deliberate indifference towards the inmate's safety. *See Farmer,* 511 U.S. at 834.

At least with respect to non-custodial cooperating witnesses, however, the Second Circuit has made clear that no special relationship exists such that a prosecutor is responsible for the safety of a witness. *See Gan,* 996 F.2d at 535; *Barbera,* 836 F.2d at 102. This case thus present the question of whether Plaintiffs incarceration imposed upon Lanzatella a "clearly established" duty to take affirmative steps to ensure his safety like the one imposed upon prison officials in *Farmer.* A constitutional right is clearly established where "(1) the law is defined with reasonable clarity (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted).

**\*12** In this case, Plaintiff has cited no authority, and this Court can find none, that requires prosecutors to step into the shoes of prison officials and safeguard prisoners. *Cf. Newman v. Gonzalez,* 05 Civ. 5215(LB), 2007 WL 674698, \*2 (E.D.N.Y. Mar. 5, 2007) ("[*Barbera* ] held that a prosecutor was entitled to qualified immunity because there was no clearly established duty to protect the witness at the time of his death. *No right has since been established."* (omissions and internal citations omitted; emphasis added)). While cognizant of the special relationship that exists between prison officials and inmates, *see Morales v. N.Y. State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1998), that relationship has not been extended to reach other state actors.

As recently as 2000, a court in this District addressed a nearly identical set of facts and found that no clearly established legal duty existed. In *Johnson v. City of New York,* the plaintiff sued the City and its officials for failing to protect him from attacks by fellow inmates against whom he had agreed to testify. *See Johnson v. City of N.Y.,* No. 00 Civ. 3626(SHS), 2000 WL 1335865, at \*1 (S.D.N.Y. Sept.15, 2000). Despite allegations that an assistant district attorney had assured the plaintiff that he would be protected from fellow inmates, Judge Stein concluded that "it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)
**(Cite as: 2010 WL 882990 (S.D.N.Y.))**

cannot be said that it was clearly established that [the assistant district attorney] had created or assumed a special relationship with [plaintiff] imbuing him with a constitutional duty to protect him." *Id.* at *4.

Based on the lack of case law establishing a duty of prosecutors to protect inmates from the violence of other inmates, the Court finds that Lanzataella did not have a clearly established duty to protect Plaintiff. Accordingly, she is protected from these allegations by qualified immunity.

### III. CONCLUSION

For the foregoing reasons, Defendants City of New York and Lanzatella's motion for summary judgment is granted in its entirety, The claims against the John Doe Defendants are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion docketed as Doc. No. 84, to enter judgment accordingly, and to close this case.

SO ORDERED.

S.D.N.Y.,2010.
Delrosario v. City of New York
Not Reported in F.Supp.2d, 2010 WL 882990 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corrr. Officer, Great Meadow C.F.;
Lawrence, Corr. Officer, Great Meadow C.F.; Whit-
tier, Corr. Officer, Great Meadow C.F.; Mulligan,
Corr. Officer, Great Meadow C.F.; Deluca, Corr.
Sergeant, Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
Sept. 27, 2013.

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assis-
tant Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION and ORDER
GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by David Douglas, Sr., ("Plaintiff")
against the six above-captioned New York State cor-
rectional employees, are the following: (1) Defend-
ants' motion for partial summary judgment (requesting
the dismissal of Plaintiff's claims against Defendant
Russell, and his claims against the remaining De-
fendants in their official capacities); and (2) United
States Magistrate Judge Randolph F. Treece's Re-
port–Recommendation recommending that Defend-
ants' motion be granted. (Dkt.Nos.70, 80.) Neither
party filed an objection to the Re-

port–Recommendation, and the deadline by which to
do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action,
the Court can find no clear error in the Re-
port–Recommendation: Magistrate Judge Treece em-
ployed the proper standards, accurately recited the
facts, and reasonably applied the law to those facts. As
a result, the Court accepts and adopts the Re-
port–Recommendation for the reasons stated therein.
(Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Re-
port–Recommendation (Dkt. No. 80) is *ACCEPTED*
and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for partial
summary judgment (Dkt. No. 70) is *GRANTED;* and
it is further

**ORDERED** that the following claims are *DIS-
MISSED* from this action: (a) all claims asserted
against Defendant Russell, and (b) all claims asserted
against Defendants in their official capacities only.
The Clerk is directed to terminate Defendant Russell
from this action; and it is further

**ORDERED** that the following claims *REMAIN
PENDING* in this action: (a) Plaintiff's claim that
Defendants Whittier, Mulligan, Perrara and/or Law-
rence subjected him to inadequate prison conditions
by depriving him of meals for approximately five
consecutive days in December 2009, in violation of
the Eighth Amendment; (b) Plaintiff's claim that De-
fendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant
Deluca failed to protect him from the use of that ex-
cessive force, in violation of the Eighth Amendment

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

and New York State common law; and (c) Plaintiff's claim that Defendant Deluca was deliberately indifferent to Plaintiff's serious medical needs (following the assaults) in violation of the Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the Plaintiff for purposes of trial only; any appeal shall remain the responsibility of the plaintiff alone unless a motion for appointment of counsel for an appeal is granted; and it is further

**ORDERED** that upon assignment of Pro Bono Counsel, a final pretrial conference with counsel will be scheduled in this action before the undersigned, at which time the Court will schedule a jury trial for Plaintiff's remaining claims as set forth above against Defendants Whittier, Mulligan, Perrara, Lawrence and DeLuca. Counsel are directed to appear at the final pretrial conference with settlement authority from the parties.

### *REPORT–RECOMMENDATION and ORDER*
RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [FN1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of

physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

> FN1. Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION
#### A. Standard of Review
Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Biedermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Personal Involvement**

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8.[FN2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

using excessive physical force against him and deny-ing him medical attention.

> FN2. Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Mo-tion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Com-plaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted sub-missions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speak-ing with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal in-volvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Cough-lin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual ac-tions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally in-volved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the viola-tion, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to contin-ue; (4) was grossly negligent in managing subordi-nates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occur-ring.[FN3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

> FN3. The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high

position of authority).

**C. Eleventh Amendment**

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining

Defendants in their official capacities be **DIS-MISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

N.D.N.Y.,2013.
Douglas v. Perrara
Slip Copy, 2013 WL 5437617 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Joseph Paul GUARNERI, Plaintiff,
v.
LT. James HAZZARD, Corporal J. Crook, Deputy
Paul March; Deputy Grippin, Deputy Howland, Dep-
uty Mace, Deputy John Doe, the Schoharie County
Jail Medical Department, Dr. Weitz, Jane Doe Nurse
Practitioner, Commissioner Frederick C. Lamy, and
Francis T. Sullivan, Defendants.

No. 9:06–CV–985 (NAM/DRH).
March 22, 2010.

West KeySummary**Prisons 310** ☞**192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treat-
ments
            310k192 k. In General. Most Cited
Cases

**Sentencing and Punishment 350H** ☞**1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in Gen-
eral
      350HVII(H) Conditions of Confinement
      350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
    State prisoner failed to show that his knee injury
was a serious medical need since he never exhibited
any limitations in his range of motion or complained

of an inability to ambulate, and thus, his Eighth
Amendment rights were not violated. The prisoner
alleged that he had a torn ACL, which was supported
by the medical evidence. However, he played bas-
ketball, even after being advised to avoid outdoor
recreation. He alleged that he suffered from severe
pain, but exhibited a normal gait and no swelling or
difficulty walking. He alleged that he was in severe
pain prior to being treated in the emergency room, but
after he received an injection of pain medication he
did not feel pain. Within an hour or two of his return,
he was involved in a physical altercation and kicked
multiple sealed doors off the hinges. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

Joseph Paul Guarneri, Schoharie, NY, pro se.

O'Connor, O'Connor, Bresee & First, P.C., Justin O'C.
Corcoran, Esq., of Counsel, Albany, NY, for De-
fendant Weitz.

Lemire, Johnson Law Firm, Gregg T. Johnson, Esq.,
Scott Quesnel, Esq., of Counsel, Malta, NY, for De-
fendants Lt. James Hazzard, Cpl. J. Cronk, Deputy
Paul Marsh, Jr., Deputy Grippin, Deputy Howland
County of Schoharie and Deputy Mace.

**MEMORANDUM–DECISION AND ORDER**
Hon. NORMAN A. MORDUE, Chief Judge.
  ***1*** In this *pro se* civil rights action under 42
U.S.C. § 1983, plaintiff claims that defendants vio-
lated his First, Eighth and Fourteenth Amendment
rights while plaintiff was incarcerated at the Schoharie
County Jail. In the second amended complaint, plain-
tiff asserts that defendants violated: (1) the Eighth
Amendment for failing to provide plaintiff with ade-
quate medical care; (2) the First Amendment and
Religious Freedom Restoration Act ("RFRA") for
denying plaintiff the right to practice his chosen reli-
gion; (3) the Fourteenth Amendment for denying

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

plaintiff Equal Protection on account of his religious beliefs; and (4) the First Amendment for denying plaintiff access to the courts. Defendants move for summary judgment and dismissal of plaintiff's second amended complaint pursuant to Fed.R.Civ.P. 56.

### FACTUAL BACKGROUND

The facts in this case, unless otherwise noted, are undisputed.[FN1] The Schoharie County Sheriff's Department ("SCSD") operates the Schoharie County Jail Facility ("SCJ") in Schoharie County, New York. At the relevant time period, James Hazzard ("Lt.Hazzard") was employed as a lieutenant in the SCSD. In 2006, Lt. Hazzard was the Chief Administrative Officer for the SCJ and was responsible for reviewing inmate grievances. Allen Nelson ("Nelson") was employed by the SCSD as a Corrections Officer and acted as the SCJ Inmate Grievance Coordinator with responsibilities that included receiving, investigation and making determinations on inmate grievances.[FN2] Paul Marsh ("Marsh") was employed as a Corrections Officer at SCJ. However, Officer Marsh was injured on November 5, 2005 and, as of December 2008, had not returned to work. James Grippin ("Grippin") was employed as a Corrections Officer at SCJ from February 2003 through August 2006. Donald Mace ("Mace") was employed as a Corrections Officer at SCJ and was employed in that capacity for 19 years. Dr. Weitz ("Weitz") is board certified in internal medicine and rheumatology and licensed to practice medicine in the State of New York. Dr. Weitz began working at SCJ in January 2004. Defendant Weitz has submitted a twenty page affidavit which details his contacts with plaintiff and comments on all of plaintiff's visits for sick call.[FN3] Defendant Weitz's affidavit chronologically details all of the dates and states whether plaintiff was seen by other medical personnel or treated by defendant Weitz.

> FN1. The facts set forth in this section are taken from: (1) the Second Amended Complaint; (2) the Answer; (3) Defendants'

Statements of Material Facts; (4) the exhibits and evidence submitted by Defendants in support of their Motions for Summary Judgment; (5) plaintiff's deposition transcript; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment. Plaintiff does not dispute the accuracy of the facts. In opposition to the motion, plaintiff provided copies of several grievances filed in 2008. The Court has reviewed those submissions and determines that they are not relevant to the issues at hand and therefore, will not be considered within the context of these motions.

> FN2. Officer Nelson is not a defendant in this action but provided an affidavit in support of defendants' motion.

> FN3. Defendant Weitz summarizes plaintiff's medical treatment from January 2004 until July 2006. The relevant portions of plaintiff's medical records are sealed medical records on file with the court. As plaintiff has not objected to the admissibility of these records, the Court accepts the medical records as evidence and the statements contained therein as true. *See Jackson v. Onondaga County,* 1998 WL 713453, at *5 (N.D.N.Y.1998).

Plaintiff has been arrested over 70 times in the past 20 years and has spent most of his adult life in and out of correctional facilities on various charges and convictions. Since 2000, plaintiff has been housed at SCJ on 16 separate occasions.[FN4] Plaintiff claims that he suffers from herniated discs in his neck and lower back, torn ligaments in his knee, post-traumatic stress disorder ("PTSD"), bi-polar disorder and depression.

> FN4. Plaintiff was incarcerated at SCJ from 2000–2005. However, for the purposes of the

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

within motion, only he relevant dates of his confinement and medical treatment are summarized herein.

**Plaintiff's Incarceration from 2004 until 2005**

Plaintiff was incarcerated at SCJ from January 2004 until January 2005. On January 29, 2004, plaintiff was evaluated by a social worker at SCJ. Plaintiff denied suicidal and homicidal ideation and was found not to be an "imminent risk" to himself or others. On February 27, 2004, a nurse practitioner examined plaintiff and prescribed Flexeril for his back pain.FN5 At plaintiff's request, the nurse agreed to discuss plaintiff's mental health complaints with Dr. Weitz. On March 2, 2004, Dr.Weitz evaluated plaintiff's mental health condition and consulted with Kelly Farnum, N.P., at Schoharie County Mental Health Clinic.FN6 Dr. Weitz and Nurse Farnum discussed plaintiff's medical condition and agreed that Dr. Weitz would prescribe Prozac and Depakote.FN7 On March 23, 2004, plaintiff was seen Nurse Farnum upon Dr. Weitz's request. Nurse Farnum noted that plaintiff was cooperative, his thoughts were organized and goal directed and plaintiff denied any suicidal or homicidal tendencies. Nurse Farnum noted that plaintiff's impulse was "intact during interview" but that his insight and judgment were "poor" and his intelligence was, "below average". Nurse Farnum suggested that plaintiff continue with his current medication.

> FN5. Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 725 (31st ed.2007).

> FN6. Kelly Farnum treated plaintiff prior to his incarceration.

> FN7. Prozac is used in the treatment of depression and obsessive-compulsive disorder. *Id.* at 730, 1562. Depakote is used in the treatment of manic episodes associated with

bipolar disorder. *Id.* at 497, 565.

**\*2** In April 2004, the medical staff at SCJ noted that plaintiff requested a transfer to "Mercy" or another "psychiatric hospital". The staff denied this request concluding that plaintiff had "adequate care" and that he was "manipulating for psychiatric hospitalization". In May 2004, plaintiff demanded to be seen by a psychiatrist. The medical staff discussed plaintiff's request with Dr. Weitz and an appointment was made for plaintiff to see Dr. Warren Becker at Schoharie County Mental Health Clinic.

On May 18, 2004, plaintiff was treated by a nurse practitioner after complaining that he hurt his right knee playing basketball. The nurse noted that plaintiff's range of motion was intact but his patella was tender. The nurse diagnosed plaintiff with a right knee strain and prescribed Bextra. FN8

> FN8. Bextra is an anti-inflammatory used for symptomatic treatment of osteoarthritis or rheumatoid arthritis. *Dorland's* at 215, 2048.

On June 15, 2004, Nurse Practitioner Nancy McDonald at SCJ noted that plaintiff was refusing to take his medication including Bextra, Wellbutrin, Flexeril, Depakote and Amoxicillin.FN9 Plaintiff reported that he did not take his medications because they "masked the problems".

> FN9. Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

On June 25, 2004, plaintiff was taken to Bassett Hospital with a prescription from Dr. Weitz for x-rays of his cervical spine, thoracic spine and lumbar spine. The x-rays revealed mild degenerative changes in the lumbar spine. Plaintiff was advised to avoid playing basketball and other outdoor recreation.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

On July 28, 2004, plaintiff was examined by Dr. Warren Becker, a psychiatrist at Schoharie County Mental Health Clinic.[FN10] Dr. Becker found that plaintiff did not display any psychiatric disorder that required medication but noted that the medication would make him "feel calmer". Dr. Becker found plaintiff to be polite and cooperative and did not conclude that he was suffering from PTSD.

> FN10. Plaintiff made a request for his own psychiatrist and that request was denied. Plaintiff did not file a grievance with respect to that denial.

On August 24, 2004, plaintiff requested a knee brace so that he could play basketball. Plaintiff was seen by a nurse practitioner on August 30, 2004 and complained that he "went to jump up and when he came down, the right knee buckled". Plaintiff was diagnosed with a right knee strain. The nurse practitioner told plaintiff to avoid basketball and ordered a knee brace. On September 27, 2004, plaintiff requested a different knee brace claiming that the neoprene knee brace he was wearing did not allow for the proper lateral movement of his knee. Nurse McDonald advised plaintiff that his brace was sufficient but stated she would discuss the issue with Dr. Weitz. Dr. Weitz stated that plaintiff needed an orthopedic evaluation to determine his need for a brace. Plaintiff was advised that an appointment would be made for a consultation.

On November 4, 2004, plaintiff was examined by Dr. Shep Friedman, an orthopedist at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament ("ACL") tear. Dr. Friedman suggested exercise and possible surgery. Dr. Friedman indicated that a brace was medically necessary and that he would speak with someone at the jail to discuss a more supportive brace that would meet jail guidelines. The medical staff told plaintiff that if the facility

paid for the brace, it would become facility property when he was transferred. Sgt. Newman and Sgt. Santoro gave Nurse McDonald permission to purchase the brace.[FN11]

> FN11. On December 14, 2004, the brace arrived at SCJ but did not comply with the facility's standards.

**\*3** In December 2004, plaintiff refused to wear a neoprene knee brace. In January 2005, Dr. Friedman re-examined plaintiff and found a normal gait and normal range of motion with some tenderness in the right knee. Dr. Friedman diagnosed plaintiff with a chronic ACL tear and noted that the jail would not permit plaintiff to use a brace with metal stays outside of his cell. Dr. Friedman suggested surgical intervention or conservative measures including physical therapy.

**Plaintiff's Incarceration in 2006**
Plaintiff was incarcerated at SCJ in June 2006 and remained there until August 24, 2006 for a parole violation.[FN12] During the three months that he was incarcerated at SCJ in 2006, plaintiff filed 102 separate inmate requests and approximately 12 medical requests.

> FN12. Defendants allege that plaintiff was admitted on June 7, 2006. Plaintiff claims he was admitted on June 5,

In June 2006, upon plaintiff's arrival at SCJ, Sgt. Newman noted that plaintiff had an "old black knee brace in his personal property. Issued a new blue knee brace-must be returned upon release".

**Plaintiff's Medical Treatment–2006**
On June 9, 2006, plaintiff completed a medical request form complaining of dizziness and insomnia. The same day, plaintiff was prescribed Prozac. On June 10, 2006, plaintiff completed another medical

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

request complaining of pain in his right leg. Plaintiff was seen by a member of the medical staff and pre-scribed 800 mg of Motrin.

On June 15, 2006, Dr. Weitz examined plaintiff and noted a history of low back pain and degenerative disc disease of his lower spine. Upon examination, Dr. Weitz found that plaintiff could walk without limping, had no motor sensory loss and no symptoms with straight leg raises. Dr. Weitz diagnosed plaintiff with low back pain and prescribed Flexeril. On the same day, plaintiff completed a medical request asking for medication called "trigosamine", a consultation with a neurosurgeon, a back brace and back surgery. Plaintiff also refused to see Dr. Weitz. Plaintiff was seen by Melissa Becker, a nurse practitioner, who noted that plaintiff's request was for an herbal remedy that was not FDA regulated. Nurse Becker noted, "I am not ordering unnecessary testing. I am trained medically to make judgment decisions."

On June 16, 2006, plaintiff submitted a grievance claiming that he was denied a back brace and adequate x-rays for herniated discs. On June 21, 2006, after an investigation, Officer Nelson concluded that plaintiff was unwilling to follow the course of action recom-mended by the medical staff and refused to take pre-scribed medication and Motrin. Therefore, Officer Nelson responded to the grievance stating, "I have no choice but to deny this grievance". Plaintiff appealed the decision to Lt. Hazzard who found that, "[y]ou again are refusing any course of action by medical. They have a plan set up which they discuss with you and you refuse to abide by it. Grievance denied". Plaintiff appealed Lt. Hazzard's decision to the Citi-zens Policy and Complaint Review Council ("CPCRC") and on August 10, 2006, CPCRC issued a decision denying plaintiff's grievance.

**\*4** On June 18, 2006, plaintiff complained of severe pain in his lower back. Plaintiff was treated on June 19, 2006 and advised to continue with his med-ications. On July 19, 2006, plaintiff requested a hinged knee brace. On July 20, 2006, plaintiff's medications were increased.

On July 21, 2006, at approximately 2:00 a.m., plaintiff allegedly sustained a knee injury when his knee, "gave out" while he was in the medical holding cell.[FN13] Officer Nelson claims that he went to plain-tiff's cell at approximately 3:00 a.m. and that plaintiff demanded to be taken to the emergency room imme-diately and refused to wear his knee brace. Officer Nelson claims that at approximately 3:12 a.m., he spoke with Dr. Weitz by telephone who directed Of-ficer Nelson to put the brace on plaintiff's knee for the rest of the evening. Dr. Weitz further advised Officer Nelson that the medical staff would examine plaintiff the next morning at the facility. Plaintiff claims that he did not put his brace on because his knee "swelled up".

> FN13. Plaintiff refers to this incident as the "give way" episode.

Later the same day, plaintiff was seen by Nurse Becker who noted that plaintiff's knee was tender to the touch with minimal swelling. Nurse Becker con-vinced plaintiff to use the brace but plaintiff insisted that he be taken to the emergency room to be fitted for a metal brace.[FN14] The nurse recommended that plaintiff be evaluated and "scanned".

> FN14. Plaintiff claims that he was not ex-amined by any member of SCJ medical staff prior to being seen at the emergency room. Officer Nelson claims that when he advised plaintiff that he would be examined in the morning, plaintiff requested, completed and submitted a Pre–Grievance form. Sgt. Newman claims that he denied the grievance on July 24, 2006 because plaintiff was taken to the hospital on July 21, 2006 and July 24, 2006. Sgt. Newman asserts that plaintiff ac-cepted the decision and that plaintiff took no further action with respect to that grievance.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

On July 21, 2006, at approximately 1:45 p.m., plaintiff was seen in the Bassett Hospital Emergency Room. Plaintiff claims he was in "severe" pain. The doctors in the emergency room prescribed Tylenol, wrapped the knee in an ace bandage and advised plaintiff to rest. The doctors also suggested that plaintiff follow with Dr. Friedman. Plaintiff claims he was able to walk out of the hospital because he was "injected" with pain medication. Plaintiff testified that within an hour or two, he was "feeling no pain". On July 21, 2006, upon plaintiff's return from the hospital, plaintiff was involved in an incident with the SCJ correctional staff. Plaintiff admitted to engaging in a verbal exchange with the staff and also admitted that he kicked one of the Corrections Officers.[FN15]

> **FN15.** On August 10, 2006, Sgt. Newman presided over a disciplinary hearing and issued an Inmate Hearing Disposition sanctioning plaintiff to 40 days punitive segregation. Plaintiff was transferred out of SCJ on August 24, 2006 and did not complete his sentence.

On July 24, 2006, plaintiff was examined by Dr. Friedman at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament tear with some arthritic change and limited range of motion. Dr. Friedman noted that plaintiff was fitted for a "Genu ACL brace" which plaintiff was "comfortable with".

From July 24, 2006 through August 24, 2006, plaintiff was permitted to wear the hinged knee brace. On August 24, 2006, Officer Mace escorted plaintiff to the Elmira Correctional Facility ("ECF") and upon arrival, advised ECF staff that the brace needed to be returned to SCJ. The ECF staff removed the brace from plaintiff, outside of Officer Mace's presence. Officer Mace returned the brace to the SCJ.

**Plaintiff's Request for a Catholic Priest**

On June 9, 2006, plaintiff submitted an Inmate Request seeking "religious assistance" from a Catholic priest. Plaintiff received a response from Cpl. Rodriguez–Stanley which stated, "I contacted our jail Chaplain Rev. Ferenczy, and he will try to reach the local Catholic priest to see when he could come out and see you". According to Lt. Hazzard, the SCJ staff, including the facility Chaplain, Reverend Paul Ferenczy, made efforts to obtain the services of a Catholic priest. Plaintiff testified that he previously met with Rev. Ferenczy. On June 26, 2006, plaintiff filed a grievance claiming that he was being denied his, "First Amendment of not having his Catholic religion for 'no' reason at all". Plaintiff claimed that SCJ was deliberately violating the "Religious Freedom Restoration Act". Plaintiff sought to have "Catholic servicers [sic]". Lt. Hazzard explained to plaintiff that ongoing efforts were being made to obtain the services of a Catholic priest. According to Lt. Hazzard, plaintiff accepted that explanation. On June 29, 2006, plaintiff's request for rosary beads was granted. In August 2006, Lt. Hazzard denied plaintiff's grievance noting that, "[e]very attempt was made to get [ ] Catholic priest into facility, our own Chaplain had been trying to assist us. Inmate was sent back to state on August 24, 2007".[FN16]

> **FN16.** According to the record, plaintiff was transferred to ECF in August 2006.

**Plaintiff's Access to Courts**

**\*5** Plaintiff testified that while incarcerated at SCJ, he filed four lawsuits. Moreover, his requests for addresses, supplies and a notary were routinely granted. On June 13, 2006, plaintiff submitted an Inmate Request seeking, "[l]egal reference material called Chapter on Parole and on Article 78 from the Jailhouse Lawyer Manual New Edition". On June 15, 2006, plaintiff filed a second Inmate Request with respect to the materials. On June 16, 2006, plaintiff was advised that the Jailhouse Lawyer Manual, "is not required library material set forth in minimum stand-

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

ards as outline by Commission of Corrections". On June 16, 2006, plaintiff filed two grievances with regard to this issue. Plaintiff sought to have all forms and chapters referenced in his prior request provided immediately and sought copies from the Jailhouse Lawyer Manual on Article 78 and parole and all legal forms from that book, "when requested in the future". Officer Nelson claims that Cpl. Wood investigated the issues and prepared a report. After reviewing the report, Officer Nelson concluded that SCJ was not required to maintain the requested information. On June 21, 2006, Officer Nelson issued a decision stating that, "[a]ll legal reference materials required by NYSCOC minimum standards are available for your review in the facility library and case law copies are available, as you well know, by request. Grievance Denied". Lt. Hazzard reviewed Officer Nelson's decisions and upheld the denial. In July 2006, plaintiff made at least three requests for extended library time and all requests were granted. Plaintiff appealed the determination to the CPCRC and on August 10, 2006, the CPCRC denied plaintiff's grievance.

**Prior Litigation**

On May 11, 2005, plaintiff filed an Amended Complaint in an action entitled *Joseph Paul Guarneri v. John Bates, Jr., Lt. Hazzard, Mr. Santoro, Mr. Newman, Roland Hirot, Mr. Gordon, Paul Marsh, Jr., Schoharie County Jail Medical Department, Dr. Weitz, Nancy McDonald, State Commission of Correction, Frederick C. Lamy, Frank T. Sullivan and Eliot Spitzer,* 05–CV–444 (GLS/DRH) (Dkt. No. 5) (*"Guarneri I"* ).[FN17] That action involved plaintiff's medical treatment while he was incarcerated at SCJ from January 2004 until January 2005. Plaintiff alleged that the defendants violated his right to medical care under the Eighth Amendment. Specifically, plaintiff alleged that during the course of his arrest on January 5, 2004, he sustained from a rotator cuff tear in his shoulder that caused him severe pain. Plaintiff claimed that the defendants were deliberately indifferent to his medical needs with regard to the shoulder injury. Further, plaintiff alleged that he suffered from

knee injuries and that the defendants were deliberately indifferent to his needs as they refused to allow plaintiff to wear his hinged knee brace outside his cell.

> FN17. Plaintiff's original complaint was filed on April 15, 2005. On May 3, 2005, Judge Sharpe issued a Decision and Conditional Order of Dismissal directing plaintiff, *inter alia,* "to set forth a short and plain statement of the alleged wrongdoing or misconduct committed by each defendant, the date of the conduct complained of and the nexus between that conduct and plaintiff's constitutional and statutory rights in order that the Court can properly assess the sufficiency of plaintiff's claims." *See Guarneri v. Bates,* 05–CV–444 (Dkt. No. 3).

On May 31, 2007, the defendants filed motions for summary judgment seeking dismissal of plaintiff's complaint. *See Guarneri v. Bates,* 05–CV–444, (Dkt. No. 72). The matter was referred to U.S. Magistrate Judge David R. Homer for a Report and Recommendation. In his report, Magistrate Judge Homer provided a factual "Background" that included a discussion of plaintiff's medical treatment from August 2004 through January 2005. Magistrate Judge Homer found that plaintiff's shoulder injury may constitute a serious medical need, however, plaintiff failed to establish that the defendants were deliberately indifferent. (Dkt. No. 86). Moreover, Magistrate Judge Homer found that plaintiff failed to offer evidence that his knee injury was serious or that the defendants were deliberately indifferent. Accordingly Magistrate Judge Homer recommended that the Court grant the defendants' motions for summary judgment and dismissal of all claims. (Dkt. No. 86).

**\*6** On March 10, 2008, District Judge Gary L. Sharpe issued a Memorandum–Decision and Order accepting and adopting Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 88).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

### SECOND AMENDED COMPLAINT AND
### PROCEDURAL HISTORY

On August 14, 2006, plaintiff filed a complaint in this action.[FN18] On February 7, 2007, plaintiff filed a Second Amended Complaint. Specifically, plaintiff alleges two causes of action under the First Amendment: (1) denial of meaningful access to courts; and (2) denial of religious freedom. Plaintiff also asserts causes of action with regard to his religious freedom pursuant to the RFRA and the Fourteenth Amendment. Plaintiff also alleges that defendants violated the Eighth Amendment claiming that: (1) defendants did not allow him to keep his hinged knee brace upon arrival at ECF; (2) defendants delayed in providing adequate emergency treatment in July 2006; (3) plaintiff received inadequate emergency care in 2000 and 2003 for herniated discs; and (4) defendants denied plaintiff proper medical care by refusing to provide a back brace.

> FN18. On August 14, 2006, plaintiff filed a complaint in this action. (Dkt. No. 1). Plaintiff was named as a "co-plaintiff" with another inmate, Ryan McNamee. On November 9, 2006, this Court issued a Decision and Order severing plaintiff's action from the action of Ryan McNamee and directing plaintiff to file an amended complaint that, "sets forth only his claims for relief and the facts in support of his claims". (Dkt. No. 9).

On June 13, 2007, defendant Weitz filed a motion pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6) seeking dismissal of plaintiff's complaint arguing that: (1) he was not personally involved in the deprivation of plaintiff's knee brace and in plaintiff's medical care; (2) the complaint failed to state a cause of action; (3) the complaint was barred by res judicata and collateral estoppel; and (4) the claims relating to plaintiff's back were barred by the statute of limitations. (Dkt. No. 19). The motion was referred to Magistrate Judge Homer for a Report and Recommendation. On February 6, 2008, Magistrate Judge Homer concluded that plaintiff failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at ECF and recommended granting Weitz's motion for summary judgment based upon lack of personal involvement with the confiscation of the knee brace. However, Magistrate Judge Homer also found that plaintiff sufficiently alleged that Dr. Weitz was personally involved in his medical care for mental health issues and back and neck injuries sustained in 2003.

Magistrate Judge Homer also found that plaintiff sufficiently alleged an Eighth Amendment violation with respect to his knee injury, mental health and 2003 back injury and recommended denial of Weitz's motion on that ground. [FN19] However, plaintiff's claims relating to medical indifference occurring in 2000 were "clearly outside the three-year [statute of limitations] period". With regard to Weitz's res judicata argument, Magistrate Judge Homer concluded that there had not been a final determination in the pending federal case (09–CV–444) against Dr. Weitz and therefore, that aspect of the motion should be denied without prejudice. On February 27, 2008, this Court adopted Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 55).

> FN19. In the Conclusion portion of the recommendation, Magistrate Judge Homer did not address defendant's motion with respect to plaintiff's Eighth Amendment claim with regard to his knee injury. However, in the text of the Report and Recommendation, Judge Homer discussed plaintiff's knee injury. Judge Homer noted:
>
> > [C]onstruing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

(Dkt. No. 54).

*7 Presently before the Court are two motions for summary judgment. Defendant Weitz moves for summary judgment and dismissal of plaintiff's complaint arguing that: (1) plaintiff's claims are precluded under the doctrine of res judicata and collateral estoppel; (2) plaintiff cannot establish that defendant was deliberately indifferent to any serious medical condition relating to plaintiff's knee, back or mental health treatment; (3) plaintiff cannot demonstrate defendant's personal involvement in medical decisions concerning plaintiff's emergency medical treatment in 2003 for herniated discs; (4) plaintiff's claim of mistreatment of a back injury in 2003 is precluded by the statute of limitations; and (5) Dr. Weitz is entitled to qualified immunity. (Dkt. No. 70). Defendants Hazzard, Marsh, Grippin, Mace, Howland, Cronk and the County of Schoharie move for summary judgment arguing: (1) plaintiff did not suffer from a serious medical need with respect to his knee, back and mental health and even assuming plaintiff suffered from serious medical need(s), defendants were not

deliberately indifferent to plaintiff's condition(s); (2) plaintiff was not denied the ability to freely exercise his religious beliefs; (3) plaintiff was not denied equal protection on account of his religious beliefs; (4) plaintiff was not denied meaningful access to the courts; (6) defendants were not personally involved in the alleged constitutional deprivations; and (7) defendants are entitled to qualified immunity. (Dkt. No. 71). Plaintiff opposes the motions. (Dkt. No. 77).

## DISCUSSION
### I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts ("Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that those facts are supported by the evidence in the record. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) (holding that the court may not rely solely on the movant's statement of

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

undisputed facts contained in its Rule 56.1 statement and must be satisfied that the movant's assertions are supported by the evidence in the record). Although a plaintiff is *pro se,* bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment. *See Higgins v. Davis,* 2001 WL 262930, at *2 (S.D.N.Y.2001).

**\*8** "Defendants can meet their burden of establishing their entitlement to motion for summary judgment by relying on plaintiff's medical records to establish the absence of any evidence supporting deliberate indifference to his mental health needs." *Mills v. Luplow,* 2009 WL 2579195, at *8 (W.D.N.Y.2009). Though conventional wisdom might dictate the submission of affidavits from the primary actors ... [the] defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's claims, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims." *Id.*

**II. Collateral Estoppel/Res Judicata**

Defendant Weitz seeks dismissal of plaintiff's claims based upon res judicata arguing that plaintiff should be precluded from "splitting" his claims into separate actions when he had, "a full and fair opportunity to litigate his claims in the previous lawsuit".[FN20]

FN20. Plaintiff does not respond to this argument.

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits in an action "precludes the parties or their privies from relitigating issues that were or could have been raised in that action". *Computer Assoc. Int'l v. Altai, Inc.,* 126 F.3d 365, 369 (2d Cir.1997). "It must first be determined that the second suit involves the same 'claim' or 'nucleus of operative fact' as the first suit". *Interoceanica*

*v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997) (citation omitted). New York law follows a transactional approach which bars the relitigation of not only matters that were litigated between parties in a preceding action, but also any matters that could have been litigated in that action. *Ramsey v. Busch,* 19 F.Supp.2d 73, 83 (W.D.N.Y.1998). To ascertain whether the two actions arise from the same claim, courts look to whether the underlying facts are "related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations". *Interoceanica,* 107 F.3d at 90 (citations omitted). A plaintiff cannot avoid claim preclusion by " 'splitting' his claim into various suits based on different legal theories (with different evidence 'necessary' to each suit)". *Waldman v. Vill. of Kiryas Joel,* 207 F.3d 105, 110 (2d Cir.2000) (citing *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 39 (2d Cir.1992)).

"As a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play." *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997) (citing *S.E. C. v. First Jersey Secs.,* 101 F.3d 1450, 1464 (2d Cir.1996)); *see also Waldman,* 207 F.3d at 113 (res judicata will not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was itself based on earlier acts). "Claims arising after the prior action need not, and often perhaps could not, have been brought in that action and are not barred by res judicata unless they represent a continuance of the same 'course of conduct' ". *Stewart v. Transport Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 443 (S.D.N.Y.2008) (citing *Green v. Illinois Dep't of Transp.,* 609 F.Supp. 1021, 1026 (N.D.Ill.1985)) (the court declined to read the doctrine of res judicata to require the plaintiff to amend his first complaint to allege a claim that arose after the suit had been filed. A party may file a supplemental pleading but it not required to do so and may file a new suit if he chooses. *Garcia v. Scoppetta,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

289 F.Supp.2d 343, 350 (E.D.N.Y.2003). In *Maharaj,* the Second Circuit held:

> **\*9** If, after the first suit is underway, a defendant engages in actionable conduct, plaintiff may-but is not required to-file a supplemental pleading setting forth defendant's subsequent conduct. Plaintiff's failure to supplement the pleadings of his already commenced lawsuit will not result in a res judicata bar when he alleges defendant's later conduct as a cause of action in a second suit.

> *Maharaj,* 128 F.3d at 97.

Res judicata, if applied too rigidly, could work considerable injustice. *Reilly v. Reid,* 45 N.Y.2d 24, 28, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978) (holding that claim preclusion is tempered by recognition that two or more different and distinct claims or causes of action may often arise out of a course of dealing between the same parties) (citations omitted). "A party's choice to litigate two such claims or causes of action separately does not bar his assertion of the second claim or cause of action." *Id.* at 29, 407 N.Y.S.2d 645, 379 N.E.2d 172 (citation omitted).

In May 2005, plaintiff filed his complaint in *Guarneri I* alleging constitutional violations relating to medical care for his shoulder and knee injuries.[FN21] On August 14, 2006, while *Guarneri I* was pending, plaintiff filed a complaint in the instant action alleging constitutional violations relating to medical care for his knee, back, neck and mental health issues. Defendant argues that plaintiff is attempting to "split" his claims and that he "could have raised the claims at issue here in the previous action". Defendant contends that "most of the complaints and treatment relating to [plaintiff's] back and mental health complaints occurred in 2004, the same period of time at issue in his previous lawsuit".

FN21. Plaintiff has made no claims with re-

gard to his shoulder in this action.

It is undisputed that a final judgment on the merits was entered in *Guarneri I.* However, in *Guarneri I,* plaintiff did not allege any violations with respect to his back, neck or mental health issues. Applying the "transactional"approach for res judicata purposes, the Court finds that the claims and factual circumstances in the present action pertain to a different time period and are not sufficiently related in time, space and origin. In both actions, plaintiff alleged constitutional violations relating to medical treatment for his knee. However, plaintiff was examined by Dr. Weitz in June 2006 and the "give way" incident occurred in July 2006. Thus, these "legally significant" acts occurred after the complaint was filed in *Guarneri I* and are not precluded under res judicata. Defendants argue that when plaintiff testified at his deposition in *Guarneri I,* the medical treatment about which plaintiff complained in the instant action had already occurred. While the record supports that assertion, the appropriate analysis involves the date of the filing of the first complaint, not the date of the deposition. Based upon the record before the Court in *Guarneri I* and the record in the present action, the factual scenarios and evidence relevant to *Guarneri I* and the present action are sufficiently different such that a judgment in the present action will not destroy or impair the rights or interests established in *Guarneri I. See Ramsey v. Coughlin,* 94 F.3d 71, 83 (2d Cir.1996). Accordingly, Weitz's motion for summary judgment and dismissal of plaintiff's claims based upon res judicata is denied.

**III. Eighth Amendment**

**\*10** Defendants claim that they are entitled to summary judgment and dismissal of plaintiff's § 1983 claims because plaintiff cannot demonstrate that any defendant was deliberately indifferent to any serious medical need.

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

sufficiently harmful to evidence deliberate indifference to serious medical needs." [FN22] *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

> FN22. Plaintiff claims that he was a pretrial detainee and enjoyed greater privileges than a convicted prisoner. However, plaintiff offers no support for this allegation. "As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences." *McQueen v. County of Albany,* 2010 WL 338081, at *10 (N.D.N.Y.2010) (citing *Benjamin v. Fraser,* 343 F.3d 35, 49–50 (2d Cir.2003)). However, the Second Circuit has held that, "[c]laims for deliberate indifference to a serious medical condition of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). A medical condition is considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). If unnecessary and wanton infliction of

pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a life-long handicap or permanent loss, the condition may be considered "sufficiently serious." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)). "Because there is no distinct litmus test, a serious medical condition is determined by factors such as '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain.' " *Whitcomb v. Todd,* 2008 WL 4104455, at *10 (N.D.N.Y.2008) (citing *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Sonds,* 151 F.Supp.2d at 310 (citing *Estelle,* 429 U.S. at 105–106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Sonds,* 151 F.Supp.2d at 310 (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*11** Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Jones v. Lindblad,* 2009 WL 804155, at *6 (W.D.N.Y.2009) (citing *Estelle,* 429 U.S. at 104). Culpable intent requires the inmate to establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to

take reasonable measures to abate the harm." *Id.* (citing *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996)). Delays must be purposeful or intended or the plaintiff must establish that the deprivation of not having treatment in the stated period was sufficiently serious. *Woods v. Goord,* 1998 WL 740782, at * 12 (S.D.N.Y.1998).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that a plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id; see also Whitcomb,* 2009 WL 4104455, at *10 (noting that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a § 1983 claim). Even if medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Dean,* 804 F.2d at 215.

**A. Knee Injury**

Defendants argue that plaintiff did not suffer from a serious knee injury and further, that plaintiff received prompt medical attention after the "give way" episode in his cell. Plaintiff claims that the "give way" episode occurred at 2:00 a.m. and that he did not receive medical treatment until five hours later. Plaintiff alleges that defendants deliberately and intentionally denied plaintiff emergency medical care after the episode.

**1. Serious Medical Need**

A plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *Lowman v. Perlman,* 2008 WL

4104554, at *5 (N.D.N.Y.2008) (citing *Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y.2006)). Generally, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection". *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered in a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D.N.Y.2006)) (holding that a "medial meniscal tear, with joint effusion" which did not render the plaintiff immobile was not a serious medical need; *see also Williamson,* 2006 WL 1977438, at *9–16 (knee injuries such as a torn meniscus, arthritis, degenerative joint disease and ligament tears are not serious injuries under the Eighth Amendment).

**\*12** In this matter, plaintiff alleges that he suffers from severe pain and torn ligaments in his knee. Plaintiff's claim that he suffers from an ACL tear is supported by Dr. Friedman's diagnosis. However, in *Guarneri I,* Magistrate Judge Homer concluded that, "the allegations of pain and chronic ACL tear do not constitute a serious medical need in these circumstances". The record in *Guarneri I* included medical records from 2004 through 2005. In the instant action, plaintiff has not produced any additional evidence demonstrating that he suffers from a serious medical condition with respect to his knee. Plaintiff never exhibited any limitations in his range of motion and never complained of an inability to ambulate. Indeed, plaintiff continued to played basketball even after he was advised, on more than one occasion, by medical staff to avoid outdoor recreation. *See Price v. Engert,* 589 F.Supp.2d 240, 245–46 (W.D.N.Y.2008) (citing *Chatin v. Artuz,* 28 F.App'x. 9, 10 (2d Cir.2001)) (two weeks after receiving alleged injuries, the plaintiff was able to play basketball, suggesting that he was not in serious pain and that his injuries did not interfere with his daily activities); *see also Lowman,* 2008 WL 4104554, at *5 (the fact that the plaintiff was able to walk and play basketball suggested that the plaintiff did not suffer from a serious medical need). Plaintiff's

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

claim that he suffered from "severe pain" as a result of his knee injury is contradicted by the medical records wherein plaintiff exhibited a "normal gait" and "no swelling or difficulty walking".

On July 21, 2006, the "give-way" episode occurred in plaintiff's cell. Plaintiff was evaluated by a nurse practitioner who noted that plaintiff ambulated without a limp and found minimal swelling in the knee with tenderness upon palpation. Plaintiff testified that he was in severe pain prior to being treated in the emergency room but that after he received an injection of pain medication, he was "feeling no pain". Indeed, within an hour or two of his return to SCJ, plaintiff had a physical altercation with Correction Officers and kicked "multiple sealed doors off the hinges". Thus, even assuming plaintiff suffered extreme pain after the "give way" episode, such a short period of pain is de minimis and does not constitute a serious medical condition under the Eighth Amendment. The medical evidence pertaining to plaintiff's knee injury/complaints fails to establish that plaintiff suffered from a serious or urgent medical condition. Plaintiff failed to provide any medical evidence, either with affidavits or medical records, that defendants' failure to provide treatment caused serious harm.

**2. Deliberate Indifference**

Even assuming plaintiff had a "serious medical need", plaintiff cannot establish that defendants were deliberately indifferent. This court has carefully outlined the extensive attention that plaintiff received for his complaints. From January 2004 until August 2006, plaintiff was examined and/or treated by the medical staff at SCJ or outside medical personnel approximately thirty times. In addition, after plaintiff made a request for a knee brace, Dr. Weitz arranged for an orthopedic consultation with Dr. Friedman. During the relevant time period, plaintiff had three appointments with Dr. Friedman-including an appointment three days after the "give way" episode. Plaintiff's complaints were never ignored, and in most instances, plaintiff only waited a few days to see medical per-

sonnel.

**\*13** Plaintiff's complaints of deliberate indifference are also contradicted by the fact that he received several prescription medications including Bextra, Flexeril and Motrin for knee pain. According to the record, plaintiff was non-compliant and refused to take the medications claiming that they "masked his symptoms". Plaintiff's history of refusing to comply with the directions of the medical staff and physicians undermines his claims of deliberate indifference. *See Wright v. Genovese,* 2010 WL 890962, at *15 (N.D.N.Y.2010) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)). In addition to medication, during his incarceration in 2004, the medical staff also offered plaintiff support for his knee including a neoprene brace. Plaintiff refused to wear the brace. Upon his arrival at SCJ in June 2006, plaintiff presented with an "old knee brace" and was provided with a new knee brace on the same day.

Plaintiff claims that his requests for physical therapy and injections were intentionally denied. Based upon the record, the medical staff deemed the requests "not medically necessary" as plaintiff did not exhibit objective signs of a serious injury. The fact that plaintiff disagreed with the course of treatment does not rise to a level of deliberate indifference and provides no basis for relief under § 1983.

Even crediting plaintiff's claim that he waited five hours for medical care after the "give way" episode, the timing of these events does not establish a disregard of a risk to plaintiff or "deliberate indifference" to his medical needs. *Shankle v. Andreone,* 2009 WL 3111761, at *6 (E.D.N.Y.2009) (citations omitted). Although the record contains conflicting accounts with regard to how quickly the medical staff responded to plaintiff's needs, by his own admission, plaintiff was treated within five hours of the incident. Courts have held that delays longer than five hours were insufficient to implicate the Eighth Amendments. *See Rodriguez v. Mercado,* 2002 WL 1997885,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

at *9 (S.D.N.Y.2002) (the plaintiff was seen within eight or nine hours of the incident); *see also Davidson v. Harris,* 960 F.Supp. 644, 648 (W.D.N.Y.1997) (holding that even assuming that the plaintiff's factual allegations were true and that he was forced to wait six to eight hours before receiving oxygen and pain medication, the plaintiff has failed to demonstrate that the alleged deprivation was "a condition of urgency, one that may produce death, degeneration or extreme pain", and therefore, failed to state a cause of action of deliberate indifference to serious medical needs).

Plaintiff's conclusory assertions that he received improper medical attention, absent other documentation, fails to constitute evidence sufficient to raise issues of fact to defeat summary judgment. *See Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1997) (granting summary judgment where "plaintiff's affidavit and deposition ... [did] not contain facts involving manifestations of ... deliberate indifference ..."). Indeed, plaintiff's complaints are contradicted by the record which establishes that plaintiff received more than adequate medical care for his knee complaints.

**\*14** Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claims that defendants violated his Eighth Amendment rights with regard to his knee injury is granted.

**B. Knee Brace**[FN23]

> FN23. This Court previously granted Weitz's motion to dismiss plaintiff's claim with regard to the confiscation of the knee brace due to lack of personal involvement. (Dkt.Nos.54, 55).

Defendants argue that they did not interfere with plaintiff's medical treatment when they confiscated the knee brace provided to plaintiff by SCJ.

Where a "prisoner is receiving appropriate on-going treatment for his condition" and brings a claim for denial of adequate medical care for an "interruption in treatment," the Second Circuit has stated that the "serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith,* 316 F.3d at 186. Plaintiff must submit some evidence that a defendant interfered with his prescribed course of treatment and caused plaintiff to suffer pain. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 270 (W.D.N.Y.1998) (holding that the plaintiff submitted evidence that the defendant's repeatedly took his cane from him on a number of occasions thereby creating an issue of fact as to whether the defendant acted with wantonness); *see also Williamson,* 2006 WL 1977438, at *18 (finding that the defendants refusal to renew the plaintiff's permit for crutches did not threaten to produce death, degeneration or extreme pain). A single, isolated occurrence, might not support an Eighth Amendment claim. *Id.*

This portion of plaintiff's claim belies his argument that defendants were deliberately indifferent to his knee condition. Plaintiff concedes that defendants provided him with a hinged knee brace after the "give way" episode in July 2006 and further, that he was permitted to wear the brace until his transfer to ECF in late August 2006. Under these circumstances, the record does not support a finding of deliberate indifference. Plaintiff has not provided evidence of any additional adverse effects or injuries stemming from the time he was forced to return the brace to SCJ to the present. There is no evidence that the deprivation of the hinged knee brace created or had the potential to create serious harm to plaintiff. Moreover, plaintiff has failed to establish that defendants "maliciously took away" his brace. *Cf. Hemmings v. Gorczyk,* 134 F.3d 104, 107 (2d Cir.1998). According to Mace's affidavit, he confiscated the knee brace upon plaintiff's transfer at the request of Lt. Hazzard. Plaintiff has failed to establish that Mace acted out of anything other than a reasonable belief that the brace was "SCJ

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

property". Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's complaint with regard to the confiscation of the knee brace is granted.

**C. Back Injury**

Defendants allege that plaintiff's activities and refusal to take medication or adhere to the recommended course of treatment by his physicians demonstrates that he did not suffer from a serious medical need with regard to his back. Defendants also claim that they were not deliberately indifferent to his medical needs as plaintiff was prescribed pain medication and muscle relaxants. Plaintiff alleges that defendants: (1) should have provided him with a back brace: (2) refused to provide emergency medical care for plaintiff's back injuries in 2000 and 2003 [FN24]; and (3) defendants refused to allow him to obtain treatment with a neurosurgeon [FN25].

> FN24. This Court previously determined that any allegations from 2000 were barred by the applicable statute of imitations.

> FN25. The allegations with regard to the neurosurgeon are not contained in the Second Amended Complaint. Rather, plaintiff raised the issue for the first time in his opposition to defendants' motions.

**\*15** The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. Williams v. Smith, 2009 WL 2431948, at *8 (S.D.N.Y.2009) (although the plaintiff may have difficulty meeting the seriousness issue at trial, all inferences must be drawn in his favor at the summary judgment stage). As this Court stated in the prior Memorandum–Decision and Order:

Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can

amount to a 'serious medical need' under the Eighth Amendment." Nelson v. Rodas, 2002 WL 31075804, at *14 (S.D.N.Y.2002) (citations omitted); see also Farraday v. Lantz, 2005 WL 3465846, at *5 (D.Conn.2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need).

(See Dkt. No. 55).

Back pain does not constitute a serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications." Jackson v. Fairchild, 2007 U.S. Dist. LEXIS 17497, at *5–9, 2007 WL 778133 (N.D.N.Y.2007).

Based upon the record, there is an issue of fact with respect to whether plaintiff suffered from a serious back injury. Dr. Weitz noted that plaintiff complained of back pain "since his arrival to jail". Plaintiff continued to complain of back pain throughout 2004 and underwent x-rays in June 2004 which revealed mild degenerative changes in the lower spine. Conversely, the record indicates that plaintiff was prescribed Tylenol, Bextra and Flexeril for his pain but that he was not compliant with his medication and disobeyed doctor's orders by playing basketball.

Even assuming plaintiff suffered from a serious medical need, plaintiff has not submitted competent evidence demonstrating that defendants were deliberately indifferent and disregarded his health or safety. As noted previously, plaintiff's request for medical treatment were routinely granted and in most cases, within 2 days of such requests. Plaintiff was evaluated by an orthopedic specialist, was prescribed several medications for his back pain and underwent x-rays of his back at an outside facility at Dr. Weitz's request.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

Accordingly, plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Plaintiff alleges that defendants ignored his requests for a back brace and refused to allow him to consult with a neurosurgeon based upon non-medical concerns. Upon a review of the record, it is clear that plaintiff's requests were denied due to plaintiff's refusal to adhere to the medical staff's prescribed course of action and his unwillingness to accept medication for his complaints of pain. The record establishes that defendants were responsive to plaintiff's request but did not provide plaintiff with the specific treatment he requested. Plaintiff was provided with muscle relaxants and other prescription medication. Plaintiff clearly disagreed with defendants course of treatment. However a disagreement, without further evidence, is insufficient to sustain a cause of action for violations of plaintiff's Eighth Amendment right. Plaintiff was treated by a number of different medical professionals who are afforded wide discretion in their treatment of prisoners. *See Aquino v. Kooi,* 2007 WL 201169, at *4 (N.D.N.Y.2007).

**\*16** Finally, plaintiff claims that defendants' deliberately refused to provide "emergency care" in 2003 after a slip and fall in the shower area and assault by another inmate at the SCJ.[FN26] As a result of the incident(s), plaintiff claims that he sustained herniated discs in his neck and lower back. Plaintiff has not provided any competent, admissible evidence to support that allegation. Indeed, the record does not contain any evidence or medical records relating to any of plaintiff's medical treatment in 2003 either within or outside of SCJ. The record is also devoid of any medical requests for treatment or any other complaints by plaintiff of pain in his neck.

FN26. From a review of the complaint, the Court is unable to determine which event occurred in 2000 and which occurred in 2003. The Court has already determined that plaintiff's claims with respect to any injury in

2000 are precluded by the statute of limitations.

Dr. Weitz argues that he is entitled summary judgment and dismissal of plaintiff's claims relating to the denial of "emergency care" 2003 because he did not begin treating plaintiff until January 2004. The record establishes that Dr. Weitz did not treat plaintiff until January 2004 and plaintiff does not dispute this contention. Accordingly, summary judgment and dismissal of this cause of action as against Dr. Weitz is appropriate on this basis as well.[FN27]

FN27. The Court has determined that Weitz was not personally involved in plaintiff's complaints of inadequate emergency care in 2003. Thus, the Court declines to engage in an analysis of Weitz remaining argument that any cause of action arising from the 2003 injury is barred by the statute of limitations.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claim that defendants were deliberately indifferent to his medical needs for back and neck injuries is granted.

**D. Mental Health**

Defendants argue that plaintiff did not suffer from a serious mental health condition. Further, defendants claim that plaintiff cannot establish that they were deliberately indifferent to his medical needs as defendant responded to plaintiff's requests for mental health treatment and plaintiff never filed any grievance with respect to the issue. Plaintiff claims that he suffers from mental illness and that the, "psychiatric care he received can be such a substantial deviation from accepted standard as to constitute deliberate indifference". Plaintiff claims he was denied supportive therapy and follow up interviews with mental health providers.

The denial of mental health care may constitute a

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

violation of the Eighth Amendment if plaintiff alleges "pain, discomfort or risk to health". *Mills, 2009 WL 2606240, at \* 16* (citation omitted). Support for the claim of mental illness may be presented in the form of "medical evidence, such as a physician's diagnosis." *Selah v. N.Y.S. Docs Com'r.* 2006 WL 2051402, at \*5 (S.D.N.Y.2006) (citing *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir.1995)). Plaintiff must provide evidence that a condition is of urgency. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 218 (N.D.N.Y.2001) (holding that even if the plaintiff's mental health care was "far from optimum", he was provided significant psychotropic medication, bi-weekly individual therapy sessions, and monthly medical reviews while incarcerated). Disagreements with the treatment offered or allegations that he should have received more time with a psychiatrist do not constitute deliberate indifference. *Id.* Moreover, plaintiff cannot establish a "serious medical need" when he is offered but refuses medication that may alleviate his mental anguish. *Sims v. Daley,* 1997 WL 33608, at \*5 (S.D.N.Y.1997).

**\*17** In this case, plaintiff alleges that he suffers from post-traumatic stress disorder, severe depression, anti-social disorder and bipolar disorder. Plaintiff presents conclusory allegations and fails to submit medical records or an affidavit from any physician or mental health provider to support his assertions. In fact, plaintiff's allegations are wholly inconsistent with the record. Dr. Becker opined that plaintiff did not suffer from PTSD. Moreover, according to the record, the mental health staff at SCJ and Schoharie Mental Health Clinic continually noted that plaintiff was not a risk to others, not a suicide risk and did not display homicidal ideation.

Even assuming plaintiff could establish that his mental health condition was serious, plaintiff cannot establish that defendants were deliberately indifferent to his condition. When plaintiff began complaining of mental health issues, Dr. Weitz contacted Schoharie Mental Health Clinic and consulted with Kelly Far-

num and arranged for an evaluation by Dr. Becker. The record demonstrates that each time plaintiff requested a mental health evaluation, he was seen and treated within days of the request. *See Mills* 2009 WL 2606240, at \* 17 (holding that the record demonstrated that the plaintiff received adequate care for his mental health condition while incarcerated as the plaintiff was seen by the prison's mental health staff each time he requested). In 2004, Dr. Weitz and Dr. Becker prescribed Depakote, Welbutrin and Prozac. Moreover, within a few days of arriving at SCJ in June 2006, plaintiff received a prescription for Prozac from SCJ's medical staff. Based upon the record, plaintiff cannot establish that defendants were deliberately indifferent to his mental health needs and therefore, defendants' motions for summary judgment and dismissal of plaintiff's Eighth Amendment claims with respect to his mental health is granted.

**IV. Plaintiff's Request for a Catholic Priest**[FN28]

> **FN28.** This cause of action has not been asserted against Weitz.

Plaintiff has alleged causes of action under the Religious Freedom Restoration Act ("RFRA") and the First Amendment.[FN29] Plaintiff claims that defendants "tried to pass off Rev. Ferenczy as a Catholic Priest" and thus, committed fraud. Defendants claim that plaintiff was not inhibited from practicing any sincerely held religious belief.

> **FN29.** Plaintiff asserted a cause of action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"). The RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Hamilton v. Smith,* 2009 WL 3199531, at \*1 (N.D.N.Y.2009) (citation omitted). Therefore, the Court construes

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

plaintiff's RFRA claim as a RLUIPA cause of action.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc–1), imposes duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009) (citation omitted). Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion. *Redd v. Wright,* 2010 WL 774304, at *3 (2d Cir.2010). "The state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id.*

**\*18** Under the First Amendment, "a generally applicable policy will not violate a plaintiff's right to free exercise of religion if the policy is 'reasonably related to legitimate penological interests' ". *Id.* (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). To succeed on a claim under the First Amendment, the plaintiff must prove that defendants conduct substantially burdened his sincerely held religious beliefs. *Pugh v. Goord,* 571 F.Supp .2d 477, 497 (S.D.N.Y.2008). The defendant must then establish that legitimate penological interests justify the impinging conduct. *Id* .

In order to be considered a "substantial burden", the plaintiff must demonstrate that the government's action pressured him to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Muhammed v. City of New York Dep't of Corrections,* 904 F.Supp. 161, 188 (S.D.N.Y.2005) (citations omitted). The burden must be more than an inconvenience, it must be substantially interfere with a tenet or belief that is central to the religious doctrine. *Id.* (citations omitted); *see also Jones v. Shabazz,* 2009 WL 3682569, at *2 (5th Cir.2009) (holding that a

government action or regulation only creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs). If the plaintiff demonstrates a substantial burden, the onus shifts to the government to prove that an action or policy is the least restrictive means of furthering a compelling state interest. *See Pugh,* 571 F.Supp.2d at 503. A court must consider whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant. *Kikumura v. Hurley,* 242 F.3d 950, 962 (10th Cir.2001). Prison security and penological institutional safety goals are unquestionably compelling state interests. *Muhammed,* 904 F.Supp. at 189. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience ... of prison [ ] administrators in establishing necessary regulations ... to maintain security and discipline ..." *Jova,* 582 F.3d at 415 (citing *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)).

While an inmate has a constitutional right to practice his religion, the prison staff "is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice". *Davidson v. Davis,* 1995 WL 60732, at *5–6 (S.D.N.Y.1995) (citing 42 U.S.C. § 2000bb–1(b)); *see also Reimers v. Oregon,* 863 F.2d 630, 632 (9th Cir.1988) (an inmate does not have the right under the Free Exercise Clause to have the particular clergyman of his choice provided to him). The Constitution does not require that a religious advisor be provided for every sect in a penitentiary. *Weir v. Nix,* 114 F.3d 817, 820–821 (8th Cir.1997) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)) (prison officials need not provide exactly the same religious facilities or personnel to prisoners of every faith). A plaintiff cannot demonstrate that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for coordinating

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

visits with spiritual advisors. *See Pogue v. Woodford, 2009 WL 2777768, at \*8 (E.D.Cal.2009)* ("[i]f the rule were to the contrary, prisons would have to fund any other religion facilitating request without which an inmate could claim a substantial burden") (citations omitted). Only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner. *Id.* (citing *SapaNajin v. Gunter,* 857 F.2d 463, 464 (8th Cir.1988)).

**\*19** In the case at hand, defendants do not dispute that plaintiff had sincerely-held religious beliefs. Accordingly, the Court analyzes whether defendants' conduct created a substantial burden upon those beliefs. Plaintiff makes the conclusory allegation that defendants attempted to perpetrate a fraud by "passing Rev. Ferenczy off as a Catholic". However, plaintiff has provided no factual basis for these assertions. Plaintiff testified that SCJ provided him with a Bible and rosary beads, upon request. Further, plaintiff admits that he had access to the facility Chaplain, Rev. Ferenczy and testified that he actually met with the Reverend on at least one occasion. As part of the motion herein, Sgt. Newman provided a copy of the SCJ's Inmate Rules and Regulations which were in effect during plaintiff's incarceration. The Rules provided, *inter alia,* "[y]ou may request religious assistance. Every effort will be made to assist you with your request, starting with the Facility Chaplain". The Rules and Regulations clearly stated that the facility would make "every effort" to honor requests for religious assistance. Moreover, according to the Regulations, SCJ allowed outside clergy to visit. Defendants have provided evidence that the SCJ staff attempted to locate a Catholic priest to meet with plaintiff. Plaintiff has not submitted any evidence demonstrating that defendants' failure to provide a Catholic priest pressured him to commit an act forbidden by his faith. Plaintiff has not demonstrated that he was "prevented" from meeting with a spiritual advisor of his choice.

Rather, plaintiff argues, without legal or factual support that defendants are obligated to provide him with such an advisor. Plaintiff's argument lacks merit. Defendants' failure to comply with plaintiff's request does not amount to either a constitutional or statutory violation. Based upon the record, plaintiff 's free exercise of religion was not substantially burdened by defendants' failure to provide him with a Catholic priest.

Even if plaintiff could establish that his rights were substantially burdened, plaintiff's claim would nonetheless fail because defendants actions were the least restrictive means in furtherance of a compelling interest. Construing plaintiff's complaints in a favorable light, plaintiff seemingly argues that he was denied visits with personal spiritual advisors. Plaintiff claims that SCJ personnel told him that Henry Eckerd, a Jehovah's Witness, would not come to see him. Plaintiff also claims that he asked to be allowed to see his godfather, a Catholic priest, but that he wasn't allowed to have visitors. Plaintiff cannot prevail on this claim for two reasons. First, according to the SCJ Inmate Rules and Regulations, "[m]eetings with attorneys, counselors and clergy are not charged as visits". Plaintiff has not submitted evidence proving that he contacted his godfather and that defendants explicitly refused to allow visitation. Further, during his deposition, plaintiff admitted that he did not call Mr. Eckerd because he did not want to "run up his phone bill". Second, even assuming plaintiff was denied visits with clergy, based upon the record, defendants' had a compelling interest in revoking plaintiff's visitation privileges. Defendants do not dispute that plaintiff's visitation privileges were revoked. Throughout his deposition, plaintiff admitted that he was prone to violence indicating that he had kicked corrections officers during altercations and that he became, "physical with the staff to see medical". Plaintiff admitted that he, "assault[ed] the staff" to get them to take him to the medical unit. Plaintiff stated that this occurred on two or three occasions. There is no unqualified constitutional right to visitation, which

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

may be regulated in keeping with legitimate penological objectives. *Smith v. Beatty,* 1996 WL 166270, at *1 (7th Cir.1996) (citing *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Even assuming plaintiff could establish that he was denied the right to visit with clergy, based upon the record, plaintiff's violent outbursts and behavior resulted in the decision to restrict plaintiff's visitation privileges. Clearly, this was the least restrictive means of furthering a compelling governmental interest. Moreover, plaintiff admitted that even before his visitation privileges were revoked, he was not visited by a Catholic priest.

**\*20** Based upon the record, plaintiff was not deprived of the right to exercise the religion of his choice. Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's First Amendment claims and RLUIPA claims relating to religion is granted.

## VI. Fourteenth Amendment–Equal Protection[FN30]

> FN30. This cause of action has not been asserted against Weitz.

Plaintiff alleges that, "Lt. Hazzard deliberately and intentionally tried to force a different religion on plaintiff" and denied plaintiff the right to Equal Protection under the Fourteenth Amendment. Defendants contend that there is no evidence that plaintiff was treated differently on account of his religious beliefs.

"The equal protection clause directs state actors to treat similarly situated people alike." *Salahuddin v. Perez,* 2006 WL 266574, at *9 (S.D.N.Y.2006) (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)). To prove an equal protection violation, plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). "[T]he Equal Protec-

tion Clause does not require that "every religious sect or group within a prison must have identical facilities or personnel". *Allen v. Toombs,* 827 F.2d 563, 569 (9th Cir.1987) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). Rather, it entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.' " *Shakur v. Schriro,* 514 F.3d 878, 891 (9th Cir.2008) (quoting *Cruz,* 405 U.S. at 322).

Plaintiff has failed to produce any evidence that defendants intentionally or purposefully discriminated against him on the basis of his faith. Plaintiff has not provided any evidence of bias, discriminatory remarks or evidence of comparable situations where fellow inmates were treated differently. Plaintiff's conclusory assertions that defendants committed "fraud" by attempting to "pass off" Rev. Ferenczy as Catholic are unsupported by facts or the record. Based upon the record, the Court finds that plaintiff has been provided with "reasonable opportunities" to practice his faith and therefore, has not been denied equal protection. *See Card v. Dugger,* 709 F.Supp. 1098, 1109 (M.D.Fla.1988).

## VII. Access to Courts[FN31]

> FN31. This cause of action has not been asserted against Weitz.

Defendants argue that plaintiff was not denied meaningful access to the courts. Specifically, defendants contend that SCJ maintains a law library that complies with New York State's Minimum Standards and Regulations for Management of County Jails and Penitentiaries and provides all required texts. Plaintiff claims that defendants impeded his ability to do legal research and that the SCJ law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system. Further, plaintiff argues that his time in the library was "in-

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

tentionally and unreasonably limited".

**\*21** Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828; *Bourdon,* 386 F.3d at 92. However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351–54, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The government does not have to afford inmates unlimited access to a library. *Bounds,* 430 U.S. at 828; *see also Shell v. Brun,* 585 F.Supp.2d 465, 468 (W.D.N.Y.2008) (holding that a prison law library may not be to an inmate's liking but that does not make it constitutionally inadequate). The plaintiff must prove that the "alleged shortcomings in the library [ ] hindered his efforts to pursue a legal claim". *Davis v. Buffardi,* 2005 WL 1174088, at \*1–2 (N.D.N.Y.2005) (citing *Lewis,* 518 U.S. at 351; *see also Santiago v. James,* 1998 WL 474089, at \*4–5 (S.D.N.Y.1998) (holding that the plaintiff failed to offer specific facts regarding the type of materials requested, who allegedly denied him the materials or when/frequency of these alleged occurrences).

In order to survive a motion for summary judgment, the plaintiff must present evidence showing that: (1) the defendants acted deliberately and maliciously; and (2) that he has suffered actual injury. *Lewis,* 518 U.S. at 351–54. Where it is alleged that access to a law library or necessary materials has been denied, plaintiff must establish that the deprivation proximately causes some prejudice or denial of a legal claim. *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204–05

(W.D.N.Y.1998) (citing *Lewis,* 518 U.S. at 351).

If the plaintiff cannot articulate any actual injury as a result of purported efforts by the defendants to prevent him from litigating his case, his access claim can not survive scrutiny. *Odom v. Kerns,* 2002 WL 31059341, at \*4 (S.D.N.Y.2002). "The underlying action that the plaintiff alleges being denied access to must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Key v. Fischer,* 2007 WL 2522352, at \*4–5 (S.D.N.Y.2007) (citing *Christopher v. Harbury,* 536 U.S. 403, 416, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)) (holding that the complaint should state the underlying claim in accordance with Fed.R.Civ.P. 8(a)). A plaintiff must offer specific references to the injury and must demonstrate that he sustained dismissal of or prejudice to a lawsuit because of the lack of law books. *Gill v. Pact Org.,* 1997 WL 539948, at \*4–6 (S.D.N.Y.1997). When the plaintiff fails to provide the court with the case number of the habeas petition that was allegedly dismissed due to the defendants' alleged actions, he has failed to demonstrate how he was actually injured or prejudiced by the alleged denial of access to the courts. *Bolton v. King,* 2008 WL 2952769, at \*5 (S.D.Miss.2008); *see also Smith v. Henderson,* 2007 WL 142765, at \*4 (S.D.Ga.2007) (holding that the plaintiff failed to establish a genuine issue of fact regarding whether he suffered an actual injury as the plaintiff was not specific about his previous case).

**\*22** Based upon the record, plaintiff has failed to show that a reasonable factfinder could conclude that his access to the courts was caused by defendants' deliberate misconduct. Conversely, the record demonstrates that plaintiff was routinely given extended library time and that his requests for addresses, pens, notebooks and a notary were all approved. Plaintiff admittedly has filed a multitude of lawsuits and testified that he filed four lawsuits while incarcerated at SCJ including an Article 78 petition filed on April 7, 2004. *See Hopper v. John Doe Myers Recre-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

*ational Coach Northwest Detention Center,* 2006 WL 3337388, at *5 (W.D.Wash.2006) (holding that the numerous civil suits, pleadings, and motions the plaintiff was able to successfully bring and vigorously prosecute in District Court, showed that he had sufficient access to the courts while detained).

Even assuming that defendants intentionally denied plaintiff access to the library and legal materials, plaintiff has not submitted evidence that he sustained any actual injury. Specifically, plaintiff testified that he was denied access to Article 78 documents and that he was prevented from filing a writ of habeas corpus. However, when plaintiff was asked about missing deadlines for filing papers due to the inadequacy of the library, plaintiff could not recall the deadline dates. Plaintiff could only state that his "divorce, my visitation and [ ] a couple Article 78s against the defendants" were dismissed based upon the fact that the complaints were insufficiently drafted. Plaintiff failed to provide any details about his Article 78 submissions or habeas petition other than the fact that he made such a petition. *See Waters,* 2009 WL 750217, at *5; *see also Swift v. Tweddell,* 2008 WL 4615053, at *9 (W.D.N.Y.2008) (holding that the plaintiff failed to identify any judicial proceeding that the plaintiff attempted to pursue that was hindered by the alleged deficiencies of the law library). Plaintiff has failed to offer any evidence establishing that the alleged deficiencies in the SCJ law library impeded his efforts to bring a viable legal claim. Plaintiff has not produced copies of petitions or lawsuits that were allegedly dismissed nor has plaintiff provided case numbers for these alleged submissions. Plaintiff has failed to submit evidence that the dismissal of any cause of action was proximately caused by his alleged denial of access to the courts. Based upon the lack of evidence, plaintiff has not established that his underlying Article 78 filing(s) or habeas petition(s) were nonfrivolous.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's cause of action alleging that his First Amendment right to access to

the courts was violated is granted.

**VIII. Personal Involvement**

Defendants Cronk, Marsh, Grippin, Howland and Mace move for summary judgment arguing that they were not personally involved in the alleged constitutional violations.

**\*23** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U .S .C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 973 (2d Cir.1995).

"In order to defeat the portion of [the] defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon [the]

plaintiff to present evidence to support an inference that the defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care." *Mendoza v. McGinnis,* 2008 WL 4239760, at *8 (N.D.N.Y.2008) (citations omitted). Personal involvement is generally a question of fact and summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citing Fed .R.Civ.P. 56(c) and cases)).

In the complaint, plaintiff referred only once to Cpl. Cronk claiming that he deliberately denied plaintiff appropriate mental health care by not allowing plaintiff speak to mental health counselors when having mental health episodes. Plaintiff failed to offer any evidence with regard to Cpl. Cronk's alleged involvement in his mental health care or such "episodes". Indeed, plaintiff testified that Cpl. Cronk was "one step of supervision below a sergeant" and that he improperly reacted to plaintiff's mental health crisis. The fact that Cpl. Cronk may have had some supervisory authority is insufficient to create liability under § 1983. Plaintiff has failed to submit any proof demonstrating that Cpl. Cronk was personally involved in any of his alleged constitutional violations. Accordingly, the Court grants Cronk's motion for summary judgment and dismissal of plaintiff's complaint for lack of personal involvement, in addition to the reasons that the Court has previously discussed.

**\*24** With respect to the remaining defendants, plaintiff has provided sufficient evidence to raise a triable issue of fact with regard to defendants involvement in the alleged constitutional violations. Plaintiff testified that Deputy Howland and Deputy Grippin refused to communicate his medical needs to the medical staff. Defendant Howland failed to submit an affidavit setting forth facts that would be admissible into evidence. *See Davis v. Goode,* 995 F.Supp. 82, 91 (E.D.N.Y.1998) (holding that the defendants failed

to carry their burden of presenting affidavits or other evidence to support their claim that no material issues of fact exist as to the personal involvement of these individual defendants). Thus, Howland has failed to sustain his burden on a motion for summary judgment on this issue.

Defendants Grippin and Mace provided affidavits admitting that they were employed at SCJ at the relevant time. Although Grippin and Mace deny any wrongdoing in the matter, there are triable issues of fact regarding Grippin and Mace's personal involvement in plaintiff's alleged constitutional violations.

Finally, plaintiff alleges that Deputy Paul Marsh denied him adequate emergency medical care after an incident that occurred at SCJ in 2003. On the motion, Marsh provided an affidavit and stated that he was injured on the job on November 7, 2005 and did not return to work. Deputy Marsh does not deny that he was working at SCJ prior to November 2005. Therefore, plaintiff has sufficiently alleged personal involvement as against Deputy Marsh. Thus, the Court denies Marsh's motion for summary judgment on this basis.

## IX. Qualified Immunity

Public officials enjoy qualified immunity from liability under § 1983 "so long as their conduct does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Second Circuit has held that "[a] right is clearly established if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* ––– U.S. ––––, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

**\*25** Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation, defendants are entitled to summary judgment on this ground. *Dorcely v. Wyandanch Union Free Sch. Dist.,* 665 F.Supp.2d 178, 219 (E.D.N.Y.2009) (citing *The Cathedral Church of the Intercessor v. The Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005)) ("[w]ithout an underlying constitutional violation, qualified immunity cannot attach").

## CONCLUSION

To summarize, the Court denies defendant Weitz's motion for summary judgment on the basis of res judicata. Weitz's motion for summary judgment and dismissal of plaintiff's Eighth Amendment claims relating to plaintiff's knee, back and mental health is granted as plaintiff has failed to establish that Weitz was deliberately indifferent to any serious medical need. Moreover, Weitz's motion for summary judgment and dismissal of plaintiff's claim that Weitz deliberately and wilfully denied "emergency care" for plaintiff's back injury in 2003 is granted based upon Weitz's lack of involvement. Accordingly, plaintiff's complaint as against defendant Weitz is dismissed in its entirety and Weitz is awarded summary judgment.

Defendant Cronk's motion for summary judgment and dismissal of plaintiff's Eighth Amendment, First Amendment and Fourteenth Amendment claims based upon lack of personal involvement is granted.[FN32]

> [FN32]. In the alternative, Cronk's motion for summary judgment is also granted for the reasons discussed in the context of defendants Hazzard, Marsh, Grippin, Howland and Mace's motions for summary judgment.

Defendants Hazzard, Marsh, Grippin, Howland, and Mace motions for summary judgment and dismissal of plaintiff's Eighth Amendment causes of action are granted as plaintiff has failed to establish that defendants were deliberately indifferent to any serious medical need. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment right to free exercise of religion are granted as plaintiff has failed to establish that defendants prevented him from engaging in religious activities without any reasonably related penological interest. Defendants motions for summary judgment and dismissal of plaintiff's Fourteenth Amendment Equal Protection cause of action is granted as plaintiff has failed to submit evidence that defendants intentionally discriminated against plaintiff on the basis of his faith. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment access to courts cause of action is granted as plaintiff has failed to demonstrate that defendants intentionally deprived him of access to courts and further, that he sustained an actual injury as a result of such denial.

In the alternative, all defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, based upon qualified immunity.

**Accordingly, it is hereby**
**ORDERED,** that defendant Weitz's motion for summary judgment and dismissal of plaintiff's com-

Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)
**(Cite as: 2010 WL 1064330 (N.D.N.Y.))**

plaint (Dkt. No. 70) is **GRANTED,** and it is further;

**ORDERED,** that defendants Hazzard, Marsh, Grippin, Howland, Mace and County of Schoharie's motions for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 71) are **GRANTED,** and it is further;

**\*26 ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties by regular or electronic mail, and it is further;

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED,** as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.
Guarneri v. Hazzard
Not Reported in F.Supp.2d, 2010 WL 1064330 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Martin HODGE, Plaintiff,
v.
Thomas A. COUGHLIN III, Commissioner of the
New York State Department of Correctional Services;
Robert Greifinger, Deputy Commissioner and Chief
Medical Officer of the New York State Department of
Correctional Services; Gustav Gavis, Regional Med-
ical Director of the New York State Department of
Correctional Services; and Guy Tufau, Director Fa-
cility Health Services of Sullivan Correctional Facil-
ity, Defendants.

No. 92 Civ. 0622 (LAP).
Sept. 22, 1994.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW OPINION

PRESKA, District Judge.

**\*1** Plaintiff brings this action under 42 U.S.C. §
1983 for violation of his Eighth Amendment rights
under the Constitution. Plaintiff alleges that defend-
ants, officials of the New York State Department of
Correctional Services ("DOCS"), have been deliber-
ately indifferent to his serious medical needs. The case
centers around the treatment of Mr. Hodge's right eye,
eyelid and surrounding tissue. Plaintiff seeks declar-
atory judgment; an injunction directing defendants to
provide constitutional medical care; and compensat-
ory and punitive damages.

A bench trial was held over six days following
which time the Court reserved judgment. The Court
has made the following findings of fact and conclu-
sions of law pursuant to Fed.R.Civ.P. 52. The Com-

plaint is dismissed, and judgment in favor of defend-
ants shall be entered.

I. *Findings of Facts*

A. Plaintiff's Medical Condition

Plaintiff Martin Hodge contracted herpes zoster
ophthalmicus when he was thirteen years old. Tr. at
16.[FN1] Herpes zoster ophthalmicus is a viral infection
that affects the first branch of the trigeminal nerve. Tr.
at 99. The trigeminal nerve is one of the cranial nerves
affecting the eye, face and forehead. *Id.* Some of the
effects of herpes zoster ophthalmicus are deep in-
flammation and scarring of the skin, neuralgia,[FN2]
corneal scarring, atrophy of the iris, neurotrophic
keratitis, keratouveitis [FN3] and pain. Tr. at 99, 100,
377.

Herpes zoster presents one of the most difficult
corneal problems that a corneal specialist can en-
counter in his or her practice. Tr. at 362. Very few
patients with herpes zoster ophthalmicus undergo
corneal transplant surgery because of the very high
risk involved and due to the reluctance among many
corneal specialists to perform the surgery. Tr. at 363.
For example, between 1941 and 1973 at Johns Hop-
kins University, approximately 1000 corneal trans-
plants were performed. Out of that 1000, only three
transplants were performed on patients with herpes
zoster ophthalmicus. Tr. at 362. Similarly, between
1980 and 1985 at the University of Michigan, ap-
proximately 1300 transplants were performed. Of the
1300 transplants, only ten were performed on patients
with herpes zoster. Tr. at 362.

One of the risks associated with herpes zoster is
that wounds will not heal properly because of the lack
of nerve stimulation to the cornea. Tr. at 367. Herpes
zoster is a complicated medical condition. While there
is corrective surgery available to treat an eye inflicted
with herpes, there is no treatment for the disease.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

Surgery is only a remedial action for something that may occur again and again. Tr. at 323.

Plaintiff's attack of herpes zoster was acute and severe. He suffered severe pain, blistering of the right eye, scabbing and scarring of the internal and external surfaces of the lid, damage to the tear duct of his eye and scabbing and scarring to his forehead. As a result of the disease, he was afflicted with entropion, or a turning in of the eyelid, and trichiasis, a condition in which the eye lashes rub against the surface of the eye, resulting in irritation and disease. Tr. at 16, 17, 54, 55, 100, 101, 320, 323.

**\*2** Subsequent to the acute episode of herpes, plaintiff had several skin grafts at Jacobi Hospital to repair his right eyelid. These grafts did not succeed in enabling plaintiff's right eye to close. Tr. at 17. Ultimately, despite the risk involved, plaintiff had plastic and optic surgery from Lester Silver, M.D. and Murray Meltzer, M.D., which included a corneal graft.[FN4] Tr. at 18, 54, 55.

Notwithstanding the surgery, plaintiff has suffered and continues to suffer pain. For example, he experiences post herpetic neuralgia during weather changes. Pain travels down the right side of his forehead and flares out across the eye. Tr. at 19, 320. He also needs to use artificial tears to lubricate the eye and predforte, a medication to prevent corneal graft rejection.[FN5] Tr. at 19. However, he has a normal left eye, with perfect vision that may exceed 20/20. Tr. at 68, 351; Trial Exh. 5 ("Exh.—").

B. Plaintiff's Entry into the Prison System

In 1986, plaintiff was incarcerated at Riker's Island, which is part of the New York City Correctional System. At Riker's Island plaintiff's vision in his right eye became blurry due to a cataract, which was probably induced by the steroid medication prescribed to keep the corneal graft from rejecting. Tr. at 105, 106. The cataract was removed in 1986, but a new lens

was not inserted. Tr. at 20. A flap of skin created by the cataract surgery caused him discomfort, which plaintiff attempted to relieve with advil and motrin. Tr. at 21. When plaintiff entered the New York State prison system in November 1986, he was still suffering from the effects of this condition. Tr. at 23.

C. Initial Medical Care

Upon becoming an inmate in the prison system of the New York State Department of Correctional Services, plaintiff was referred to ophthalmology and plastic surgery clinics for plastic surgery consultations to treat the ptosis or drooping right eyelid. From June 1987 until the end of 1988, plaintiff was seen intermittently at ophthalmology or plastic surgery clinics. Exh. 27. The surgeons who evaluated Mr. Hodge's condition had differing opinions as to the correct course of treatment and whether plastic surgery was advisable. In July of 1987, a surgeon concluded that the ptosis could be treated, however, plaintiff would risk exposure, infection and possible loss of the globe. Tr. at 359; Exh. 27 at 180, 183. In October of 1987, a plastic surgeon recommended that the eyelid should not be lifted. Exh. 27 at 183. This doctor noted on a previous visit that plaintiff was "able to close eye completely." *Id.* at 180.

Nonetheless, surgery to correct the ptosis and entropion was performed on December 12, 1988 at the Albany Medical Center ("AMC"). Tr. at 24, 25, 359–362; Exh. 27 at 189–196. After the surgery, plaintiff received numerous follow-up appointments. A few months after the surgery, plaintiff developed bullous keratopathy, which is a swelling of the cornea with blistering, and graft rejection. This was noted during an examination at AMC by Peter Zloty, M.D., who was an attending physician and Director of the AMC Ophthalmology Clinic. Tr. at 360; Exh. 27 at 197. Richard Smith, M.D., former chairman of the ophthalmology department at AMC, confirmed the graft rejection at AMC on January 3, 1989, noting graft failure with exposure keratopathy in his report. Tr. at 360; Exh. 27 at 196, 197, 198, 201. Exposure

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

occurs when the lids do not meet. Tr. at 553.

**\*3** Defendants' expert, Gregory J. Pamel, M.D., a board-certified ophthalmologist, explained that it appeared from the medical records of plaintiff's condition directly after the plastic surgery that "because the eye was exposed, the surface layer broke down," causing graft rejection. Tr. at 360, 552–53. The eye, which apparently had full or near complete closure before the plastic surgery, may have slightly overcorrected. *Id.* Therefore, the concerns of some of the ocular plastic surgeons who had examined Mr. Hodge prior to the surgery appear to have been realized. Tr. at 360.

However, plaintiff's expert, Dr. Zloty, testified that the graft rejection occurred due to the failure of defendants to treat plaintiff's trichiasis effectively. Tr. at 112, 113. Based on all of the evidence, including observation of the witnesses, this Court found Dr. Pamel's testimony (citing exposure as the probable cause) more credible than that of Dr. Zloty. As noted by Dr. Pamel, the treating doctor listed exposure, and not trichiasis, as the cause of the graft rejection, Tr. at 553. Furthermore, from his review of the medical records, Dr. Pamel noted that plaintiff's trichiasis was documented intermittently and appropriately controlled. Tr. at 412, 553.

After the rejection was diagnosed, plaintiff received frequent examinations and treatments by resident and attending ophthalmologists at AMC, and by Gregory Goldman, M.D., also an ophthalmologist, at Shawangunk Correctional Facility ("Shawangunk"). Tr. at 26–29; Exh. 27 at 196–198, 201. On April 4, 1989, plaintiff was diagnosed at AMC as having an ulcer in his right eye. After being treated, he was scheduled to return to AMC on April 12, 1989.

He was instead referred to the Shawangunk Eye Clinic and treated by Dr. Goldman on April 8, 1989. Tr. at 60–62, 677. Dr. Goldman did not observe an ulcer on the eye, which had evidently healed, and he

treated Mr. Hodge for a blep or blister. Tr. at 677; Exh. A at 251. The blep was probably the result of the corneal graft rejection process. Tr. at 678. For follow-up care, Dr. Goldman instructed medical personnel at Sullivan Correctional Facility ("Sullivan") to telephone him on April 14th. Pursuant to his instructions, Dr. Goldman was called on April 14, 1989. Tr. at 678–79, 688–689; Exh. A at 120. Subsequently, plaintiff's eye was examined on many occasions at the Sullivan Clinic, and on May 19, 1989, a provider noted that plaintiff's right eye looks "very good." Exh. 27 at 98.

At times, follow-up care was provided by a general practitioner, who consulted with a corneal specialist. Dr. Pamel testified that under ideal circumstances it is best that a patient be followed by an ophthalmologist, but it is not unreasonable to have a general practitioner provide follow-up care in consultation with an ophthalmologist. In fact, Dr. Pamel testified that in his own private practice there are instances when he speaks with a relative and prescribes medication over the phone because the patient is not able to come to his office. Tr. at 386–87.

**\*4** After plaintiff was diagnosed with corneal graft rejection, physicians began to consider performing a new corneal transplant and lens insertion. Exh. 27 at 222, 224. On July 31, 1989, the ophthalmologist at the AMC ophthalmology clinic recommended that plaintiff be given a follow-up appointment with Dr. Goldman at Shawangunk for a corneal transplant. However, the physician also requested that Mr. Hodge return to AMC in at least six months for "any eye infection/severe pain/abrupt loss of vision OD." Exh. 27 at 224. Thereafter, Dr. Goldman informed Guy Tufau, M.D., Sullivan's Medical Director and a defendant in this case, that since AMC was able to provide tertiary care, Mr. Hodge should return to AMC for evaluation regarding the proposed corneal transplant rather than to the Shawangunk clinic. Exh. 27 at 225. Dr. Goldman's practice is limited to general ophthalmology and the treatment of cataracts and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

glaucoma, and therefore the AMC clinic was the more appropriate place for Mr. Hodge to undergo evaluation. Tr. at 673.

Moreover, plaintiff had a history of continuous treatment at AMC. In the past, he had been treated by Dr. Smith, who was in charge of corneal transplants at AMC, and Mr. Hodge was already on the waiting list at AMC for a corneal transplant. However, AMC could not determine when the procedure would occur. Exh. 27 at 108, addendum to 9/7/89. There was a shortage of corneal tissue in the upstate New York area at that time, Tr. at 242, 578–79, and the waiting list for corneal transplant tissue was twelve to sixteen months. Tr. 578–579. Mr. Hodge believed that he might have to wait as long as two years. Tr. at 333, 461, 716, 720.

D. Plaintiff's Treatment By Murray Meltzer, M.D.

Frustrated with the waiting list at AMC and Dr. Goldman's reluctance to perform the corneal graft, plaintiff suggested to Sharon Lilly, the nurse administrator at Sullivan, that Dr. Meltzer, the ophthalmologist who performed his original corneal graft in 1983, be contacted. Dr. Tufau concurred with plaintiff's suggestion. Nurse Administrator Lilly, therefore, telephoned Dr. Meltzer and scheduled an appointment. Tr. at 34, 64, 65, 463, 464, 465, 466, 717, 718.

Thereafter, beginning March 16, 1990, plaintiff's ophthalmological problems were treated by Dr. Meltzer. Plaintiff was transported to Dr. Meltzer's office in New York City on approximately five occasions. Tr. at 34, 64, 65, 463 and Exh. 27 at 237 (March 16, 1990); Exh. 27 at 238 (April 4, 1990); *Id.* at 239 (April 25, 1990); *Id.* at 240 (June 1, 1990); *Id.* at 244 (September 21, 1990). It is not the policy of DOCS, and is in fact quite unusual, for correction officers to transport and escort an inmate to the private physician the inmate used prior to incarceration. Tr. at 480. During the period of Dr. Meltzer's treatment, plaintiff was also sent to the ophthalmology clinic at AMC for an examination after an altercation in which Mr.

Hodge was struck in the right eye. Exh. 27 at 242.

**\*5** In a letter to Dr. Tufau dated March 15, 1991, Dr. Meltzer recommended surgery consisting of penetrating keratoplasty (corneal graft) and IOL insertion (lens transplant), to be performed at Elmhurst General Hospital. Tr. at 34, 460; Exh. 27 at 237, 239, 244–245. Dr. Tufau approved the surgical plan, and Nurse Lilly scheduled the appointments and made inquiries about setting up the necessary arrangements for security. Tr. at 336–40, 718. After learning of Dr. Meltzer's surgical plan, Exh. 27 at 245, Deputy Superintendent Clement Capuano, who, as Deputy Superintendent for Administration at Sullivan, has jurisdiction over the administration of the medical department, contacted Gustav Gavis, M.D. Tr. at 516. As Regional Medical Director, Dr. Gavis, who is also a defendant in this case, was the appropriate person to contact in order to coordinate the treatment of plaintiff. Tr. at 523–524.

Initially, Dr. Gavis supported the decision that plaintiff's surgery would be performed in New York City by Dr. Meltzer. Tr. at 308. When he learned that the surgery was scheduled at Elmhurst General Hospital, however, a problem arose because Elmhurst General Hospital does not accept New York State inmates. Tr. at 309. This policy originated in 1984, when a shooting occurred at Elmhurst General Hospital involving a New York State inmate and two corrections officers. Tr. at 310; Exhs. D1, D2. As a result of the shooting, Esta Armstrong, former director of prison services for the New York City Health and Hospital Corporation ("NYCHHC"), barred state inmates from utilizing the services of Elmhurst General Hospital, which is part of NYCHHC. Exh. D1. This policy continues to exist for all NYCHHC hospitals. Tr. at 616, 617, 664, 665.

Dr. Meltzer did not offer to perform surgery at any other of the medical centers at which he is on the staff. This may have been because physicians are often reluctant to perform surgical procedures on prisoners in private hospitals. Tr at 642–43. In any event, it was

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

the NYCHHC policy, and not cost and security arrangements, which was the determinative factor in the decision that the surgery could not take place at Elmhurst General Hospital. Although the need for security and the added cost are always considerations in deciding whether to place an inmate in a nonsecure hospital, security has frequently been arranged to facilitate such a placement. Tr. at 466–67, 493–94, 504–05, 526, 616–18).

E. Plaintiff's Surgical Procedures at Albany Medical Center

Because the surgery could not be performed at Elmhurst General Hospital, and Dr. Meltzer did not propose any alternate site for the surgery, Dr. Gavis contacted AMC to arrange for the surgery to be performed there after all. Tr. at 315. Although in the past there had been difficulties scheduling some New York State inmates at AMC, there were never problems in scheduling plaintiff for examination and treatment at AMC. This was principally because Mr. Hodge was a former AMC patient with a unit number, which insured that he would remain a patient of AMC. Tr. at 324, 635, 636.[FN6] The delay experienced by plaintiff in having surgery performed at AMC was no different than that endured by all AMC patients requiring corneal surgery. Tr. at 324, 715.

**\*6** Therefore, shortly after Dr. Gavis' involvement and approximately four months after defendants received notice of Dr. Meltzer's surgical plan and the fact that Dr. Meltzer could not perform the surgery, plaintiff received an appointment at AMC. Exh. 27 at 244; Exh. 25 at 3, 4. On July 29, 1991, plaintiff was evaluated for a corneal transplant and lens insertion by Dr. Zloty. Tr. at 94; Exh. 27 at 247.

Dr. Zloty planned a staged surgical procedure where he would perform a lens implant first and, after allowing the eye to "quiet down," proceed with the corneal transplant in a separate procedure if the initial procedure was sufficiently successful. Tr. at 140–41, 170. On August 22, 1991, he initially performed a corneal photocoagulation (laser treatment) to shrink the blood vessels in the cornea. Exh. 27 at 247. He saw Mr. Hodge on at least two or three other dates before performing a lens insertion on November 5, 1991. Exh. 27 at 251. Finally, additional photocoagulation treatments and a YAG capsulatomy were performed to open up the membrane of the posterior capsule. Exh. 27 at 260; Exh. 25 at 40. During the surgery itself, Dr. Zloty removed a region of blood vessel ingrowth, a small conjunctival tag and three or four of the largest bumps on the upper side of the cornea. Tr. at 139–144; 166–168; Exh. 25; Exh. 27 at 242–273.

Dr. Zloty saw Mr. Hodge six to ten times for post operative care. Tr. at 181–83; Exh. 25. In fact, the medical records show that between his initial consultation on July 29, 1991 through the surgery and follow-up appointments, which apparently concluded on March 4, 1992, plaintiff had fourteen consultations at AMC. Exh. 27 at 242, 247–48, 250–51, 253–558, 260, 262, 264–65. Each time Dr. Zloty scheduled a follow-up appointment, DOCS transported plaintiff to AMC. Tr. at 219.

While Dr. Zloty's surgical procedures did alleviate some of Mr. Hodge's pain, they did not improve his vision and in fact his vision may have deteriorated. Tr. at 144–45, 155–56, 186–97. After the lens was inserted, it displaced. Tr. at 196. In addition, the YAG capsulatomy was not successful, in that the opening in the membrane resealed itself. Tr. at 195–98. Indicative of this lack of success, on November 13, 1991, eight days after the surgery, Dr. Zloty noted "[m]arkedly changed appearance since last visit? Trauma. (Pt. [patient] denies). Wound leaks interiorly." Exh. 27 at 255. Then on June 4, 1992 he noted "no improvement to aphakic correction (+ 12.00 lens)." Exh. 25 at 43.

In actuality, it was unlikely that Dr. Zloty's surgical plan would significantly improve plaintiff's vision. Pre-operatively, plaintiff's vision in the right eye was 20/400, and with a lens placed in front of his eye, the vision only improved to 20/200. Tr. at 364–65;

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

Exh. 25 at 6–7. More importantly, Dr. Zloty's plan of performing the lens implantation and corneal graft during two different surgeries was questionable, as this doubled the risk of hemorrhage, infection, inflammation, and other dangers associated with eye surgery. Tr. at 367–368.

**F. Plaintiff's Scheduled Surgery with Richard Smith, M.D.**

**\*7** After Dr. Zloty's surgical procedures, plaintiff was seen almost monthly at either the Fishkill or AMC clinic up until his referral to Dr. Smith for corneal transplant evaluation on February 4, 1993.[FN7] Dr. Gavis personally contacted Dr. Smith, the former chairman of the ophthalmology department at AMC, to ascertain if he would be willing to see Mr. Hodge in his private practice, and Dr. Smith agreed. Tr. at 315–16, 579, 583, 637–639. At his initial visit, plaintiff was examined at Dr. Smith's private office in Albany. At that time, Dr. Smith recommended a corneal graft, an anterior vitrectomy, a relocation of the displaced lens and possible removal of scar tissue. Tr. at 567–68, 572; Exh. 28 at 36.

Dr. Smith scheduled plaintiff's surgical procedure, including the corneal graft, for September 29, 1993. On September 29, 1993, DOCS transported Mr. Hodge to Memorial Hospital for the surgery. The corneal tissue was in the refrigerator adjacent to the operating room ready to be used in the surgery. Tr. 574–75. Immediately prior to the surgery, Dr. Smith visited the ambulatory room to see Mr. Hodge and to insure that preoperative procedures had been taken. At this time, Mr. Hodge handed Dr. Smith two very detailed letters from Dr. Zloty addressed to plaintiff's attorney, William D. Rold, Esq., providing Dr. Zloty's prognosis and recommending specific surgical techniques and post operative care. Tr. at 569.

Dr. Smith disagreed with several points of Dr. Zloty's treatment. However, plaintiff informed Dr. Smith that he strongly wished Dr. Smith to treat him according to the procedure outlined in Dr. Zloty's

letter. Since Dr. Smith believed that Dr. Zloty's treatment plan was not appropriate, Dr. Smith was compelled to cancel the surgery. Tr. at 569–571, 574–575; Exh. A at 271, 273–276). As testified by Dr. Smith:

> So it put me in the no win position of either going against Dr. Zloty's treatment plan and Mr. Hodge's expressed strong wishes or else going along with it and doing something that I didn't think was appropriate based on my personal clinical judgment.

Tr. at 571. As he further stated in his letter dated October 1, 1993:

> Based on all of the above, I felt that Mr. Hodge's actions had irretrievably broken the doctor/patient relationship, and I cancelled the surgery because I felt severely threatened by the situation.

Exh. A at 273–274. Dr. Smith's decision not to perform the surgery was a reasonable and appropriate exercise of his professional judgment. Other surgeons in his position would have made the same decision. Tr. at 389, 637–640. Mr. Hodge's own conduct in insisting on a certain surgical procedure caused the surgery, which was moments away from being performed, to be cancelled.

Plaintiff interfered with his medical treatment on other occasions as well by failing to keep medical appointments and refusing medications. Tr. at 71–72, 723; Exh. A at 25, 49, 85, 104, 108, 134, 251. While at least one of Mr. Hodge's failures to appear was due to his being in court, Exh. A at 25, on one occasion he refused to leave for a medical appointment on time because he wanted to finish his lunch. Exh. A at 104. Mr. Hodge also failed to provide the medical department with advance notice that he was going to run out of his medications, which would have permitted the facility to renew his prescriptions in a timely manner. Tr. at 713; Exh. A at 59, 61.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

**\*8** Plaintiff contends that not only did he provide sufficient advance notice, many times defendants failed to provide him with the proper artificial tears prescription, and, on one occasion, delayed twelve days before providing him with a graft rejection medication. Tr. at 146. Nurse Lilly testified that when prescribed medicine was out of stock, the inmate's doctor was called and a substitute medicine was provided. Tr. at 711–12.[FN8] For example, Dr. Pamel testified that there are many substitute medications for Mr. Hodge's prescribed artificial tear medication, celluvisc. Tr. at 394–95, 543. Furthermore, there is no evidence that Mr. Hodge suffered specifically because of the twelve-day delay in receiving the graft rejection medication.

G. Plaintiff's Overall Medical Care

Since 1989 plaintiff has been transported to a total of 52 consultations by medical specialists. Tr. at 739. This averages to almost one specialty consultation per month. *Id.;* Exh. I. Moreover, from 1989 through 1993, plaintiff has experienced a total of 402 health care encounters with physicians, nurses and physician assistants at the facility clinics.[FN9] Tr. at 739–749; Exh. I. Altogether, over a five year period, plaintiff averaged 1.7 encounters each week with some kind of health care provider.

Plaintiff argues that while he may have been "seen" by "medical staff" extensively, he did not receive continuous or adequate treatment from specialists. In support of this argument, plaintiff asserts that Dr. Meltzer's treatment plan was aborted, Dr. Smith never treated plaintiff and plaintiff did not receive continuous treatment at AMC, but merely had visits at AMC.

Rather than finding defendants' understanding of the term "treatment" as all-encompassing, however, the Court finds plaintiff's understanding of that term to be overly narrow. In the very least, when a patient is examined and diagnosed, the plaintiff has been "treated" by the physician. Although surgery by Dr.

Meltzer was necessarily cancelled, plaintiff had approximately six appointments with Dr. Meltzer and at each visit he was examined, diagnosed and provided with a recommendation. Exh. 28 at 238–44. Plaintiff was also examined, diagnosed and provided with a recommendation by Dr. Smith. Exh. 28 at 36. As noted above, when Dr. Smith was to perform the surgery, plaintiff required him to adhere to another doctor's treatment plan, causing Dr. Smith, not unreasonably, to cancel the surgery. Tr. at 569–71. Finally, plaintiff's appointments at the AMC clinic are too numerous to document, but the record is replete with evidence of plaintiff's being examined and diagnosed at AMC on numerous occasions.

H. Current Prognosis and Treatment Plan

Despite the cancellation of Mr. Hodge's surgery with Dr. Smith, he is still under consultation at Albany Medical Center. Tr. at 49, 324, 721–723. Subsequent to the aborted surgery, plaintiff was treated and/or evaluated at AMC on October 25, 1993, November 11, 1993, December 6, 1993, December 22, 1993, January 13, 1994 and February 4, 1994. Exh. 66 at 44–45, 48; Exh. 71 at 44–49; Exh. 72; Exh. V.[FN10]

**\*9** Mr. Hodge was examined on December 10, 1993 by Dr. Belin, an Associate Professor and Director of Corneal External Disease and Refractive Surgery at Albany Medical College. Tr. at 581. After examining plaintiff, Dr. Belin concluded that plaintiff represents a high-risk corneal transplant patient, given his previous graft rejection and heavy vascularization.

Dr. Belin recommended against surgery for a number of reasons. First, plaintiff has normal vision in his left eye. Therefore, in placing the surgical risks and benefits in perspective, since plaintiff is not in a "professional and/or social environment that requires binocular vision, this is a case that [Dr. Belin] normally would not recommend for surgical intervention." Exh. 70 at 2.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

Secondly, the complexity and high risk of re-grafting requires multiple and frequent examinations, which is difficult for an incarcerated person. Nevertheless, Dr. Belin's decision to recommend "no further surgical intervention is significantly not different from how [he would] evaluate non-incarcerated patients." Exh. 70 at 1–2. Given the risk-benefit ratio, Dr. Belin strongly urged no further intervention, since Mr. Hodge has only a limited potential benefit. Exh. 70 at 2.

Dr. Smith testified that he believed the conclusions reached by Dr. Belin were medically reasonable. Tr. at 581–82. Although Dr. Smith had originally agreed to perform the surgery, Dr. Smith recognized that there was a very guarded chance of success since plaintiff had a difficult case with a past history of surgeries and lid deformities. Tr. at 572. Additionally, Dr. Smith noted that the herpes zoster had attacked the eye causing loss of sensation in the cornea and affecting the tissue. As a result, the eye, especially the surface of the eye (which is critical in a corneal transplant) would not heal well. Tr. at 580–81. Dr. Smith summed up his prognosis:

The bottom line is that almost anyone who has a severe enough damage to their cornea from shingles has a very poor prognosis for corneal grafting because of all these factors. They just don't heal well, they don't keep a clean graft, and they don't recover vision. Nevertheless, we try to do things, but we have to tell the patient that the outlook is not good.

Tr. at 581. Therefore, Dr. Smith estimated the chance of success as well below fifty percent. Tr. at 573.

Likewise, Dr. Pamel opined that even if there was a period of quiescence within which to perform surgery, major risks, such as infection and hemorrhage, would still be involved with surgery. Tr. at 547. Additionally, he explained that surgery causes inflam-

mation which promotes graft rejection. He also agreed that Mr. Hodge's herpes zoster would create further wound healing problems. Tr. at 367. He estimated Mr. Hodge's chance of successful surgery at between thirty and forty percent. Tr. at 559.

Dr. Zloty, who was plaintiff's expert witness, also expressed doubt that a new corneal graft would be successful. As stated in his deposition:

**\*10** To do more extensive surgery, such as a cornea transplant, has a risk of being counterproductive in that it can set up more inflammation.

Exh. 61 at 46; Tr. at 206. As further stated in his deposition:

It would be an option for him if he wanted to take the risk of proceeding with an additional surgical procedure. Anytime you do any surgery, there is risk of infection and bleeding, and, particularly with a corneal transplant, a risk that it would reject it and become uncomfortably painful and make the situation even worse.

Exh. 61 at 50; Tr. at 210. Finally, in Dr. Zloty's letter dated August 26, 1993 to William I. Rold, Esq. he wrote:

With vessel ingrowth noted 360 degrees, I would be hesitant to perform a repeat transplant. The patient would be at a high risk for rejection as well as a recrudescence of the inflammation often seen in zoster patients. Unfortunately, the posterior capsule is too fibrotic to be adequately incised with the YAG laser, as was my original intention.

Exh. 16 at 3.

Therefore, it seems that, although any type of surgery is inherently risky, with Mr. Hodge's added poor eye condition, more extensive surgery could very likely worsen his condition.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

II. *Conclusions of Law*

Recovery under the Eighth Amendment based on inadequate medical care is limited to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). There is an objective component to this standard, "was the deprivation sufficiently serious, violating contemporary standards of decency," *Helling v. McKinney,* 113 S.Ct. 2475, 2480–82 (1993); and a subjective component, "did the officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 2324–26 (1991). In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)).

With respect to the subjective component, a plaintiff must prove that the defendant acted wantonly or with deliberate indifference. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Proper allegations of "deliberate indifference" include allegations of callous indifference to medical needs; intentional denial or delay of an inmate's access to medical care; or intentional interference with treatment. *Estelle,* 429 U.S. at 104–05; *Harding v. Kuhlman,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985).

Negligence or mere allegations of malpractice on the part of a diagnosing or treating physician will not state a valid Eighth Amendment claim. *Estelle,* 429 U.S. at 106 & n. 14. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Rather, the plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' " or incompatible with the "evolving standards of decency that mark the progress of a maturing society." *Id.* 429 at 102, 105 (citations omitted).

**\*11** A prisoner's disagreement with the diagnostic techniques or forms of treatment utilized by prison medical personnel does not give rise to a cognizable Eighth Amendment claim: "A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *Estelle,* 429 U.S. at 107; *accord, Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982). Nor does an allegation of "misdiagnosis or faulty [medical] judgment" state a claim. *Tomarkin,* 534 F.Supp. at 1230. Furthermore, a dispute between two doctors as to the proper course of medical treatment will not give rise to an Eighth Amendment violation. *Estelle,* 429 U.S. at 107; *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir.1970), *cert. denied,* 401 U.S. 983 (1971).

The same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel. To establish such a claim plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment. *Harding v. Kuhlman,* 588 F.Supp. at 1315–16 (quoting, *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) and *Ferranti v. Moran,* 618 F.2d 888, 890 (1st Cir.1980)). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim,* 698 F.Supp. 57, 59 (S.D.N.Y.1988), *aff'd,* 904 F.2d 33 (2d Cir.1990).

In the present case, the facts simply do not support the type of egregious lack of medical care that would establish a claim of "deliberate indifference" to serious medical needs.[FN11] On the contrary, although there were some short periods of delay in treatment at AMC, Mr. Hodge's eye condition was never ignored. The evidence demonstrates that plaintiff was seen on a regular basis by the health care providers at Green Haven, Sullivan, Newburgh, Fishkill and Shawangunk Correctional Facilities. Plaintiff's treatment was con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

tinuous and conformed with good medical judgment.

1. Alleged Delay in Providing Plastic Surgery

Mr. Hodge contends that there was a delay in providing him medical treatment for ptosis, since surgery was first recommended in April or May of 1987 and was not performed until December 12, 1988. As aforementioned, there were differing opinions as to whether plastic surgery to raise plaintiff's eyelid would place plaintiff's eye at risk, and the surgery likely did cause Mr. Hodge's subsequent graft rejection. Furthermore, far from being ignored during this period, plaintiff was seen quite often at ophthalmology and plastic surgery clinics. Therefore, especially due to the difference in medical opinion as to the advisability of the plastic surgery, the delay in performing the actual surgery was not unreasonable and certainly not "repugnant to the conscious of mankind." *Estelle,* 429 U.S. at 102.

2. Alleged Delay in Treating the Ulcer

**\*12** Mr. Hodge additionally argues that defendants delayed in treating his eye for an ulcer. On April 4, 1989 a doctor at AMC noted that plaintiff had an ulcer. Dr. Goldman testified that he examined plaintiff four days later and plaintiff did not have an ulcer, but a blep, or blister, induced by the graft rejection. In addition to the follow-up treatment by Dr. Goldman, plaintiff was seen and evaluated at Sullivan by Dr. Tufau, who consulted with Dr. Goldman. Evidently, therefore, appropriate care was provided for this condition.

3. Alleged Delay in Further Corneal Surgery

In 1989, Dr. Smith placed Mr. Hodge on a twelve-to sixteen-month long waiting list at AMC for a corneal transplant. Tr. at 578–579. Being placed on a waiting list was not a denial of medical care, but normal for a person waiting for a corneal transplant. Tr. at 682. Indeed, Mr. Hodge's own expert, Dr. Zloty, testified that only a limited supply of corneal tissue exists in this country. Tr. at 242. The initial four-month delay in receiving an appointment with

Dr. Zloty at AMC for evaluation of corneal transplant surgery (after Dr. Meltzer's surgical plan was aborted) was not sufficiently egregious to constitute an Eighth Amendment violation. Likewise, the seven-month delay in receiving the appointment with Dr. Smith for evaluation of corneal surgery (after Dr. Zloty left New York), especially in light of the intermittent care provided by the AMC and Fishkill clinics during the seven months, was also not sufficiently extreme to constitute deliberate indifference.

Plaintiff has additionally argued throughout the litigation that his claim that defendants' failure to render possible the surgery by Dr. Meltzer constituted an Eighth Amendment violation. Quite to the contrary, the fact that defendants facilitated plaintiff's treatment by his personal physician in the first place demonstrated their concern for plaintiff. Indeed, arranging for a prisoner's treatment by his private physician, with the attendant expense of transporting him under guard to Dr. Meltzer's unsecured private office, is a striking exception to prison protocol. Tr. at 307. In any case, it is not constitutionally required that an inmate be treated by a physician of his own choosing. *See Ross v. Kelly,* 784 F.Supp. 35, 46–47 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 113 S.Ct. 828 (1992); *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). As recently stated by the District Court:

> We reject completely the notion that a prisoner has a constitutional right to select the doctor who treats him—a privilege not normally available even to those who pay for their own treatment at Health Maintenance Organizations.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994).

Furthermore, the additional delay in further corneal surgery was caused by Mr. Hodge's own conduct in insisting, on the verge of surgery, that Dr. Smith

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

follow Dr. Zloty's surgical procedure and technique. The failure of defendants to obtain an early date for plaintiff's second corneal transplant, a procedure noted by many experts to be quite risky for Mr. Hodge, does not rise to the level of "deliberate indifference." *Estelle,* 499 U.S. at 104.

4. Alleged Shortages of Medication

**\*13** Plaintiff also alleges that defendants failed to provide him with prescribed medications. This allegation is without merit. The evidence shows that, at times, Sullivan was caught short of medications because plaintiff failed to notify the nurse before he ran out of medications. Nurse Administrator Lilly also facilitated plaintiff's receipt of medications that were difficult to obtain by arranging with AMC to fill prescriptions directly. Finally, as recently stated by the district court:

> The fact that the specific medication sought by plaintiff was merely out of supply belies the intentionality required to sustain an Eighth Amendment claim based on improper medical treatment.

*Leroy McBride v. Nurse Sandy Gomez, et al.,* 1994 WL 37816, at *2 (McKenna, J.) (S.D.N.Y. Feb. 8, 1994). *See also, United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir.1970) (prisoner's preference for pills as opposed to liquid form of medication did not make out an actionable claim).

5. Level of Plaintiff's Medical Care

The total number of health care encounters experienced by plaintiff, along with his frequent and steady appointments with ophthalmologists with corneal and anterior specialties hardly constitute a deprivation that denies "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Nonetheless, the Second Circuit has recognized that despite receiving extensive medical care, a plaintiff could still have an Eighth Amendment claim where the quality of care is quite low or the care is ineffec-

tive. *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991) (proof of three-month gap in care and failure to monitor plaintiff's condition despite alarming deterioration, resulting in death); *Archer v. Dutcher,* 733 F.2d 14, 15–17 (2d Cir.1984) (plaintiff identified intentional efforts of defendant to delay access to medical care when defendant knew that plaintiff was in extreme pain); *see also Williams v. O'Leary,* 805 F.Supp. 634, 638 (N.D.Ill.1992) (prison doctors prescribed ineffective medicine for over two years causing inmate constant pain).

Yet, while incarcerated persons are entitled to quality medical care, the level of care must be seriously low before an Eighth Amendment violation is established. As also recently stated by Judge Goettel:

> As "guests" of the state, prisoners are entitled to receive medical care. While their medical care is not necessarily of the highest quality (although it does exceed that available to many taxpayers who are paying for the prisoner's treatments), it must fall to a low level with serious repercussions before it constitutes a civil rights violation.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994); *Archer,* 733 F.2d 14, 17 ("[w]e have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital"). After hearing and reviewing the evidence in this case, this Court has found the quality of care to meet standards of reasonableness.

**\*14** Finally, throughout this litigation, plaintiff has also argued that defendants have failed to fund adequately and provide specialty medical consultations to plaintiff and other inmates in the New York State prison system. The care provided to inmates as a class is not at issue in this action. The evidence shows that plaintiff was provided with frequent, continuous and effective treatment with ophthalmologists who

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

specialize in corneal and anterior eye diseases. Sharon Lilly, R.N., who, as nurse administrator at Sullivan, was responsible for scheduling specialty consults, testified that she never experienced a problem setting up timely consultations for specialty services.

Plaintiff argues, however, that the low rate of reimbursement to medical providers restricts the availability of specialists, especially surgeons, to treat inmates and that it has had a direct impact on his care. Individual providers are as a rule reimbursed at the Medicaid Rate. Presently, the rate for ophthalmology and plastic surgery is twenty-four dollars for initial and follow-up visits. Tr. at 653. As stated previously, however, plaintiff never suffered from the unavailability of ophthalmological services—the evidence clearly shows that the defendants were far from indifferent to the needs of Mr. Hodge for specialty medical services. Thus he has failed to prove the objective component of an Eighth Amendment claim.

Plaintiff has also failed to establish the subjective component of his claim, *i.e.,* that the defendants had the requisite state of mind necessary to show an Eighth Amendment violation. The defendant's conduct, together will all reasonable inferences to be drawn therefrom, does not come remotely close to meeting the standard of deliberate indifference; throughout plaintiff's incarceration in the state system he received good and adequate medical care and continues be provided with such care.

*Conclusion*

Plaintiff has not established a claim for violation of his Eighth Amendment rights, and, therefore, the Complaint is dismissed and judgment shall be entered for the defendants.

SO ORDERED.

FN1. The trial transcript is referred to as "Tr. at —".

FN2. Neuralgia is a pain that occurs after shingles from nerve inflammation. Tr. at 377.

FN3. Both neurotrophic keratitis and keratouveitis are types of inflammations. Tr. at 100.

FN4. A corneal graft, or corneal transplant, is a transplant of the front surface of the eye. Tr. at 102.

FN5. During a corneal transplant, part of the patient's cornea is removed and replaced with donor tissue. Corneal graft rejection occurs when the patient rejects the donor tissue. Such rejection is a risk with any transplant. Tr. at 102, 104.

FN6. Whether AMC was open to New York State inmates was an issue frequently raised during the trial. However, Nurse Administrator Sharon Lilly testified that she never had a problem scheduling a Sullivan inmate at AMC. Tr. at 332, 715. Hodge had a total of 20 consults at AMC, and was on the waiting list for a transplant as early as September 7, 1989. Exh. 27 at 108; Tr. at 333.

FN7. Dr. Zloty had left New York and therefore could no longer treat plaintiff. In support of his claim, plaintiff asserts that there was a seven month delay from when he last saw Dr. Zloty at AMC on June 25, 1992 until he saw another ophthalmologist—Dr. Smith—in February 1993. However, this assertion is misleading. Upon review of the records, Mr. Hodge was seen at either the Fishkill or AMC clinic on the following dates in 1992 (unless otherwise noted): July 16, Ex. 28 at 31; August 26, plaintiff requested to see Dr. Tufau only, Ex. 28 at 7; September

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
(Cite as: 1994 WL 519902 (S.D.N.Y.))

17, Ex. 28 at 33; October 23, Ex. 28 at 34; November 18 and 27, a general practitioner consulted with an AMC ophthalmologist, who stated that there was no need for a consultation with Mr. Hodge until his regular check-up, Ex. 28 at 14, 15; January 18, 1993, Ex. 28 at 35. Far from being completely neglected for nine months, plaintiff was seen at least monthly at the plastic or eye clinic outside Sullivan.

Furthermore, the fact that Mr. Hodge had not seen an ophthalmologist regarding corneal transplant surgery since June 1992 is not unreasonable. After Dr. Zloty's surgery in November 1992, further corneal surgery could not be performed until a sufficiently long period of quiescence existed. The Court credits Dr. Pamel's testimony that for corneal graft surgery, a quiescent period of at least two to three years would be necessary. Tr. at 544. During the seven month period between seeing Dr. Zloty and Dr. Smith, Mr. Hodge's eye was certainly not "quiet." Ex. 28 at 11, 13, 31, 33.

FN8. Plaintiff also cites inventory problems and inefficiency in providing medication at Sullivan due to the loss of its pharmacist. Plaintiff argues that the pharmacist has not been replaced due to the low, uncompetitive salary offered for the position and that this has had a negative effect on his medical care. Nurse Lilly testified that, to the best of her knowledge, she does not recall a patient suffering because of medications being out of stock. Tr. at 711–12. When the pharmacist was phased out, the facility simply filled prescriptions from a central pharmacy or a local pharmacy. *Id.* She also testified that, although there were times that Mr. Hodge did not receive his necessary medication, this did

not occur frequently. Tr. at 712.

FN9. Approximately 36 of these visits were not eye-related.

FN10. The latest examination of Mr. Hodge on February 4, 1994, occurred after trial and is therefore not a part of the trial record.

FN11. The *Estelle* Court illustrated the type of conduct that would give rise to a cause of action under this standard by citing to several Circuit Court decisions:

*See, e.g., Williams v. Vincent,* 508 F.2d 541 (C.A.2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference ... rather than an exercise of professional judgment"); *Thomas v. Pate,* 493 F.2d 151, 158 C.A.7), *cert. denied sub nom. Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones v. Lockhart,* 484 F.2d 1192 (C.A.8 1973) (refusal of paramedic to provide treatment); *Martinez v. Mancusi,* 443 F.2d 921 (C.A.2 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

429 U.S. at 104, n. 10.

S.D.N.Y.,1994.
Hodge v. Coughlin

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)
**(Cite as: 1994 WL 519902 (S.D.N.Y.))**

Not Reported in F.Supp., 1994 WL 519902 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aldo Contreras LIBERATI, Plaintiff,
v.
GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
Sept. 24, 2013.

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. johnson, Esq,
Mary E. Kissane, Esq, of Counsel, Malta, NY, for
Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.
**\*1** On May 14, 2012, Plaintiff commenced this
civil rights action pursuant to 42 U.S.C. § 1983, al-
leging that upon arrival at Clinton County Correc-
tional Facility, Defendant used excessive force against
Plaintiff, causing him injury. *See* Dkt. No. 1. On De-
cember 28, 2012, Defendant moved for summary
judgment seeking dismissal of Plaintiff's claim pur-
suant to Rule 56 of the Federal Rules of Civil Proce-
dure. *See* Dkt. No. 22–7 at 5. Defendant argues that
dismissal is appropriate based on (1) plaintiff's failure
to exhaust the available administrative remedies at
Clinton before commencing suit; (2) the record evi-
dence, from which no reasonable factfinder could
conclude that he used force that violated Plaintiff's
constitutional rights; and (3) his entitlement to quali-
fied immunity from suit. *See generally* Dkt. No. 22–7.
Plaintiff failed to oppose Defendant's motion for
summary judgment. *See* Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated
August 9, 2013, Magistrate Judge Peebles recom-
mended that the Court grant Defendant's motion for
summary judgment and dismiss Plaintiff's complaint.
*See* Dkt. No. 31 at 2. Specifically, although Magistrate
Judge Peebles found that questions of fact preclude
granting the motion on exhaustion grounds, he found
that the motion should be granted on the merits be-
cause no reasonable factfinder could conclude that
Defendant violated Plaintiff's Eighth Amendment
rights. *See id.* at 21. Neither party objected to Magis-
trate Judge Peebles Report–Recommendation and
Order.

On February 5, 2012, Plaintiff was transferred to
Clinton Correctional Facility ("Clinton") located in
Dannemora, New York. *See* Dkt. No. 22–2 at 3.
During the transfer, the corrections officers escorting
Plaintiff called Clinton to notify them that Plaintiff
was difficult and combative. *See id.* Upon arrival, the
staff at Clinton prepared Plaintiff for housing by per-
forming the routine intake and booking procedures.
See id. at 4. Part of the normal procedure was to
conduct a patdown search to detect any contraband
that was not detected by the "BOSS" chair. *See id.* at
3. During the pat-down, Plaintiff disobeyed orders on
at least two occasions when he refused to face and
keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff
had a second layer of pants underneath his jeans, they
instructed him to remove them in a private changeout
room. See id. at 4. After removal of the pants Plaintiff
refused to remain on the wall, so they attempted to
physically restrain him. See id. at 5. Upon hearing this
commotion, Defendant entered the changeout room to
assist with the situation. See id. He observed Plaintiff
resisting the officers that were trying to restrain him.
See id. Defendant administered "a single, one second,
application of O.C. spray towards other officers to

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

continue to gain control over Plaintiff and secure his hands." *Id* . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir.1994)* (cita-

tions omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id. at 36–37* (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)* (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers, 43 F.3d at 36* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986))* (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y., 322 F.3d 139, 143 n. 5 (2d Cir.2003)* (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2007)* (quoting *Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)* (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2007)* (quoting *Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983))*. However, this does not mean that a *pro se*

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

litigant is excused from following the procedural requirements of summary judgment. See id. at 295 (citing Showers v. Eastmond, No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." Lee v. Coughlin, 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing Cary v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. See Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " Estelle v. Gamble, 429 U.S. 97, 102–03 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 100–01 (1958); Gregg v. Georgia, 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. See Farmer v. Brennan, 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two componentsone subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009) (citing Hudson v. McMillian, 503 U.S. 1, 7–8 (1992); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999)). The subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." Wright, 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson, 503 U.S. at 6 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." Wright, 554 F.3d at 268 (quoting Hudson, 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." Wright, 554 F.3d at 268–69 (quoting Hudson, 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. See Hudson, 503 U.S. at 7; Whitley, 475 U.S. at 321; Romano v. Howarth, 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

**\*4** After careful review of Magistrate Judge Pee-bles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the

reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport, plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair.[FN2] Id. at ¶¶ 3, 10.

> FN2. A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately administered one, single application of "O.C. spray" to regain control of plaintiff.[FN3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

> FN3. The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

II. *PROCEDURAL HISTORY:*

Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendant's Motion*

The court's local rules require that a party seeking summary judgment must submit a statement of material facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).FN4 To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

> FN4. Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.FN5 See *generally* Docket Sheet.

> FN5. Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24).

On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

strued defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at \*1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also* Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [FN6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN7]

> **FN6.** In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

> **FN7.** While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

There are grievance procedures in place and available to any Clinton inmate who desires to com-

plain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit,[FN8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

> **FN8.** 18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

D. *Plaintiff's Excessive Force Claim*

In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v.*

*Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 559 U.S. at 37; *Hudson,* 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth,*

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282,

291 (2d Cir.2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support this claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed plaintiff only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted.[FN9]

> [FN9]. Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

### IV. *SUMMARY AND RECOMMENDATION*

In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2013.
Liberati v. Gravelle
Slip Copy, 2013 WL 5372872 (N.D.N.Y.)

END OF DOCUMENT

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Charles McALLISTER also known as Charles
McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor, Mohawk Cor-
rectional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
Signed Oct. 28, 2014.
Filed Oct. 29, 2014.

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York
State Attorney General, The Capitol, Keith J. Starlin,
AAG, of Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate
Judge Hummel's October 9, 2014 Re-
port–Recommendation and Order, *see* Dkt. No. 81,
and Plaintiffs objections thereto, *see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant
times, in the custody of the New York Department of
Corrections and Community Supervision, commenced
this action pursuant to 42 U.S.C. § 1983. In his orig-
inal complaint, Plaintiff asserted claims against Brian
Fischer, Lucien J. LeClaire, Patricia LeConey, Carol
Woughter, and John and Jane Does. Defendants
moved for summary judgment. *See* Dkt. No. 49. By
Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this

Court dismiss all claims against the named individuals
and direct Plaintiff to join Harold Call as a Defendant.
*See* Dkt. No. 55. This Court accepted the Report and
Recommendation and Order in its entirety and di-
rected Plaintiff to file an amended complaint to "in-
clude only one cause of action a procedural due pro-
cess claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No.
58 at 4–5.

Plaintiff thereafter filed his amended complaint
and requested compensatory and punitive damages.
*See* Dkt. No. 64, Amended Complaint at 4. In this
amended complaint, Plaintiff alleged that Defendant
violated his constitutional rights under the First,
Eighth and Fourteenth Amendments. *See* Dkt. No. 64,
Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. *See* Dkt. No. 74. In a Re-
port–Recommendation and Order dated October 9,
2014, Magistrate Judge Hummel recommended that
this Court grant Defendant's motion in part and deny
his motion in part. *See* Dkt. No. 81 at 33. Plaintiff filed
objections to Magistrate Judge Hummel's recom-
mendations. *See* Dkt. No. 83.

Where a party makes specific objections to por-
tions of a magistrate judge's report and recommenda-
tion, the court conducts a *de novo* review of those
recommendations. *See Trombley v. Oneill,* No.
8:11–CV–0569, 2011 WL 5881781, \*2 (N.D.N.Y.
Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)(2); 28
U.S.C. § 636(b)(1)(C)). Where a party makes no ob-
jections or makes only conclusory or general objec-
tions, however, the court reviews the report and rec-
ommendation for "clear error" only. *See Salmini v.
Astrue,* 3:06–CV–458, 2009 WL 1794741, \*1
(N.D.N.Y. June 23, 2009) (quotation omitted). After

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

conducting the appropriate review, a district court may decide to accept, reject, or modify those recommendations. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general or conclusory, given his *pro se* status, the Court has conducted a *de novo* review of Magistrate Judge Hummel's Report–Recommendation and Order. Having completed its review, the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a

copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"),[FN2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's

motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

> FN2. McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not

specifically controvert.").

### II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). FN3 Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 FN4 (unauthorized exchange) and 180.17 (unauthorized assistance).FN5 *Id.;* Am. Compl. ¶ 7.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

> FN4. Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

> FN5. Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which ap-

pear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

**III. Discussion**[FN6]

> FN6. All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

**A. Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depo-

sitions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

**B. Eleventh Amendment**

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the

scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

**C. Personal Involvement**

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g.,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

*Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

> FN7. Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for

his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

**E. Eighth Amendment**

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

**F. Fourteenth Amendment**
**1. Due Process**

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. **Denial of Liberty Interest**

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant

hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard ( *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g.* *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest ( *Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

#### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide

the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

McAllister disagreed with Call's opinion that posses-
sion of such documents would be a *per se* violation of
the rules, Call's assertion of belief in this matter was an
opinion he reached following his personal review of
this evidence. *See Johnson v. Doling,* No.
05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y.
Oct. 17, 2007) (holding that where the "[p]laintiff was
provided the opportunity to testify, [and] call and
question witnesses .... [d]isagreement with rulings
made by a hearing officer does not constitute bias").
Thus, it does not appear that Call prejudged this evi-
dence.

**\*13** To support his claim that Call exhibited bias
and partiality against him in the Tier III hearing,
McAllister points out that, after he objected to the
misbehavior report for failing to provide him suffi-
cient notice of the documents confiscated, Call read
the portion of the misbehavior report describing the
documents as "[a]rticles of paper which appear to be
legal work including some signed affidavits," and
stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32).
When read in context, this statement does not establish
bias on Call's part, rather it appears to be a genuine
question. Though it may be said that Call could have
couched this question in a kinder manner, this state-
ment does not demonstrate bias. Moreover, that the
Tier III determination was reversed on appeal, without
more, is not evidence of bias or other due process
violation. *Eng v. Therrien,* No. 04–CV–1146, 2008
WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the ex-
istence of question of fact whether Call prejudged his
guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate
McAllister next suggests that he was denied
procedural due process because Call declined to in-
terview the law library officer. Am. Compl. ¶ 29. Call
permitted McAllister to present testimony on his be-
half and afforded him the opportunity call witnesses.
Had McAllister wished to hear testimony from the law

library officer, he could have requested the law library
officer as a witness. *Wolff,* 418 U.S. at 566 (inmates
have a right to call witnesses in their defense at disci-
plinary hearings). That Call found it unnecessary to
independently interview the law library of-
ficer—especially where McAllister did not demon-
strate that his testimony would be relevant—does not
result in a denial of due process because "[t]here is no
requirement ... that a hearing officer assigned to pre-
side over a disciplinary hearing conduct an inde-
pendent investigation; that is simply not the role of a
hearing officer." *Robinson v. Brown,* No.
9:11–CV–0758, 2012 WL 6799725, \*5 (N.D.N.Y.
Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a
due process violation based on Call's alleged failure to
investigate.

### iv. Confidential Witness
To the extent it can be discerned, McAllister
contends that he was denied due process because Call
relied on confidential witness testimony, yet failed to
provide him with advance notice of the confidential
witness and refused to inform him of his or her iden-
tity or the nature of the testimony. Am. Compl. ¶¶
30–34. The Second Circuit has held that a hearing
officer must perform an independent assessment of a
confidential informant's credibility for such testimony
to be considered reliable evidence of an inmate's guilt.
*Sira,* 380 F.3d at 78 (noting that, "when sound dis-
cretion forecloses confrontation and
cross-examination, the need for the hearing officer to
conduct an independent assessment of informant
credibility to ensure fairness to the accused inmate is
heightened.").

**\*14** Here, the record provides no indication that
Call independently assessed the credibility and relia-
bility of the confidential witness. The confidential
witness form merely states that Call "was provided
confidential information relating to the misbehavior
report ." Dkt. No. 74–3, at 13. Similarly, Call does not

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity and substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could

support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–2, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at *3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at *4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would

provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ....")); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

Call, throughout the entire disciplinary hearing de-

prive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

*Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony ( *Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal

documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. **Conclusion**
For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

a. dismissing plaintiff's First Amendment claims;

b. dismissing plaintiff's Eighth Amendment claims;

c. dismissing plaintiff's challenge to the constitu-

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

tionality of Directive 4913;

d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

a. plaintiff's Fourteenth Amendment procedural due process claims;

b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

N.D.N.Y.,2014.
McAllister v. Call
Slip Copy, 2014 WL 5475293 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry; F. Englese; Sergeant Edwards; K. Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
March 31, 2010.

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*
Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b)

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

"even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate griev-ance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the fa-cility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a cer-tain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written de-cision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superinten-dent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

> FN1. *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS

18791, at *6 (S.D.N.Y. Oct 3, 2002).

> FN2. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison em-ployees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the com-plaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A simi-lar "special" procedure is provided for claims of dis-crimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural re-quirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3] Moreover, any failure by the IGRC or the superintendent to timely

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[FN4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[FN5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[FN6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

FN3. *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN5. *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

FN6. *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance

of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [cita-

tions omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [FN10] (b) the inmate was specifically informed that the claim in question was grievable,[FN11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[FN12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[FN13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[FN15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN16]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

FN8. *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

FN9. *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and

opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

FN10. *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

FN11. *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

(S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

FN12. *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

FN13. *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

FN14. *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

FN15. *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

FN16. *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [FN17]

    FN17. *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact,

'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

    Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[FN18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[FN19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[FN20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [FN21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----,* 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[FN22]

> FN18. *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

> FN19. *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7

(S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

> FN20. *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v.*

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

*S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

FN21. *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

FN22. *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v.*

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

*Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

**II. ANALYSIS**

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

**A. Availability of Administrative Remedies**

*5 New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587,

2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [FN23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [FN24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [FN25]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

**FN23.** The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

**FN24.** In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on

November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

**FN25.** For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.[FN26]

> FN26. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

plaintiff could have accomplished on his own.").

## C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plain-

tiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[FN27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[FN28]

> FN27. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

> FN28. The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

    (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

    **\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

    **ACCORDINGLY,** it is

    **ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

    **ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2010.
Murray v. Palmer
Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Pernorris TAYLOR, Sr., Plaintiff,
v.
Dr. CHALOM, Defendant.

Civil Action No. 9:10–CV–1494 (NAM/DEP).
Dec. 13, 2011.

Pernorris Taylor Sr., Rossevelt, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney
General, Charles Quackenbush, Esq., Assistant At-
torney General, of Counsel, Albany, NY, for De-
fendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate
Judge.
   **\*1** Plaintiff Pernorris Taylor, a former New York
State prison inmate who is proceeding *pro so* and *in
forma pauperis,* has commenced this action pursuant
to 42 U.S.C. § 1983 alleging deprivation of his civil
rights. In his complaint, though vague and sparse in
terms of factual allegations, Taylor appears to claim
that the defendant, a physician employed at the prison
in which he was confined at the relevant times, failed
to provide him with proper medical care and to exempt
him from working in the facility mess hall due to his
physical condition, in violation of his rights under the
Eighth Amendment to the United States Constitution.

   In response to Taylor's complaint, defendant has
moved seeking its dismissal on two grounds. De-
fendant maintains that plaintiff's claims are procedur-
ally barred based upon his failure to avail himself of
the internal prison system grievance process before
commencing suit. Defendant additionally argues that
in any event plaintiff's claims lack merit based upon
his failure to allege a plausible medical indifference
cause of action. For the reasons set forth below, I
recommend that plaintiff's complaint be dismissed as
both procedurally barred and lacking in substantive
merit.

II. *BACKGROUND*[FN1]

>    FN1. In light of the procedural posture of the
>    case the following recitation is derived from
>    the record now before the court, with all in-
>    ferences drawn and ambiguities resolved in
>    favor of the plaintiff. *Terry v. Ashcroft,* 336
>    F.3d 128, 137 (2d Cir.2003).

   Plaintiff is a former prison inmate recently re-
leased from the custody of the New York State De-
partment of Corrections and Community Supervision
("DOCCS"); at the times relevant to his claims, Taylor
was designated to the Ogdensburg Correctional Fa-
cility ("OCF"), located in Ogdensburg, New York. *See
generally* Amended Complaint (Dkt. No. 6); *see also*
Dkt. Entry dated August 31, 2011. Plaintiff claims to
be physically disabled as a result of being struck by a
motor vehicle in June of 2008 and suffering resulting
back and knee injuries. Amended Complaint (Dkt. No.
6) § II(D). Plaintiff also suffers from a testicular cyst.
*Id.* at § III.

   Upon his arrival at Ogdensburg, plaintiff was as-
signed to work in the facility mess hall. Amended
Complaint (Dkt. No. 6) § II(D); Statement of Case
(Dkt. No. 18) p. 1. Plaintiff complained to prison
officials claiming that he was unable to perform the
duties required at the mess hall in light of his limita-
tions in bending, lifting, and standing for long periods

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

of time resulting from his physical injuries. *Id.*

Though not clear from his complaint, as amended, it appears that plaintiff's claims go beyond his mess hall assignment to the alleged failure of Dr. M. Chalom, who is a prison physician at Ogdensburg, to provide him with adequate medical treatment, including to order x-rays desired by the plaintiff. Statement of Case (Dkt. No. 18) p. 1. Plaintiff also complains that Dr. Chalom, though aware of his condition from having received medical records of his treatment from Nassau County Medical University Hospital, nonetheless failed to remove him from mess hall duty.[FN2] Statement of Case (Dkt. No. 18) p. 2. Taylor further complains that Dr. Chalom did not provide him with an elastic support for his right knee. *Id.*

> [FN2] Plaintiff also contends that because he has been exposed to Tuberculosis he should be not have been assigned to work around food. Statement of Case (Dkt. No. 18) p. 2. Because this argument implicates potential danger to other inmates, rather than the plaintiff, Taylor lacks a standing to assert such a claim. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant").

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on December 10, 2010, and, at the directive of the court, filed an amended complaint on March 8, 2011 providing somewhat greater elaboration regarding his claims. Dkt. Nos. 1, 4, 6. In his complaint plaintiff names Dr. M. Chalom as the sole defendant and appears to assert a deliberate medical indifference claim under the

Eighth Amendment, seeking an award of monetary damages. *Id.*

In lieu of answering plaintiff's complaint, defendant has moved to dismiss plaintiff's claims both for failure to state a claim upon which relief may be granted and on the ground that the action is procedurally barred based upon the plaintiff's failure to exhaust available administrative remedies before commencing suit. Dkt. No. 15. That motion, which plaintiff has opposed, *see* Dkt. Nos. 18, 19, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 129, ——, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of *Twombly* and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

**\*3** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

**B.** *Failure to Exhaust*

In his motion defendant Chalom argues that plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance through the DOCCS internal administrative process prior to commencing this action.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007).[FN3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN4]

> FN3. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

> FN4. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

**\*4** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN5] *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of

non-exhaustion by failing to properly raise or preserve it or whether, through his own actions in preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN6] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

> FN5. Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* NO. 04–CV–395, 2007 WL 2847304, at *2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).

> FN6. In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Ordinarily, failure to exhaust is an affirmative defense which must be pleaded and established by the defendant. *See Arnold v. Goetz,* No. 01 Civ. 8993, 2003 WL 256777, *2–3 (S.D.N.Y. Feb.4, 2003) (collecting cases); *Torrence v. Pesanti,* 239 F.Supp.2d 230, 231 (D.Conn.2003) (citing *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999)). For this reason, dismissal under Rule 12(b) of the Federal Rules of Civil Procedure for failure to exhaust is not always appropriate. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 574 (S.D.N.Y.2010). Such a dismissal is proper, however, when a plaintiff's failure to exhaust under the PLRA is "readily apparent" or "unambiguously established in the record," provided that the plaintiff has had notice of the argument and an opportunity to respond. *Tor-*

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

*rence,* 239 F.Supp.2d at 231–32 (citing *Snider v. Melindez,* 199 F.3d 108, 111–14 (2d Cir.1999)).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider,* 199 F.3d at 112–13). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN7] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN7. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

**\*5** In response to the questions posed in the printed form utilized to file his complaint, plaintiff has acknowledged that his claim arose during the course of his confinement, and that there is a grievance procedure available at Ogdensburg, but that he did not file a grievance utilizing that procedure. Amended Complaint (Dkt. No. 6) § IV. Plaintiff notes instead that he

informed his counselor, Mr. M. Stoner, of the claim. *Id.* In his submission in opposition to the motion, plaintiff reiterates having informed his counselor concerning his grievance and states that his counselor did not advise him of the need to file a grievance, instead informing him that he should sign up for sick call to address the issue.[FN8] Statement of Case (Dkt. No. 18) p. 3.

> FN8. In support of his motion defendant Chalom has submitted an affidavit from Jeffrey Hale, the Assistant Director of the DOCS Inmate Grievance Program ("IGP"), in which he states that a search of records of the DOCCS Central Office Review Committee ("CORC") failed to reveal submission of any grievance appeal by Taylor to the CORC during the period of his incarceration at Ogdensburg. *See* Hale Decl. (Dkt. No. 15–2) ¶¶ 1–4. Because this issue is being addressed on a motion to dismiss pursuant to Rule 12(b)(6), I have not considered the Hale affidavit in making my recommendation. *See, e.g., Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000) ("a district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (internal quotation marks, citations and alteration omitted).

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In this instance defendant has properly raised the issue, and plaintiff fails to allege any conduct on the part of the defendant that deterred or inhibited his

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

filing of a grievance.

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676–77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Based upon plaintiff's response to the motion, it does not appear that this narrow exception applies in this instance. Taylor states that he made his complaints regarding Dr. Chalom known to his counselor, who nonetheless failed to advise him of a need to file a grievance and instead directed him to sick call to address his issue. *See* Statement of Case (Dkt. No. 18) pp. 3, 5. Plaintiff does not allege that his counselor informed him that his complaint was not grievable, a circumstance which could potentially implicate a recognized exception to the otherwise steadfast statutory requirement of exhaustion. *Brown v. Koenigsmann,* No. 01 Civ 10013(LMM), 2005 WL 1925649, at *1 (S.D.N.Y. Aug. 10, 2005). Similarly, plaintiff cannot claim an estoppel from raising an exhaustion defense since it was not Dr. Chalom, but another prison official who, he intimates, dissuaded him from filing a grievance. *Id.*

**\*6** Under these circumstances, plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance related to the claims raised in his complaint.

### C. *Deliberate Indifference*

In his motion Dr. Chalom also argues that plaintiff's complaint fails to assert a plausible deliberate medical indifference claim. In support of that contention defendant asserts that the plaintiff has neither pleaded facts demonstrating the existence of a serious medical need, nor has he established a plausible claim of subjective deliberate indifference on the part of Dr. Chalom to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at *7–8 (E.D.N.Y. Mar.8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

*1. Objective Requirement*

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant

inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

**\*7** Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

Plaintiff's complaint is devoid of specifics regarding his back and knee injuries, or his testicular cyst; rather, he merely alleges in a conclusory fashion that he has pain and soreness in both knees, back pain, and a great deal of "pain and suffering" from his cyst. Plaintiff's complaint does not contain any allegations as to what, if any, treatment he received for those conditions while at Ogdensburg. Instead, while noting that Dr. Chalom retrieved plaintiff's medical records from an outside medical facility where he apparently received treatment for his injuries, he alleges that Dr. Chalom did not arrange for x-rays or provide him with elastic support for his knee, and argues that the de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

fendant "had the authority to remove [sic] from the mess hall" implying that he should have but did not do so.[FN9] *See* Plaintiff's Opposition (Dkt. No. 18) p. 2 of 7. These allegations are insufficient to satisfy the objective prong of the deliberate indifference test. Plaintiff's complaint provides no information concerning the alleged inadequacy of treatment received for his medical conditions, and instead appears only to assert plaintiff's disagreement with the course of diagnosis and treatment followed by Dr. Chalom, a matter which is not cognizable under the Eighth Amendment. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted); *Amaker v. Kelly,* No. 9:01–CV–877, 2009 WL 385413, at *14–16 (N.D.N.Y. Feb.9, 2009) (Scullin, S.D.J. and Peebles, M.J.).

> FN9. While plaintiff alleges that Dr. Chalom did not provide him with an elastic support for his knee, he also asserts that another physician, Dr. Aley, did provide him with the desired support. Plaintiff's Motion Opposition (Dkt. No. 18) p. 2 of 7.

2. *Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the ence." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.)

(same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811).

**\*8** Plaintiff's complaint is similarly deficient in that it does not allege facts plausibly demonstrating that Dr. Chalom was deliberately indifferent to Taylor's condition. While the complaint does not specify the nature of actions or inactions by Dr. Chalom forming the basis for plaintiff's claims against him, his submission in opposition to the motion provides some degree of clarification. That document reveals that rather than ignoring plaintiff's medical condition, Dr. Chalom instead made efforts to secure his medical records. Again, while plaintiff asserts his belief that x-rays should have been ordered and that he was in need of surgery to his right knee, these allegations, which allege nothing more than a mere disagreement with the treatment he received, are insufficient to plausibly satisfy the subjective element of the deliberate indifference test. *See Rosales,* 10 F.Supp.2d at 264; *Amaker,* 2009 WL 385413, at *14–16.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint, which sets forth a deliberate medical indifference claim in only skeletal form, devoid of factual allegations which would permit the court to assess whether plaintiff has met the objective and subjective prongs necessary to plead a cognizable deliberate medical indifference cause of action, is subject to dismissal on the merits. In addition, because it appears clear from his complaint and submissions in opposition to defendant's motion that he failed to file and pursue to the CORC a grievance concerning his medical complaints, plaintiff is procedurally barred from maintaining this action.

Ordinarily, a *pro se* complaint should not be dismissed without leave to amend unless it appears clear that the plaintiff is unable to set forth any facts that would support a plausible cause of action. *See*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

*Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999); *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile."). In this instance, how-ever, because plaintiff has already amended once, and since it seems clear that he is procedurally barred from raising the claims set forth in his complaint based upon his failure to exhaust available internal admin-istrative remedies, I recommend against permitting further amendment. *See Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

It is therefore hereby respectfully

RECOMMENDED that defendant's dismissal motion (Dkt. No. 15) be GRANTED, and that plain-tiff's complaint be dismissed in all respects, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS RE-PORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*9** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further.

N.D.N.Y.,2011.
Taylor v. Chalom
Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnny WASHINGTON, a/k/a Johnnie P. Washington, Plaintiff,
v.
T. FAROOKI, Dentist, Clinton Correctional Facility; R. Oliveira, Dentist, Clinton Correctional Facility; DORIS, Clerk/Call–Out, Clinton Correction Facility Defendants.[FN1]

> FN1. For the reasons outlined in Magistrate Judge Hummel's Report and Recommendation, any and all claims against Defendant "Doris" have been dismissed from this action.

No. 9:11–CV–1137.
July 2, 2013.

Johnny Washington, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER
THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Christian F. Hummel, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the May 15, 2013 Re-

port–Recommendation have been raised. After examining the record, this Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report–Recommendation for the reasons stated therein. It is, therefore, ORDERED that Defendants' Motion for Summary Judgement, Dkt. No. 51, be **DENIED;** and upon *sua sponte* review by the Court any First Amendment claims asserted by Plaintiff [FN2] are **DISMISSED** from this action.

> FN2. In liberally construing Plaintiff's Complaint, Magistrate Judge Hummel found a potential First Amendment claim in Plaintiff's Complaint. This claim was not addressed by Defendants, but, upon review, is found to be without merit.

IT IS SO ORDERED.

JOHNNY WASHINGTON, a/k/a JOHNNIE P. WASHINGTON,

Plaintiff,

v.

T. FAROOKI, Dentist, Clinton Correctional Facility; R. OLIVEIRA, Dentist, Clinton Correctional Facility; DORIS, Clerk/Call–Out, Clinton Correctional Facility,

Defendants.[FN1]

> FN1. By letter dated October 19, 2011, non-party Superintendent Thomas L. La-Valley informed the Court that the Clinton Correctional Facility ("Clinton") was unable to locate an individual by the name "Doris" at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

Clinton's Dental Office. Dkt. No. 8 at 1. By letter dated November 5, 2011, Washington indicated that "Doris" could also be an individual named "Delores" or "Dora." Dkt. No. 12 at 2. On November 9, 2011, the Court reissued a summons to "Doris." Dkt. No. 13. By letter dated December 9, 2011, DOCCS's Deputy Counsel William M. Gonzalez informed the Court that DOCCS does not have sufficient information to identify a DOCCS employee named "Doris," "Delores," or "Dora" who worked with defendant Oliveira at Clinton's Dental Office. *See* Dkt. Nos. 16 at 1, 17 at 1.

Where a defendant has not been served with process within 120 days of the filing of the complaint, the complaint must be dismissed without prejudice as to that defendant or the court must order "service be made within a specified time." FED. R. CIV. P. 4(m). If, however, the plaintiff demonstrates good cause for service failures, the Court must also extend the time to serve. *Id* . Additionally, the Second Circuit has held that "district courts have discretion to grant extensions even in the absence of good cause." *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007). Here, more than 120 days have passed since Washington filed his complaint on September 26, 2011. Service of process has not been effected on "Doris," "Delores," or "Dora." Washington has not provided any reasons constituting good cause for failing to serve this named defendant. Accordingly, any and all claims alleged against said defendant should be dismissed from this action.

**REPORT–RECOMMENDATION AND ORDER[FN2]**

FN2. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Johnny Washington, also known as Johnnie P. Washington ("Washington"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, two DOCCS dentists, violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 51. Washington opposes this motion. Dkt. No. 56. For the following reasons, it is recommended that defendants' motion be denied.

**I. Background**

The facts are related herein in the light most favorable to Washington as the nonmoving party. *See* subsection II(A) *infra* . At all relevant times, Washington was an inmate at Clinton Correctional Facility ("Clinton").

On February 10, 2011, Washington went on a dental call-out. Compl. at 4. Defendant Dr. Oliveira, a dentist, attested that defendant Dr. **Farooki**, also a dentist, had diagnosed **Washington** with a Periapical Abscess [FN3] on tooth number twenty-six. Oliveira Decl. (Dkt. No. 51–3) ¶ 4; Dkt. No. 56 at 25. **Farooki** placed **Washington** on antibiotics, pain medication, and the root canal waiting list. Oliveira Decl. ¶ 4. **Farooki** gave **Washington** a ten-day prescription for Penicillin and Motrin and scheduled **Washington** for an appointment on February 24, 2011. Compl. at 4; Washington Resp. (Dkt. No. 56) at 2–3, 25. Washington was never called to attend the February 24, 2011 appointment, and at the same time, he had a tooth infection. Compl. at 4.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

FN3. Periapical refers to something that is "situated at or surrounding the apex of a tooth." DORLAND'S ILLUSTRATED MED. DICTIONARY 1257 (28th ed.1994) [hereinafter "DORLAND'S"]. Abscess is "a localized collection of pus buried in tissues, organs, or confined spaces." *Id.* at 5.

By letters dated February 24, 2011 and February 28, 2011, **Washington** advised **Farooki** that he was in serious pain, required dental treatment, and had a tooth infection. Dkt. Nos. 1 at 20, 56 at 15. These letters were left unanswered. Compl. at 4. **Farooki** does not present any evidence disputing **Washington's** claims.

**\*2** On March 28, 2011, Washington was in excruciating pain and asked non-party Stickle, a program officer, to place him on emergency dental call-out in order to receive medical care. Compl. at 4; Washington Resp. at 3. Stickle granted Washington's request. Washington Resp. at 3. Oliveira took an X-ray of Washington and advised Washington that the tooth infection prevented Oliveira from performing a root canal procedure. *Id.* Oliveira continued Washington on the root canal waiting list and scheduled a dental appointment two weeks from that time. *Id.* However, Washington was never called to attend that appointment. *Id.;* Compl. at 4. According to Oliveira, he started Washington's root canal procedure on March 28, 2011. Oliveira Decl. ¶ 5.

On March 31, 2011, Oliveira performed a root canal on Washington, prescribed Washington Ibuprofen and Amoxicillin/Clavulanate, and informed Washington that he was scheduled to return two weeks from that day. Compl. at 4. Washington never received the dental call-out. Compl. at 4. Oliveira attested that during emergency dental sick-call on March 31, 2011, Washington presented an acute Periapical Abscess with swelling and placed Washington on the root canal waiting list.[FN4] Oliveira Decl. ¶ 6.

FN4. An acute abscess is "one which runs a relatively short course, producing some fever and a painful local inflammation." *Id.* at 5.

On April 4, 2011, Washington wrote a letter stating his infection returned.[FN5] Compl. at 4. On the same day, Washington's Ibuprofen prescription expired. Dkt. No. 56 at 26. On April 6, 2011, Washington's Amoxicillin/ Clavulanate prescription expired. *Id.* By letter dated April 9, 2011, Washington advised Oliveira that he required dental assistance because he could not eat or sleep due to swollen and bleeding gums, which also caused him great pains. Dkt. Nos. 1 at 19, 56 at 16.

FN5. Washington does not indicate to whom the letter was addressed or submit the letter to the Court.

On April 12, 2011, Washington informed Stickle that he was in terrible pain despite taking over 3000 milligrams of Ibuprofen. Compl. at 4. Washington did not sleep for two days and had swollen and bleeding gums. *Id.* at 5. Washington had tooth pain and used emergency dental sick-call. Oliveira Decl. ¶ 7; Washington Resp. at 4–5. Washington saw Oliveira, who "punctured a hole to front gumms [sic] beneath tooth, swabbed blood with gorze [sic]." Compl. at 5. Oliveira changed Washington's antibiotic and placed Washington on pain medication. Oliveira Decl. ¶ 7; *see* Washington Resp. at 4–5. Specifically, Oliveira prescribed Washington Ibuprofen that expired on April 16, 2011, and Levofloxacin that expired on April 18, 2011. Compl. at 5; Dkt. No. 56 at 26. Oliveira stated Washington would be placed on dental call-out in two weeks, albeit that did not transpire. Compl. at 5.

On April 19, 2011, Washington informed his program shop officer that he required to go on emergency dental call-out. Compl. at 5. Oliveira treated Washington "by placing rods in the front tooth cavity,

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

closed cavity[, and] stated [that Washington] would be place[d] on dental call-out." *Id.* Again, Washington never received the appointment. *Id.* Washington continually sought medical attention through call-out procedures from February 10, 2011 until June 14, 2011.[FN6] *Id.* According to Oliveira, Washington's April 19, 2011 visit was a regular root canal dental visit. Oliveira Decl. ¶ 8.

> FN6. Washington contends that he received dental call-out on May 31, 2011 and June 14, 2011 because of a complaint he sent to La-Valley. Compl. at 5.; Dkt. No. 56 at 13–14.

*\*3* On May 15, 2011, Washington submitted a grievance concerning the difficulties he encountered with attempting to receive medical care for his tooth abscess. Compl. at 6; Dkt. Nos. 1 at 18, 56 at 17. In his grievance, Washington contends that he had not seen Oliveira since April 12, 2011. Dkt. Nos. 1 at 18, 56 at 17. Washington complained that this process was ongoing for three months, during which he suffered unbearable headaches and high blood pressure. Dkt. Nos. 1 at 18, 56 at 17.

Washington contends that pursuant to DOCCS Directive # 4040, the Inmate Grievance Resolution Committee ("IGRC")[FN7] was obligated but failed to confirm receipt of his grievance within two working days of its mailing. Compl. at 6. Washington further contends that, as the Directive mandates, the IGRC failed to issue a disposition within sixteen days from when he filed his grievance.[FN8] *Id.*

> FN7. The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Commit-

tee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

> FN8. Neither Washington nor defendants provided the Court a copy of Directive # 4040.

On May 31, 2011, non-party Baker, a program officer, advised Washington of a dental call-out. Compl. at 6. According to Oliveira, the call-out was for completing Washington's root canal procedure and a final radiograph showed proper completion of endodontic[FN9] treatment. Oliveira Decl. ¶ 9. Washington argued the root canal should have been completed on May 15, 2011. Washington Resp. at 6. When Washington returned from dental call-out, Baker informed Washington that his IGRC call-out was rescheduled. Compl. at 6. Washington never received a rescheduled IGRC call-out. *Id.*

> FN9. Endodontic refers to "a branch of dentistry concerned with the etiology, prevention, diagnosis, and treatment of diseases and injuries affecting the dental pulp, tooth root, and periapical tissue." DORLAND'S at 553.

On June 9, 2011, Washington wrote a letter to Oliveira for a dental appointment. Compl. at 6; Dkt. Nos. 1 at 17, 56 at 18. On June 11, 2011, Washington wrote non-party Superintendent LaValley a letter seeking assistance in completing the root canal procedure. Compl. at 6; Dkt. Nos. 1 at 14, 56 a t 20. On the same day, Washington complained to the IGRC by letter that he never had a rescheduled call-out to see the IGRC and he required further dental care. Dkt. Nos. 1 at 15–16, 56 at 19. On June 14, 2011, Washington's root canal was completed with a tooth filling. Compl. at 6; Oliveira Decl. ¶ 10; Dkt. No. 56 at 24.

On June 15, 2011, Washington received an IGRC

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

decision, with which Washington disagreed. Compl. at 6; Dkt. No. 56 at 22. On June 16, 2011, Washington appealed the IGRC decision to LaValley. Dkt. No. 56 at 22. The IGRC decision stated, "[Washington] ... is advised that he is on the list for completion of root canal (root canals are performed on front teeth only). [Washington] ... will be placed on a call-out in the near future." *Id.*

On June 30, 2011, Washington was transferred to South Port Correctional Facility. Oliveira Decl. ¶ 11; **Washington** Resp. at 7. At this point, Oliveira and **Farooki** no longer treated **Washington**. Oliveira Decl. ¶ 11; Washington Resp. at 7. Washington contends that he had gone a total of forty-four days without medication. Washington Resp. at 13.

On July 11, 2011, Washington appealed LaValley's July 2, 2011 decision, which stated,

**\*4** Inmate Washington was transferred to Southport Correctional Facility on 6–27–11 during his ongoing treatment. Dr. O advised that his root canal treatment was completed and he was on the list for restoration when he was transferred. Dr. F advised that it is difficult to make any other observations or comments without consulting the patients chart.

Dkt. No. 56 at 23. Washington takes issue with the signature on the decision, alleging that it belongs to a sergeant, not Superintendent LaValley. Compl. at 6; Dkt. No. 1 at 9.[FN10] By disposition dated September 21, 2011, CORC upheld the Superintendent's determination. Dkt. No. 56 at 24. CORC stated that Washington's grievance was filed on May 19, 2011, not May 15, 2011, and it was processed in accordance with Directive # 4040. *Id.*

> FN10. By letter dated August 8, 2011, Washington informed Bellamy of his belief that he received a fake superintendent appeal because it was signed by a sergeant, not Su-

perintendent LaValley. Dkt. No. 1 at 9. By a separate letter authored on the same day, Washington informed Bellamy of his concern as to how Clinton's delay in sending him mail may affect the timeliness of his grievance appeals. *Id.* at 8. On September 21, 2011, CORC issued a decision on Washington's grievance appeal. Dkt. No. 56 at 24.

## II. Discussion

**Washington** contends that defendants **Farooki** and Oliveira violated his Eighth Amendment rights by (1) exhibiting deliberate indifference to his serious dental needs and (2) committing dental malpractice. Defendants contend that they provided Washington with competent, professional, and timely dental care.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Pru-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

*dential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

**\*5** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37

F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Since there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disa-

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

greements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**\*6** Washington claims that the majority of his requests and scheduled dental call-outs were either ignored or cancelled. Record evidence overwhelmingly establishes that **Washington** received dental treatment from both **Farooki** and Oliveira. Even though the "treatment of a [plaintiff's] medical condition 'generally defeats a claim of deliberate indifference,' " *Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (citation omitted), "the Court interprets [Washington's] ... claim as one for delay in the provision of medical treatment." *Brunskill v. Cnty. of Suffolk,* No. 11–CV–586 (SJF)(ETB), 2012 WL 2921180, at \*3 (E.D.N.Y. July 11, 2012).[FN11]

> FN11. All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

### 1. Delay in Dental Treatment

Defendants summarily asserted that Washington failed to allege or prove both the objective and subject elements of his medical indifference claims. However, defendants failed to show an absence of a genuine issue of fact with respect to both elements.

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Brunskill,* 2012 WL 2921180, at \*3 (citing

*Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003)); *see also, Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) ("[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (internal quotation marks, alteration, and citation omitted)). Courts have found delay to constitute deliberate indifference when "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Brunskill,* 2012 WL 2921180, at \*3 (citation omitted).

In this case, Washington has proffered sufficient evidence showing a genuine issue of fact with respect to the objective element. Washington's abscessed tooth required multiple dental appointments and call-outs with defendants and resulted in an X-ray, prescription pain medications and antibiotics, and placement on the root canal waiting list. Further, Washington contends that he endured excruciating pain during the time leading up to the root canal procedure. Furthermore, Washington maintains that the tooth pain caused him to have headaches and prevented him from eating or sleeping. Moreover, it has been held that an "aggravation of a dental problem due to a three-week delay in treatment constitutes sufficiently serious medical conditions." *Ramos v. O'Connell,* 28 F.Supp.2d 796, 802 (W.D.N.Y.1998) (citations omitted). While **Farooki** prescribed **Washington** medication that expired on February 19, 2011, despite **Washington's** numerous attempts to go on dental call-out, more than three weeks had passed before **Washington** received medical attention from Oliveira on March 28, 2011. Thus, this delay in treatment may result in an aggravation constituting a sufficiently serious medical condition.

**\*7** Defendants failed to submit any evidence to support their contention that Washington's dental

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

condition was not sufficiently serious as to warrant an Eighth Amendment claim. Crediting Washington's repeated complaints of pain, in conjunction with the dental records supplied by defendants, such submissions support a finding of the existence of a medical need worthy of treatment, a medical condition that significantly affected Washington's daily activities, and Washington having suffered extreme or chronic and substantial pain. *Brock,* 315 F.3d at 162–63. Further, the delay in treating Washington may have aggravated Washington's dental condition, especially since an infection prevented Oliveira from performing a root canal procedure on March 28, 2011.[FN12] *Ramos,* 28 F.Supp.2d at 802. Therefore, Washington has sufficiently raised a material issue of fact as to the objective prong of his claims.

> FN12. The governing law dictates that the evidence must be viewed in the light most favorable to the non-moving party.

As for the subjective element of his medical indifference against **Farooki**, **Washington** has raised an issue of fact that requires resolution by a jury. Throughout the remainder of February 2011, **Washington** made at least two more dental call-out requests to **Farooki**. Record evidence shows that despite **Washington's** pleas, **Farooki** never examined **Washington** again after the February 10 diagnosis. **Farooki** has advanced nothing to refute **Washington's** claims. The dental requests, in conjunction with **Farooki's** silence, create a factual issue as to whether **Farooki** intentionally delayed **Washington** access to continuing medical care. *Estelle,* 429 U.S. at 104; *Chance,* 143 F.3d at 702. Thus, **Washington** has sufficiently raised a material issue of fact as to the second element of his claim against **Farooki**.

Turning to the subjective element of Washington's medical indifference claim against Oliveira, Washington has also raised an issue of fact. If accepting Washington's contentions as true, Oliveira either ignored Washington's requests for dental-calls

or failed to follow-up on Washington with scheduled dental appointments on numerous occasions between March and June 2011. Despite that Oliveira in fact treated Washington during this time period, Oliveira does not put forth any evidence refuting Washington's allegations concerning the unanswered medical requests and canceled appointments. There remains issues of fact as to whether Oliveira intentionally delayed examining and prescribing Washington medication, which left Washington in serious pain. This includes Washington's assertion that his May 31, 2011 root canal completion should have taken place on May 15, 2011, where it remains unclear whether Washington was medicated during the two-week period. As such, a reasonable finder of fact could find in favor of Washington. *Gallo,* 22 F.3d at 1223–24.

Accordingly, defendants' motion on this ground should be denied.

**2. Dental Malpractice**

Washington's allegations that defendants violated his Eighth Amendment rights by committing medical malpractice withstands defendants' motion for summary judgment. In the prison context, "medical judgments amount[ing] to negligence or malpractice ... [do] not become a constitutional violation simply because the plaintiff is an inmate." *Wright v. Genovese,* 694 F.Supp.2d 137, 155 (N.D.N.Y.2010), aff'd, 415 F. App'x 313 (2d Cir.2011) (citing *inter alia Sonds,* 151 F.Supp.2d at 312); *see also Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). However, "medical malpractice may rise to the level of deliberate indifference ... when [it] involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Chance,* 143 F.3d at 703 (internal quotation marks and citation omitted). Here, as discussed *supra,* Washington presents an issue of material fact as to whether defendants consciously disregarded a substantial risk of serious harm by delaying Washington's requests for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3328240 (N.D.N.Y.)
**(Cite as: 2013 WL 3328240 (N.D.N.Y.))**

dental treatment. Defendants do not address whether or not they received Washington's requests or were aware of Washington's experience with continuing tooth pain. Because defendants do not present evidence refuting Washington's allegations, and Washington presented evidence showing that defendants were aware of Washington's dental needs, there remains factual issues that must be resolved by a jury. *Celotex Corp.,* 477 U.S. at 323.

**\*8** Accordingly, defendants' motion on this ground should be denied.

### C. Inadequate Processing of Grievances

Liberally construing the complaint, Washington alleged a potential First Amendment claim against the IGRC members and LaValley for failing to file and process his grievance and appeals in accordance with the IGP and Directive # 4040 at Clinton. Defendants do not address this potential claim.

The First Amendment provides that prisoners have a constitutional right of access to the courts. *Lewis v. Casey,* 518 U.S. 343, 346 (1996). This right is implicated when prison officials "actively [interfer[e] with inmates' attempts to prepare legal documents ... or file them...." *Id.* at 350 (citing cases). "However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) (citation omitted). Here, Washington challenges the alleged delay in receiving the IGRC response and the Superintendent's disposition and the authenticity of the Superintendent's disposition. Nevertheless, even assuming such violations occurred, those violations *per se* do not amount to a cognizable claim in this action. Therefore, any allegations concerning the inadequacy in the processing of his grievance cannot establish a viable claim.

Accordingly, Washington's potential First Amendment claim should be dismissed.

### III. Conclusion

For the reasons stated above, it is hereby

1. **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 51) be **DENIED;** AND

2. Further **RECOMMENDED** that Washington's First Amendment claims be dismissed from this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.
Washington v. Farooki
Slip Copy, 2013 WL 3328240 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2009 WL 2991817 (W.D.N.Y.)
**(Cite as: 2009 WL 2991817 (W.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Evan N. WESTMORELAND, Plaintiff,
v.
James CONWAY, et al., Defendants.

No. 07–CV–104(Sr).
Sept. 15, 2009.

Evan Westmoreland, Rochester, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office,
Buffalo, NY, for Defendants.

### *DECISION AND ORDER*

H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties
have consented to the assignment of this case to the
undersigned to conduct all proceedings in this case,
including the entry of final judgment. Dkt. # 13.

Currently before the Court is a motion to dismiss
James Conway and Brian Fischer as defendants in this
case due to their lack of personal involvement in the
allegations set forth in the complaint. Dkt. # 6. For the
following reasons, defendants' motion is granted.

### *BACKGROUND*

Plaintiff, proceeding *pro se,* commenced this ac-
tion pursuant to 42 U.S.C. § 1983, claiming deliberate
indifference to his mental health, gross negligence and
intentional infliction of pain and suffering, in violation
of the Fourth and Fourteenth Amendments to the
United States Constitution, while in the custody of the
New York State Department of Corrections
("DOCS"), at the Attica Correctional Facility ("Atti-
ca"). Dkt. # 1. Specifically, plaintiff complains that
beginning in August, 2006, he was denied adequate
access to the Mental Health Unit and that defendant
Dr. Rutigliano discontinued his psychotropic medica-
tion despite plaintiff's success on that medication for
several years prior to his incarceration at Attica. Dkt. #
1, ¶ ¶ 15, 17–18, 42 & 45. Following the discontinua-
tion of that medication, plaintiff began to hear voices
and relive traumatic events in his past. Dkt. # 1, ¶¶ 51
& 62.

Although plaintiff acknowledges that the Inmate
Grievance Review Committee ("IGRC"), dismissed
his grievance and advised him to write to the Mental
Health Unit Chief because mental health issues do not
fall under the jurisdiction of the Inmate Grievance
Procedure,[FN1] plaintiff complains that defendant
James Conway, Superintendent of Attica, failed to
respond to his appeal of the decision of the IGRC or to
subsequent letters of complaint regarding his lack of
mental health treatment. Dkt. # 1, ¶¶ 19, 21 & 26–27.
Plaintiff alleges that he wrote Superintendent Conway
on several occasions "trying to get some
re-consideration on his part so that plaintiff could be
seen by the Mental Health Department of Attica," but
never received any reply. Dkt. # 1, ¶ ¶ 13–14 & 50.

> FN1. Specifically, plaintiff alleges that the
> Inmate Grievance Committee responded
> that:
>
> > Grievant is advised to write the MHU Unit
> > Chief. Mental Health issues do not fall
> > under the IGP's jurisdiction. Grievance is
> > dismissed per 4040, 701.5, 6, 4, l, d. End of
> > report.
>
> > Dkt. # 1, ¶ 19.

Not Reported in F.Supp.2d, 2009 WL 2991817 (W.D.N.Y.)
**(Cite as: 2009 WL 2991817 (W.D.N.Y.))**

Plaintiff also alleges that defendant Brian Fischer, DOCS Acting Commissioner, has failed to respond to his letters complaining about the denial of proper mental health treatment at Attica. Dkt. # 1, ¶ 23.

### *DISCUSSION AND ANALYSIS*
**Dismissal Standard**

When ruling on a motion to dismiss, the court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff and against the defendants. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *Cohen v. Koenig,* 25 F.3d 1168, 1171–72 (2d Cir.1994); *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. *Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck,* 463 F.2d 620 (2d Cir.1972), *cert. denied,* 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973). The court is required to read the complaint broadly and with great latitude on a motion to dismiss. *Yoder v. Orthomolecular Nutr. Inst.,* 751 F.2d 555, 558 (2d Cir .1985). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

**\*2** The United States Supreme Court recently revisited the standard of review on a motion to dismiss and concluded that:

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the

assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929(2007) (internal citations omitted). In setting forth this standard, the Supreme Court disavowed an often quoted statement from its decision in *Conley v. Gibson* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 561, *quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Supreme Court explained that

This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals [for the Second Circuit] appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard ...

*Id.* The Supreme Court decried that

On such a focused and literal reading of *Conley's* "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint does not set forth a single fact in a context that suggests an agreement. It seems fair to say that this approach to pleading would dispense with any showing of a " 'reasonably founded hope' " that a plaintiff would be able to make a case ...

*Id.* at 561–62 (internal citations omitted). The Supreme Court then limited *Conley* to describing "the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of ade-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2991817 (W.D.N.Y.)
**(Cite as: 2009 WL 2991817 (W.D.N.Y.))**

quate pleading to govern a complaint's survival." *Id.* at 563. The Supreme Court reiterated that it did "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on it face." *Id.* at 570; *see Ashcroft v. Iqbal, ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (May 18, 2009).*

### Personal Involvement

Defendants Conway and Fischer argue that allegations that they ignored plaintiff's complaints are not sufficient to sustain a § 1983 claim against them. Dkt. # 7.

**\*3** "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal,* 129 S.Ct. at 1948. Thus, it is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873.

In the instant case, plaintiff alleges that he wrote letters to Superintendent Conway and Acting Commissioner Fisher complaining of the deprivation of mental health treatment and the discontinuation of his psychotropic medication. Dkt. # 1, ¶¶ 13, 23, 26–27 & 50. Generally, however, "the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983." *Ward v. LeClaire,* No. 07–CV–6145, 2008 WL 3851831, at *3 (W.D.N.Y. Aug.14, 2008) (collecting cases). "[T]o allow a mere letter to an official to impose supervisory liability would permit an inmate to place liability on individuals who had no authority over the situation complained of merely by sending letters. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002); *see Walker v. Pataro,* No. 99CIV.4607, 2002 WL 664040, at *12 (S.D.N.Y. April 23, 2002) ("if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.").

It remains unclear in this circuit whether a supervisor who reviews and ultimately denies a grievance can be considered personally involved in the unconstitutional act underlying the grievance. *See Garcia v. Watts,* No. 08 Civ. 7778, 2009 WL 2777085, at *15 (S.D.N.Y. Sept.1, 2009) (collecting conflicting cases). However, plaintiff's allegation is not that Superintendent Conway denied his grievance, but that he failed to respond to plaintiff's appeal of the dismissal of his grievance. Dkt. # 1, ¶ 21. As alleged by plaintiff, his grievance was dismissed because the Inmate Grievance Committee lacked authority over the Mental Health Unit. Dkt. # 1, ¶ 19.

**\*4** Plaintiff's allegation comports with DOCS' Inmate Grievance Procedures, which state: "Any policy, regulation or rule of an outside agency (e.g., the division of parole, immigration and customs enforcement, the office of mental health, etc.) or action taken by an entity not under the supervision of the commissioner is not within the jurisdiction of the IGP." 7 NYCRR § 701.3(f). The Inmate Grievance

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2991817 (W.D.N.Y.)
**(Cite as: 2009 WL 2991817 (W.D.N.Y.))**

Procedures further provide that the IGRC may dismiss and close a grievance if it determines that the grievant is seeking action with respect to any policy, regulation, rule or action of an agency not under the supervision of the Commissioner of Correctional Services. 7 NYCRR § 701.5(d). An inmate may appeal such a dismissal to the Inmate Grievance Program Supervisor. 7 NYCRR § 701.5(e)(iii). In addition, an inmate may pursue a complaint that the IGP supervisor failed to reinstate an improperly dismissed grievance by filing a separate grievance. 7 NYCRR § 701.5(e)(iii). Since the Superintendent is not part of the process for appealing the dismissal of a grievance for lack of jurisdiction over the issue complained of, Superintendent Conway's failure to respond to plaintiff's appeal of that dismissal cannot be construed as personal involvement.

### CONCLUSION

For the foregoing reasons, it is hereby **OR-DERED** that the motion (Dkt.# 6), to dismiss James Conway and Brian Fischer as defendants in this case due to their lack of personal involvement is **GRANTED.**

**SO ORDERED.**

W.D.N.Y.,2009.
Westmoreland v. Conway
Not Reported in F.Supp.2d, 2009 WL 2991817 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.